DANIEL J. MULLER, SBN 193396
dmuller@venturahersey.com
ANTHONY F. VENTURA, SBN 191107
aventura@venturahersey.com
VENTURA HERSEY & MULLER, LLP
1506 Hamilton Avenue
San Jose, California 95125
Telephone:  (408) 512-3022
Facsimile:  (408) 512-3023

Attorneys for Plaintiff Jenale Nielsen &
the Proposed Class

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENALE NIELSEN, individually and on behalf of others similarly situated, | Case No.:  8:21-cv-02055-DOC-ADS |
| Plaintiff, | FIRST AMENDED CLASS ACTION COMPLAINT |
| vs. | DEMAND FOR JURY TRIAL |
| WALT DISNEY PARKS AND RESORTS U.S., Inc., a Florida Corporation, and DOES 1 through 25, inclusive, | |
| Defendants. | |

Plaintiff Jenale Nielsen ("Ms. Nielsen") hereby brings this First Amended Complaint against Defendant Walt Disney Parks And Resorts U.S., Inc. ("Disney") and Does 1-25 (collectively referred to herein as "Defendants") for misleading consumers about the nature, benefits, and restrictions of the Dream Key Passes that Disney sold to Ms. Nielsen and others similarly situated.  Ms. Nielsen alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.      Ms. Nielsen is an individual who resides in Santa Clara County, California.

2.      Walt Disney Parks And Resorts U.S., Inc. is a Florida Corporation whose principal place of business is in Lake Buena Vista, Florida.  Disney has, at all relevant times, engaged in trade or commerce in California by advertising and offering theme park admission tickets to California consumers.

3.      Ms. Nielsen is ignorant of the true names and capacities of the defendants sued

-1-

herein as Does 1 through 25, inclusive, and therefore sues these defendants by such fictitious names.  Ms. Nielsen prays for leave to amend this complaint to allege the defendants' true names and capacities when the same have been ascertained.

4.      Ms. Nielsen is informed and believes, and on that basis alleges, that each of the Defendants, including Does 1 through 25, inclusive, is the principal, agent, servant, employee, or alter ego of each of the other Defendants, and in doing the things hereafter mentioned, each Defendant was acting in the scope of its, his, or her authority as such agent, servant, and employee with the permission and consent of each of the other Defendants.

## GENERAL ALLEGATIONS

5.      Disney operates theme parks, including the Disneyland Resort in Anaheim, California which includes the Disneyland theme park and the California Adventures theme park.

6.      Ms. Nielsen is a longtime Disney customer who enjoys visiting Disney's theme parks, including the parks located in Anaheim, California.

7.      Disney requires that all guests entering its theme parks make a reservation and purchase a ticket.  A ticket alone is not sufficient for entry.  As it explains on its website: "To enter a theme park, Guests (ages 3 and older) will need a valid ticket and a theme park reservation for the same day and same park they want to visit." (https://disneyland.disney.go.com/)  Disney makes reservations available via its website.  Before purchasing a ticket, consumers are guided to a reservation calendar to determine the days for which reservations are available.  If a reservation is available, the consumer can reserve a desired date and proceed to purchase a ticket.  The ticket will then be valid for the day of the reservation.  If reservations are not available for a particular day, consumers are not able to purchase tickets for that day.

8.      In or about August 2021, Disney introduced a sales program that it calls the Disneyland Resort Magic Key program.  Pursuant to the program, Disney offers for sale a variety of Magic Key Passes.  Consumers who purchase a Magic Key pass from Disney are entitled to make reservations to enter the Disneyland and/or California Adventures theme parks without having to purchase a ticket for a period of one year from when their Magic Key pass is first used.  As a Disney enthusiast, Ms. Nielsen was interested in purchasing a Magic Key pass and, in

September 2021, she began to research the various Dream Key options on the Disney website.

9.      Ms. Nielsen learned that Disney offered several different types of Magic Keys, including each of the following:  the Enchant Key pass, the Believe Key pass, and the Dream Key pass.  Ms. Nielsen was immediately interested in the top tier Dream Key pass because, according to Disney, it was not subject to "blockout dates" and would provide her with the most opportunities to visit the theme parks.  Based on her review of Disney's advertising materials, Ms. Nielsen reasonably understood that, if reservations were available and the park was not at capacity, Ms. Nielsen could use her Dream Key pass to make a reservation.

10.     Disney charges $1,399.00 for the Dream Key pass.  Disney advertised the Dream Key pass as follows:

## Dream Key Pass
## No Blockout dates

Total
$1,399.<sup>00</sup>

- Reservation-based admission to one or both theme parks every day of the year
- Theme park reservations can be made up to 90 days in advance.  This pass can hold up to 6 park reservations at a time on a rolling basis during any 90-day window, subject to restrictions.
- Park reservations are subject to availability and are not guaranteed for any specific dates or park
- Up to 15% off select dining
- Up to 20% off select merchandise in store
- Standard theme park parking included*

  **No Blockout Dates**

  Admission is not guaranteed and is subject to capacity and other closures.

11.     The statements quoted in the above paragraph are taken from an advertisement that

1  Ms. Nielsen reviewed on the Disney website and relied upon when she decided to purchase a

2  Dream Key Pass.  A true and correct copy of a printout of the Advertisement is attached hereto as

3  Exhibit A.  Collectively, the statements and Exhibit A are referred to herein as "the

4  Advertisement."

5        12.    The phrase "blockout date" is not defined in the Advertisement.  Ms. Nielson and

6  the proposed class members reasonably understood the phrase to mean that Dream Key pass

7  holders would not be blocked out from making reservations whenever Disney was offering park

8  reservations for entrance to the theme parks.  They understood, of course, that if the parks were

9  closed because of Covid or some other reason, and park reservations were unavailable, they would

10  not be able to enter the parks.  Similarly, if the parks were open but park reservations were not

11  available because the park was being used to host a private event or film a movie, a Dream Key

12  pass would not be sufficient to obtain a reservation.  Ms. Nielsen and the proposed class members

13  also understood, of course, that if the parks could not offer park reservations because the parks

14  were at capacity, they would not be able to enter the parks.

15        13.    The Advisement does not define the phrase "subject to availability."  Ms. Nielsen

16  and the proposed class members reasonably believed that the reference in the Advertisement to

17  park reservations being "subject to availability" meant that if park reservations were available and

18  being offered to the public, Dream Key holders could use their passes to make reservations for

19  entry to the parks.  At no time did Disney inform Ms. Nielsen or others that Disney intended to

20  create a category of "Dream Key reservations" (presumably a subset of "park reservations") which

21  would be limited in quantity and subject to Disney's sole discretion and that Dream Key pass

22  holders would be blocked out from making park reservations that were available to other

23  customers.  In the Advertisement, the term "Park reservations" was not qualified or limited.

24  Ms. Nielsen and others reasonably understood and believed that, if Disney was taking reservations

25  to either park, such park reservations would be open to Dream Key holders because their passes

26  were not subject to blockout dates.  Disney did not inform Ms. Nielsen or the proposed class

27  members (either in the Advertisement or the terms and conditions provided at the time of

28  purchase) that Disney planned to make *Dream Key reservations* (as opposed to park reservations)

unavailable even though park reservations were available to others.

14.     Ms. Nielsan's conclusions about the product and services being offered were both reasonable and understandable.  Disney also advertises the Enchant Pass and the Believe Pass.  In its advertisements for those passes, Disney tells consumers that "Blockout dates apply." Ms. Neilsen decided not to purchase the Enchant Pass or the Believe Pass because she understood the phrase "blockout dates apply" to mean that Disney would block her from using the Enchant Pass or the Believe Pass on select dates even when "park reservations" were otherwise available. The whole point of the Dream Key pass is that it would not be subject to such subjective restrictions.

15.     After reading the Advertisement, Ms. Nielsen decided to purchase a Dream Key Pass.  She paid $1,399.00 for the Dream Key Pass and finalized her purchase on September 23, 2021.

16.     Shortly thereafter, Ms. Nielsen attempted to use her Magic Key to make park reservations to visit Disneyland.  She was, however, disappointed to learn that Disney had already blocked out many days, including all weekend days in the month of November 2021.

17.     Specifically, on or about October 19, 2021, Ms. Nielsen attempted to use her Dream Key to obtain an admission ticket to Disneyland in November 2021.  The Disney website informed her that, for Dream Key passholders, a total of seventeen days in November, including all weekend days, had been blocked out.  Given that Disney had advertised and promised that there would be no "blockouts" for Dream Key holders, Ms. Nielsen was surprised.  As a frequent Disneyland visitor, Ms. Nielsen thought it unlikely that *all* park reservations for both Disneyland and California Adventures had already been taken for seventeen of the 30 calendar days in November 2021.

18.     Ms. Nielsen explored further.  She navigated to the section of the Disney website where consumers can make park reservations and purchase single day passes to Disneyland and California Adventures.  That portion of the website revealed that, in fact, as of October 19, 2021, both parks had park reservations available for any single day in November 2021.  In other words, Disney had park reservations available for all of the days it had blocked out to Dream Key

1    passholders.  Disney was happy to allow Ms. Nielsen and other consumers to make park

2    reservations and purchase single day passes for either park (or for both parks) for any day in

3    November 2021.  The problem was not that park reservations were unavailable, or that the parks

4    had reached their capacity and therefore could not provide reservations to Dream Key pass

5    holders, the problem was that Disney had decided to block out otherwise available park

6    reservations so that they were only available to new purchases and were not available to Dream

7    Key pass holders.

8         19.    Ms. Nielsen's experience with attempting to make a Dream Key reservation in

9    October 2021 to visit the parks in November 2021 is completely at odds with the advertised

10   features of the Dream Key pass and with Disney's promises to Ms. Nielsen when she purchased

11   her Dream Key that she would be allowed "Reservation-based admission to one or both theme

12   parks every day of the year."  The Advertisement told Ms. Nielsen and her fellow consumers that

13   a Dream Key would not be subject to blockout dates.  Ms. Nielsen reasonably believed and relied

14   upon Disney's advertisement and promise to mean that, if park reservations were available and

15   Disney had capacity at its Anaheim parks, Ms. Nielsen and her fellow Dream Key pass holders

16   would be allowed to make reservations and visit the parks.  The Advertisement did not define the

17   phrase "subject to availability," nor did it inform Ms. Nielsen or others that Disney was reserving

18   the right to declare park reservations "unavailable" to Dream Key pass holders in order to block

19   out certain dates for them.  It was misleading and fraudulent for Disney to sell passes that were

20   advertised as having no blockout days and not inform Ms. Nielsen and other consumers that

21   Disney was reserving the right to make park reservations "unavailable" whenever it wanted, even

22   when park reservations are and were *actually* available.

23        20.    On information and belief, even though park reservations are available, Disney

24   appears to be limiting the number of reservations available to Dream Key pass holders on any

25   given day in order to maximize the number of single-day and other passes that Disney can sell.

26   This practice directly contradicts Disney's advertised promise that the Dream Key would not be

27   subject to blockout dates.  Ms. Nielsen and others reasonably understood that, by advertising "no

28   blockout dates," Disney understood and expected consumers to believe that Disney would not

-6-

**FIRST AMENDED CLASS ACTION COMPLAINT**

1  artificially limit the availability of park reservations for Dream Key pass holders, or the capacity

2  of its parks, and/or limit the number of Dream Key pass holders that can visit the parks on any

3  given day.

4       21.    It is true that, at the time of purchase, Disney told Ms. Nielsen and others that

5  "reservations are subject to availability and are not guaranteed for any specific dates or park."

6  Disney did not, however, tell Ms. Nielsen or other consumers that Disney planned to artificially

7  limit the number of available park reservations by only allowing a certain number of Dream Key

8  passes to be used on each particular day.  In fact, Disney told Ms. Nielsen and her fellow

9  consumers the opposite:  It told them there would be no blockout dates.  Ms. Nielsen reasonably

10  understood the Advertisement—and the terms and conditions accompanying it—to mean that she

11  could use her Dream Key to reserve a ticket to a park so long as the park was not at capacity and

12  so long as park reservations were available.  As alleged, however, Ms. Nielsen and others were

13  blocked out from using their Dream Key passes to make reservations even though Disney had park

14  reservations available and made those reservations available to others.

15       22.    Ms. Nielsen understood that she might not get a reservation for her preferred day or

16  days for any number of reasons, including limited capacity as a result of all tickets to the park

17  having already been purchased or due to a public health order that closed the park or reduced the

18  numbers of guests that could visit the park.  Ms. Nielsen did not know—and had no way of

19  knowing—that the Dream Key was, essentially, a "second class" ticket that would not allow

20  Dream Key pass holders to make reservations even though park reservations were available.

21       23.    Ms. Nielsen understood that, by purchasing a Dream Key, she was paying a

22  premium so that she would have the highest tier pass and no blockout dates.  It would be one thing

23  if Disney had expressly told Ms. Nielsen and fellow customers that it intended to only allow a

24  certain number of Dream Key reservations each day, regardless of park capacity or the availability

25  of park reservations, so that Dream Key pass holders would be on notice that the parks would, as a

26  practical matter, be unavailable to them at Disney's whim.  Ms. Nielsen could have then decided

27  whether it was worth it to pay $1,399.00 for a pass that would allow her entry if and when Disney

28  decided it could not sell tickets to others for higher prices.  Disney, however, did the opposite of

1   providing such information.  It told customers that there would be no blockout dates and that she

2   could use her pass when park reservations were available, which reasonably led Ms. Nielsen and

3   others to believe that Disney would not engineer reservation unavailability.

4        24.    Ms. Nielsen has commenced this lawsuit to stop Disney from engaging in the

5   unlawful trade practices set forth more fully below in connection with its offer and sale of the

6   Dream Key passes, including its practice of promising consumers that Dream Keys would have no

7   blockout dates even though Disney restricts the use of Dream Keys so that, in fact, they cannot be

8   used by Dream Key pass holders on multiple days each month.  Ms. Nielsen seeks injunctive relief

9   to prevent Disney from engaging in these and similar unlawful trade practices, civil penalties to

10   deter Disney and others similarly situated from engaging in these and similar unlawful trade

11   practices, disgorgement of Disney's unlawfully obtained revenue and profit, and the payment of

12   costs, attorney's fees, damages, and restitution based on the harm consumers have experienced due

13   to Disney's conduct.

14        25.    Ms. Nielsen was deceived by and relied upon the Advertisement.  Ms. Nielsen

15   purchased her Dream Key pass in reliance on the false and deceptive advertising and without

16   knowledge of Disney's true practices regarding the reservation of park tickets with Dream Key

17   passes.  Ms. Nielsen, as a reasonable consumer, is not required to scrutinize advertisements to

18   ferret out misleading facts and omissions.  She is entitled to take a statement like "no blockout

19   dates" at face value and conclude that Disney would not artificially reduce the number of ticket

20   reservations available to Dream Key pass holders.  Ms. Nielsen is lawfully entitled to rely on

21   statements that Disney deliberately places on its websites.

22        26.    Ms. Nielsen, and others similarly situated, have not received the benefits of the

23   Dream Key passes that were promised to them.  Instead of receiving a "no blockout date" pass that

24   would allow them to reserve admission to the parks whenever the parks had capacity, Ms. Nielsen

25   and her fellow Dream Key pass holders received a much more limited right to make reservations

26   for a limited class of Dream Key tickets.  This is a far cry from what Disney advertised to

27   consumers and from what Disney sold to its customers.

28        27.    Ms. Nielsen would not have purchased a Dream Key pass if she had known, or if

**FIRST AMENDED CLASS ACTION COMPLAINT**

Disney had told her, that the Dream Key pass reservations would be limited such that, on many days in any given month (and all weekends) park reservations that were otherwise available would be unavailable to Dream Key pass holders.  Had Disney not violated California law, Ms. Nielsen and her fellow Dream Key pass holders would not have been injured as they were.

28.    Ms. Nielsen and the proposed class have lost money as a result of Disney's unlawful behavior.  Ms. Nielsen and the proposed class altered their position to their detriment and suffered loss in an amount equal to, at least, the fee for the Dream Key pass.  In fact, Ms. Nielsen decided to visit the parks in November 2021 and had to purchase a ticket even though she holds a Dream Key pass because Disney blocked out reservations on so many of the days in November for Dream Key pass holders.  Ms. Nielsen and the proposed class members have also lost the opportunity to purchase Disney products and services at discount per the terms of the Dream Key pass.

29.    On December 20, 2021, after having filed her Complaint in this matter, Ms. Nielsen wrote to Disney pursuant to California Business and Professions Code section 1782(a) and demanded that Disney correct, repair, replace, or otherwise rectify the violations of B & P Code Sections 1770(a)(5), 1770(a)(9), and 1770(a)(10).  Ms. Nielsen has not received any response to her letter and, to her knowledge, Disney has made no effort to correct the violations alleged in her letter.

**CLASS ALLEGATIONS**

30.    Ms. Nielsen brings this action individually and as a class action on behalf of all of other consumers who purchased Dream Key passes from Disney during the four years prior to the filling of this lawsuit up to the time class certification is granted.

31.    Ms. Nielsen's claims are typical of the claims of the class because she purchased her Dream Key passes after having read and reviewed the Advertisement that was made available to all consumers who purchase Dream Key passes.

32.    Ms. Nielsen is a representative party who will fully and adequately protect the interests of the class members because it is in her best interest to effectively prosecute the claims alleged herein to obtain the injunctive relief, restitution, damages, and/or penalties provided to her

and her fellow consumers under California law.  Ms. Nielsen has retained counsel who is competent in both class action and consumer protection litigation.  Ms. Nielsen does not have an interest which is contrary to, or in conflict with, those of the class members which she seeks to represent.

33.   The number of class members is believed to include thousands of people which makes it impracticable to bring all members of the class individually before the court, or to join hundreds of individual class members as parties.  Furthermore, the identity of the members of the classes are determinable from the Defendants' records.  In addition, the records pertaining to the Dream Key passes purchased by consumers, the reservations made available to Dream Key pass holders, and the reservations that Dream Key pass holders were blocked from making are maintained by the Defendants.  A class action is, therefore, a reasonable and practical means of resolving the claims raised in this action.

34.   A class action is superior to other available means for the fair and efficient adjudication of this lawsuit.  Even if any class member could afford individual litigation against a large company like Disney, it would be unduly burdensome to the court system.  Individual litigation would magnify the delay and expense to all parties.  By contrast, a class action presents far fewer management difficulties and affords the benefits of uniform adjudication of the claims, financial economy for the parties, and comprehensive supervision by a single court.  Concentrating this litigation in one forum will promote judicial economy and parity among the claims of individual class members and judicial consistency.  Notice of the pendency and any resolution of this action can be provided to class members by mail, print, broadcast, internet, and/or multimedia publication.

35.   This type of case is well-suited for class action treatment because Disney's advertising and practices with regard to Dream Key passes are uniform and were available and applicable to all proposed class members in the same way.

36.   Many issues of law and/or fact are common to Ms. Nielsen and the class members.  These issues predominate over any individual questions.  These common issues and/or facts include:

a.  Whether Disney falsely advertised its Dream Key passes when it told Ms. Nielsen and her fellow consumers that the Dream Key passes did not have blockout dates;

b.  Whether Disney falsely advertised its Dream Key passes when it failed to tell Ms. Nielsen and her fellow consumers that reservation availability for Dream Key passes would be limited not by the capacity of the theme parks but by Disney's policy and practice of allocating only a certain amount of reservations on each day to Dream Key pass holders.

c.  Whether reasonable consumers like Ms. Nielsen and the proposed class were mislead by the statements contained in the Advertisement;

d.  Whether Disney's practices constitute unfair business practices within the meaning of California Business & Professions Code §§ 17200 and 17203;

e.  Whether Disney's practices constitute false or misleading advertising with the meaning of California Business & Professions Code § 17500.

f.  Whether Disney's conduct violates California's Consumer Legal Remedies Act;

g.  Whether Ms. Nielsen and the class members are entitled to compensatory damages and, if so, the means of measuring such damages;

h.  Whether Ms. Nielsen and the class members are entitled to restitution;

i.  Whether Disney's conduct, as alleged, should be enjoined;

j.  Whether Disney is liable for attorneys' fees and costs.

## FIRST CAUSE OF ACTION

### VIOLATIONS OF THE CONSUMERS LEGAL REMEDIES ACT

### CAL. CIV. CODE §§ 1750 ET SEQ.

37.    Ms. Nielsen realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

38.    The Consumer Legal Remedies Act prohibits unfair or deceptive practices in connection the sale of goods or services to a consumer.  The CLRA is meant to be "[c]onstrued liberally and applied to promote its underlying purposes, which are to protect consumers against

-11-

1    unfair and deceptive business practices and to provide efficient and economical procedures to

2    secure such protection." *See* Civil Code Section 1760.

3        39.    The Dream Key passes that Disney sells to consumers are "Services" as defined by

4    the CLRA.  The Dream Key passes also constitute "Goods" because they entitle pass holders to

5    discounts on purchases within the parks and other Disney locations.

6        40.    Ms. Nielsen and the proposed class members are "Consumers" as defined by the

7    CLRA.

8        41.    Ms. Nielsen's purchase of a Dream Key pass from Disney, and the proposed class

9    members' purchases of Dream Keys from Disney, were "Transactions" as defined by the CLRA.

10        42.    Disney's false and misleading practices as alleged herein and other policies, acts,

11    and practices described herein were designed to, and did, induce Ms. Nielsen and the proposed

12    class members to purchase Dream Keys for personal, family, or household purposes, and violated,

13    and continue to violate, at least the following sections of the CLRA:

14            a.    § 1770(a)(5):  Representing that goods or services have sponsorship, approval,

15                characteristics, ingredients, uses, benefits, or quantities that they do not have or that

16                a person has a sponsorship, approval, status, affiliation, or connection that the

17                person does not have; and

18            b.    § 1770(a)(9):  Advertising goods with intent not to sell them as advertised;

19            c.    § 1770(a)(10):  Advertising goods or services with intent not to supply reasonable

20                expectable demand, unless the advertisement discloses a limitation of quantity.

21        43.    Disney violated Sections 1770(a)(5), (9), and (10) by marketing and falsely

22    representing Dream Keys as having "no blockout dates" even though Disney has a practice of

23    blocking Dream Key pass holders from making park reservations even when Disney's theme parks

24    are not at capacity and even when park reservations are available.  Disney also violated the

25    foregoing sections by representing that Dream Key passes could be used to make reservations

26    when park reservations were available when, in fact, Disney does not allow Dream Key holders to

27    make reservations even though park reservations are, in fact, available.

28        44.    Disney never intended to sell Ms. Nielsen or the other proposed class members

-12-

1   Dream Key passes that were not subject to blockout dates and / or that allowed them to make

2   reservations for the parks whenever park reservations are available.

3        45.    On information and belief, Disney's violations of the CLRA discussed above were

4   done with the actual knowledge, intent, and awareness that the conduct alleged was wrongful.

5        46.    On information and belief, Disney committed these acts knowing it would harm

6   Ms. Nielsen and the proposed class members.

7        47.    Ms. Nielsen and the proposed class members were injured by Disney because they

8   purchased Dream Key passes believing that the passes would not be subject to blockout dates and

9   that they would be allowed to make reservations for the parks when park reservations were

10  available.  In fact, once they owned the passes, Ms. Nielsen and other pass holders learned that the

11  passes are subject to extensive block outs and that Dream Pass holders are unable to make

12  reservations even when park reservations are available, as alleged herein.

13       48.    As alleged herein, Ms. Nielsen demanded more than thirty days ago that Disney

14  correct violations of the Consumer Legal Remedies Act but Disney has not corrected the alleged

15  violations.  Ms. Nielsen has, therefore, complied with California Civil Code Sections 1782 (a)(1-

16  2). In addition, Disney has not corrected the violations since the original Complaint in this matter

17  was filed on

18       49.    Ms. Nielsen and the proposed class members were harmed as a direct and

19  proximate result of Disney's violations of the CLRA and are thus entitled to a declaration that

20  Disney violated the CLRA.

21       50.    Ms. Nielsen, on behalf of herself and the proposed class members, seeks her actual

22  damages and the actual damages of the proposed class members pursuant to Civil Code Section

23  1780(1).

24       51.    Ms. Nielsen, on behalf of herself and the proposed class members, seeks injunctive

25  relief under Civil Code § 1780(2) and 1782(d).

26       52.    Disney's acts as alleged herein were malicious, oppressive or fraudulent with intent

27  to vex, injure, and annoy Ms. Nielsen and her fellow proposed class members.  Ms. Nielsen, on

28  behalf of herself and the proposed class members, seeks punitive damages as permitted by

1    California Civil Code Section 1780(4).

2                                   **SECOND CAUSE OF ACTION**

3                          **VIOLATIONS OF THE FALSE ADVERTISING LAW**

4                            **CAL. BUS. & PROF. CODE §§ 17500 ET SEQ.**

5          53.    Ms. Nielsen realleges and incorporates the allegations elsewhere in the Complaint

6    as if set forth in full herein.

7          54.    California's False Advertising Law ("FAL") provides that "[i]t is unlawful for any

8    person, firm, corporation or association, or any employee thereof with intent directly or indirectly

9    to dispose of real or personal property or to perform services" to disseminate any statement

10   "which is untrue or misleading, and which is known, or which by the exercise of reasonable care

11   should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

12         55.    As alleged herein, the Advertisement, policies, acts, and practices of Disney

13   relating to the sale of Dream Key passes mislead Ms. Nielsen and other consumers acting

14   reasonably to purchase tickets and attempt to make reservations to visit Disney's theme parks in

15   California.

16         56.    Ms. Nielsen and the proposed class members suffered injury in fact as a result of

17   Disney's actions as set forth herein because they purchased Dream Key passes based on Disney's

18   false and misleading marketing claims that the Dream Key pass would not be subject to blockout

19   dates and that Dream Key pass holders could make reservations for the park when park

20   reservations are available.

21         57.    Ms. Nielsen and the proposed class members suffered injury in fact as a result of

22   Disney's actions as set forth herein because they purchased Dream Keys in reliance on Disney's

23   false and misleading Advertising. Specifically, Ms. Nielsen and the proposed class members were

24   injured by Disney because they purchased Dream Key passes believing that the passes would not

25   be subject to blockout dates only to learn, once they owned the passes, that, in fact, they were

26   subject to extensive block outs as alleged herein.  They have also been injured because they have

27   not been allowed to make park reservations even when park reservations are available.

28         58.    Disney's business practices as alleged herein constitute unfair, deceptive, untrue,

and misleading advertising pursuant to the FAL because Disney advertised Dream Key passes in a manner that is untrue and misleading, which Disney knew or reasonably should have known.

59.     Disney profited from its sales to unwary consumers of the falsely and deceptively advertised Dream Key passes.

60.     As a result, pursuant to Cal. Bus. & Prof. Code § 17535, Ms. Nielsen and the proposed class members are entitled to injunctive and equitable relief and restitution.

### THIRD CAUSE OF ACTION

### VIOLATIONS OF THE UNFAIR COMPETITION LAW

### CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.

61.     Ms. Nielsen realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

62.     The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.  The acts, omissions, misrepresentations, practices, and non-disclosures of Disney as alleged herein constitute business acts and practices.

63.     A statement or practice is fraudulent under the UCL if it is likely to deceive the public, applying a reasonable consumer test.  As set forth herein, Disney's statements relating to the sale of its Dream Key passes are likely to deceive reasonable consumers and the public.

64.     The acts alleged herein are also "unlawful" under the UCL in that they violate at least the following laws: The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq*. and The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq*.

65.     Disney's conduct with respect to the advertising and sale of its Dream Key passes was unfair because Disney's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

66.     Disney's conduct with respect to the advertising and sale of its Dream Key passes was also unfair because it violated public policy as declared by specific statutory or regulatory provisions, including but not limited to the False Advertising Law.

67.     Disney's conduct with respect to the advertising and sale of its Dream Key passes

was also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided.

68.     Disney profited from the sale to unwary consumers of its falsely, deceptively, and unlawfully advertised Dream Key passes.

69.     Ms. Nielsen and the proposed class members are likely to be damaged by Disney's deceptive trade practices, as Disney continues to disseminate, and is otherwise free to continue to disseminate misleading information.  Thus, injunctive relief enjoining this deceptive practice is proper.

70.     Disney's conduct caused and continues to cause substantial injury to Ms. Nielsen and the proposed class members, who have suffered injury in fact as a result of Disney's fraudulent, unlawful, and unfair conduct because Disney has, in fact, blocked out dates for Drem Key pass holders.

71.     In accordance with Bus. & Prof. Code § 17203, Ms. Nielsen, on behalf of herself, the proposed class members, and the general public, seeks an order enjoining Disney from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

72.     Ms. Nielsen, on behalf of herself and the proposed class members, also seeks an order for the restitution of all monies from the sale of the Dream Key passes that Disney unjustly acquired through acts of unlawful competition.

<u>**FOURTH CAUSE OF ACTION**</u>

<u>**BREACH OF CONTRACT**</u>

73.     Ms. Nielsen realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

74.     As alleged herein, Ms. Nielsen and the proposed class members entered into contracts with Disney whereby Disney agreed to sell Dream Key passes to Ms. Nielsen and the proposed class members in exchange for $1,399.00 each.  Ms. Nielsen and the class members specifically agreed with Disney that the Dream Key passes purchased by Ms. Nielsen and the class members would not be subject to blockout dates.

75.     By entering into the foregoing agreements, Disney incurred the obligation of an implied covenant of good faith and fair dealing found in every contract within this state.

76.     Ms. Nielsen and the proposed class members have performed their obligations pursuant to their contracts with Disney by paying Disney the agreed price for the Dream Key passes.

77.     Disney has breached its contracts with Ms. Nielsen and the proposed class members by failing to provide Dream Key passes that are free from blockout dates.  Specifically, Disney blocks out certain dates making reservations "unavailable" to Dream Key pass holders even those the parks are available and open.  Disney has also breached its contracts by refusing to allow Dream Key pass holders the ability to make park reservations even when park reservations are available.

78.     In addition by refusing to all Dream Key pass holders to make reservations despite the fact that park reservations are available, Disney has violated the covenants of good faith and fair dealing, thus denying Dream Key pass holders the benefits of their respective contracts.

79.     As a result of Disney's breaches of the Agreements and the covenants contained therein, Ms. Nielsen seeks monetary damages, on behalf of herself and others similarly situated, in excess of the jurisdictional limit in an amount to be proven at trial.  Ms. Nielsen also seeks all appropriate equitable relief.

## **FIFTH CAUSE OF ACTION**

## **NEGLIGENT MISREPRESENTATION**

80.     Ms. Nielsen realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

81.     Disney represented to Ms. Nielsen and other consumers that the Dream Key passes would not be subject to blockout dates.  To communicate this representation and to convince Ms. Nielsen and the proposed class members to purchase Dream Key passes, Disney supplied them with information, namely the Advertising found on Disney's website.  Disney knew, or should have known, that the information contained in the Advertising was false and/or misleading to Ms. Nielsen and the proposed class members.

82.    The misrepresentations concerned material facts about the Dream Key passes that influenced Ms. Nielsen and the proposed class members to purchase Dream Key passes.

83.    At the time Disney made the misrepresentations, Disney knew or should have known that the misrepresentations were false or Disney made the misrepresentations without knowledge of their truth or veracity.

84.    Ms. Nielsen and the proposed class members reasonably, justifiably, and detrimentally relied on the misrepresentations and, as a proximate result thereof, have and will continue to suffer damages in the form of lost money from the purchase price of the Dream Key passes.

**SIXTH CAUSE OF ACTION**

**CONCEALMENT/ NON-DISCLOSURE**

85.    Ms. Nielsen realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

86.    Disney knew at the time of sale that it had falsely represented the fact that Dream Key passes would actually be subject to blockout dates.  In addition, Disney knew that it was, in fact, concealing from Ms. Nielsen and the proposed class members that the Dream Key passes would be subject to arbitrary and artificial capacity and availability limitations set by Disney that had nothing to do with the actual capacity of its theme parks but, instead, were designed to allow Disney to sell more single day passes rather than allow reservations for Dream Key pass holders. In addition, Disney knew at the time that is sold the Dream Key passes that it would not allow Dream Key pass holders to make reservations to enter the parks even though park reservations were available.

87.    Disney had exclusive knowledge of the Advertisement's falsity at the time of sale. The defect (the actual practices regarding blockout dates, availability, and capacity limitations including therefusal to allow pass holders to make reservations even though park reservations are available) is latent and not something that Ms. Nielsen and the proposed class members, in the exercise of reasonable diligence, could have discovered independently prior to purchase.  The defect would not be disclosed by careful, reasonable inspection by the purchaser.

88.     Disney had the capacity to, and did, deceive Ms. Nielsen and the proposed class members into believing that they would receive Dream Key passes that were not subject to blockout dates or artificially created limitations.  Disney also had the capacity to, and did, deceive Ms. Nielsen and the proposed class members into believing that, if park reservations were available, they would be allowed to make reservations when, in fact, Disney does not allow them to make reservations despite the availability of park reservations.  Ms. Nielsen and the proposed class members did not receive the Dream Key passes as advertised and promised.

89.     Disney undertook active and ongoing steps to conceal its actual practices with regarding to Dream Key passes and the use of them to reserve admission to Disney's theme parks. Ms. Nielsen is aware of nothing in Disney's advertising, publicity, or marketing materials that discloses the truth about the actual blockout dates and capacity limitations associated with the Dream Key passes despite the fact the Disney has known all along about such practices.

90.     The facts concealed and/or not disclosed by Disney to Ms. Nielsen and the proposed Class Members are material facts in that a reasonable person would have considered them important in deciding whether to purchase a Dream Key pass.

91.     Disney had a duty to disclose accurate information regarding the actual benefits associated with a Dream Key pass.

92.     Disney intentionally concealed and/or failed to disclose its actual practices with regard to Dream Key passes for the purpose of inducing Ms. Nielsen and the proposed class members to act thereon.

93.     Ms. Nielsen and the proposed class members justifiably acted or relied upon the concealed and/or non-disclosed facts to their detriment, as evidenced by their purchase of the Dream Key passes.

94.     Ms. Nielsen and the proposed class members suffered a loss of money as a result of Disney's false information because they would not have purchased the Dream Key passes if the truth concerning Disney's Advertisement and the Dream Key passes had been known.

95.     WHEREFORE, Ms. Nielsen prays for judgment against Defendants, and each of them, as set forth below.

**<u>PRAYER</u>**

1. An Order declaring this action to be a proper class action, appointing Ms. Nielsen as class representative, and appointing her undersigned counsel as class counsel;

2. An Order requiring Disney to bear the cost of class notice;

3. An Order enjoining Disney from engaging in the unfair, unlawful, and deceptive business practices and false advertising complained of herein;

4. An Order compelling Disney to conduct a corrective advertising campaign;

5. An Order compelling Disney to recall and destroy all misleading and deceptive advertising materials;

6. An Order requiring Disney to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

7. An Order requiring Disney to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, plus pre- and post-judgment interest thereon;

8. An Order requiring Disney to pay all actual and statutory damages permitted under the causes of action alleged herein;

9. An award of attorneys' fees and costs; and

10. Any other and further relief that Court deems necessary, just, or proper.

Dated: February 4, 2022                    VENTURA HERSEY & MULLER LLP


                                    By:   /s/
                                          _____
                                          DANIEL J. MULLER
                                          Attorneys for Plaintiff and the Proposed Class

**FIRST AMENDED CLASS ACTION COMPLAINT**