1  DANIEL J. MULLER, SBN 193396
   *dmuller@venturahersey.com*
2  ANTHONY F. VENTURA, SBN 191107
   *aventura@venturahersey.com*
3  VENTURA HERSEY & MULLER, LLP
   1506 Hamilton Avenue
4  San Jose, California 95125
   Telephone:  (408) 512-3022
5  Facsimile:  (408) 512-3023

6  Attorneys for Plaintiff Jenale Nielsen &
   the Proposed Class

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11 | JENALE NIELSEN, individually and on behalf | Case No.:  8:21-cv-02055-DOC-ADS
   | of others similarly situated,               |
12 |                                             | PLAINTIFF JENALE NIELSEN'S
   |                        Plaintiff,            | OPPOSITION TO DEFENDANT'S
13 |                                             | MOTION TO DISMISS PLAINTIFF'S
   |              vs.                             | FIRST AMENDED COMPLAINT
14 |                                             |
   | WALT DISNEY PARKS AND RESORTS               | Date:     April 4, 2022
15 | U.S., Inc., a Florida Corporation, and DOES 1 | Time:     8:30 a.m.
   | through 25, inclusive,                      | Judge:    Hon. David O. Carter
16 |                                             | Court:    9D
   |                     Defendants.             |

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................. 1

II.   FACTS ............................................................................................................. 1

III.  ARGUMENT .................................................................................................... 2

    A.   Ms. Nielsen Is Not Alleging That Her Dream Key Pass Would Be
       Limited Only By The Capacity At Disney's Theme Parks ............................ 2

    B.   Ms. Nielsen's Consumer Statutory Claims (Causes of Action One,
       Two, and Three) Should Not Be Dismissed ...................................................... 5

        1.   Ms. Nielsen's Consumer Statutory Tort Claims Should Not Be
           Dismissed Because She Has Alleged That Reasonable
           Consumers Were Misled By Disney's Advertisement And
           Terms And Conditions ........................................................................ 5

        2.   A Dream Key Pass Is A Service Pursuant To the CLRA. ................. 10

        3.   The Court Can Grant Equitable Relief Pursuant To The
           Consumer Statutory Violations Alleged In The First Amended
           Complaint. ........................................................................................ 12

        4.   Ms. Nielsen Has Standing To Pursue Prospective Relief ................. 14

    C.   Ms. Nielsen's Claims For Breach Of Contract Should Not Be
       Dismissed ..................................................................................................... 14

        1.   The Court Should Reject Disney's Strained And Implausible
           Definition Of The Phrase "No Blockout Dates" ............................... 15

        2.   The Court Should Disregard Disney's Arguments Regarding
           "Reservation Availability" Because They Ignore The Actual
           Allegations Of The Complaint .......................................................... 20

        3.   The Contract Interpretation Cases Cited By Disney Do Not
           Support Disney's Breach of Contract Argument .............................. 21

        4.   Ms. Nielsen's Breach of Covenant of Good Faith And Fair
           Dealing Allegations Should Not Be Dismissed ............................... 23

    D.   Ms. Nielsen Does Not Oppose The Dismissal Of Her Fifth And Sixth
       Causes Of Action ......................................................................................... 24

IV.   CONCLUSION .............................................................................................. 25

1

## TABLE OF AUTHORITIES

2

<u>Cases</u>

3

*Anderson v. Seaworld Parks and Entertainment, Inc.*,
  2016 WL 8929295 (N.D. Cal. Nov. 7, 2016) .......................................................... 11

4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................ 2

5

6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 2007) .................................................................................................. 2

7

*Brobeck, Phleger & Harrison v. Telex Corp.*,
  602 F.2d 866 (9th Cir. 1979) ................................................................................ 19

8

9

*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*,
  2 Cal. 4th 342 (1992) ............................................................................................ 24

10

*Claiborne v. Water of Life Community Church*,
  2017 WL 9565337 (C.D. Cal. August 25, 2017) ................................................. 12

11

12

*Colgan v. Leatherman Tool Group, Inc.*,
  135 Cal. App.4th 663 Cal.Rptr.3d 36, 48 (2006) ................................................. 5

13

*Digerati Holdings, LLC v. Young Money Entertainment, LLC*,
  194 Cal. App. 4th 873 (2011) .............................................................................. 24

14

15

*DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.*,
  176 Cal. App. 4th 697 (2009) ............................................................................... 16

16

*Ex parte Quarg*,
  149 Cal. 79 (1906) ................................................................................................ 10

17

18

*Fairbanks v. Superior Court*,
  46 Cal. 4th 56 (2009) ............................................................................................ 11

19

*Freeman v. Time, Inc.*,
  68 F.3d 285 (9th Cir.1995) ..................................................................................... 5

20

21

*Goodrich v. Alterra Mountain Co.*
  2021 WL 2633326 (D. Col. June 25, 2021) .......................................................... 12

22

*Gruenberg v. Aetna Ins. Co.* (1973)
  9 Cal. 3d 566 ......................................................................................................... 24

23

24

*Guz v. Bechtel Nat'l Inc.*,
  24 Cal. 4th 317 (2000) .......................................................................................... 23

25

*Hall v. Marriott International, Inc.*,
  2020 WL 4727069 (S.D. Cal. August 14, 2020) .................................................... 9

26

27

*Hall v. Sea World Entm't, Inc.*
  2015 WL 9659911 (S.D. Cal. Dec 23, 2015) .................................................. 11, 12

28

-ii-

*In re Easysaver Rewards Litig.*,
    906 F. 3d 747 (9th Cir. 2018) ......................................................................... 18

*Kang v. P.F. Chang's China Bistro, Inc.*
    844 Fed. App'x. 969 (9th Cir. 2021) ............................................................... 8

*Klein v. Chevron U.S.A., Inc.*
    202 Cal. App. 4th 1342 ..................................................................................... 8

*Kouball v. SeaWorld Parks & Entertainment, Inc.*
    2020 WL 5408918 (S.D. Cal. September 9, 2020) ...................................... 11

*Kraus v. Trinity Management Services, Inc.*,
    23 Cal. 4th 116 (2000) ................................................................................... 14

*Lilly v. ConAgra Foods, Inc.*,
    743 F.3d 662 (9th Cir. 2014) ............................................................................ 5

*Lisner v. Sparc Group LLC,*
    2021 WL 6284158 (C.D. Cal. December 29, 2021) .................................... 13

*Lowry v. Southwest Airlines, Co.,*
    2015 WL 12656950 (C.D. Cal. Aug. 10, 2015) ......................................... 23

*Moore v. Mars Petcare US, Inc.*,
    966 F. 3d 1007 (9th Cir. 2020) ................................................................... 6, 9

*Morales v. Trans World Airlines,*
    504 U.S. 374 (1992) ........................................................................................ 18

*National Tax Institute, Inc. v. Topnotch at Stowe Resort & Spa,*
    388 F. 3d 15 (1st Cir. 2004) ..................................................................... 21, 22

*Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*,
    69 Cal. 2d 33 (1968) ...................................................................................... 16

*Pridgen v Church & Dwight Co.,*
    2020 WL 2510517 (C. D. Cal. Mar. 2, 2020) .............................................. 9

*Scales v. Six Flags, Inc.,*
    2004 WL 1870499 (Ohio Ct. App. Aug. 20, 2004) .................................. 22

*Sonner v. Premier Nutrition Corp.*,
    971 F. 3d 834 (9th Cir. 2020) ................................................................. 12, 13

*Souter v. Edgewell Personal Care Company,*
    2022 WL 485000 (S.D. Cal. February 16, 2022) ...................................... 13

*Sultanis v. Champion Petfoods USA Inc.,*
    2021 WL 3373934 (N.D. Cal. August 3, 2021) ........................................... 9

*United States v. Fisher,*
    137 F. 3d 1158 (9th Cir. 1998) .................................................................... 18

*Universal Sales Corp. v. California Press Mfg. Co.*,
    20 Cal. 2d 751 (1942) .................................................................................... 16

-iii-

*Victoria v. Superior Court*,
    40 Cal. 3d 734 (1985) ............................................................................... 19

*Williams v. Gerber Prod. Co.*,
    552 F.3d 934 (9th Cir. 2008) ...................................................................... 5

*WYDA Associates v. Merner*,
    42 Cal. App.4th 1702 (1996) .................................................................... 16

*Zeiger v. WellPet LLC*
    526 F.Supp.3d 652 (N. D. Cal. 2021) ................................................. 6, 13

<u>Statutes</u>

Cal. Bus. & Prof. Code § 17200 ........................................................................ 5

Cal. Bus. & Prof. Code § 17500 ........................................................................ 5

Cal. Civ. Code § 1654 ...................................................................................... 19

Cal. Civ. Code § 1770 ........................................................................................ 5

1

## I.     INTRODUCTION

2

Plaintiff Jenale Nielsen ("Ms. Nielsen") opposes Defendant Walt Disney Parks And

3   Resorts U.S., Inc.'s ("Disney") *Motion To Dismiss Plaintiff's First Amended Complaint*.  [Doc.

4   No. 27.]

5

## II.    FACTS

6

In or about August 2021, Disney introduced a sales program that it calls the Disneyland

7   Resort Magic Key program.  (Doc. No. 23; First Amended Complaint ¶ 8, hereafter "FAC ¶ __.")

8   Pursuant to the program, Disney offers for sale a variety of Magic Key Passes.  (FAC ¶ 8.)

9   Consumers who purchase a Magic Key pass from Disney are entitled to make reservations to enter

10  the Disneyland and/or California Adventures theme parks without having to purchase a ticket for a

11  period of one year from when their Magic Key pass is first used.  (FAC ¶¶ 16-17.)

12

Ms. Nielsen decided to purchase a Dream Key Pass and paid $1,399.00 for her pass.  (FAC

13  ¶ 15.)  When it advertised the Dream Key Pass, Disney promised that Dream Key Passes would

14  not be subject to "blockout dates" and that passholders could enter Disney's Anaheim theme parks

15  using their Dream Key Passes so long as park reservations were available and the park was not at

16  capacity.  (FAC ¶ 10, Exh. A.)[1]

17

After purchasing her Dream Key Pass, however, Ms. Nielsen learned that Disney would

18  not allow her to use the Dream Key pass to make a reservation for the theme parks even though

19  the parks were not at capacity and even though park reservations were listed as available on

20  Disney's website.  (FAC ¶¶ 17-18.)  For example, when Ms. Nielsen attempted to use her Dream

21  Key pass in October 2021 to make park reservations to visit Disneyland, she was disappointed to

22  learn that Disney had blocked out many days, including all weekend days in the month of

23  November 2021, even though park reservations were available.  (FAC ¶ 18.)

24

In her First Amended Class Action Complaint, Ms. Nielsen states claims for violations of

25  California's Consumer Legal Remedies Act, violations of California's False Advertising Law,

26

27

[1]     Disney made additional representations about Dream Key passes and park
reservations in the Terms and Conditions that Ms. Nielsen agreed to when she
purchased her Dream Key pass.  (Doc. No. 27, Schoenfeld Decl., Ex. A, p. 2.)

28

-1-

1   violations of California's Unfair Competition Law, breach of contract, negligent

2   misrepresentations, and concealment.  Ms. Nielsen seeks to represent a class of consumers who

3   purchased Dream Key passes and who were blocked out from entering Disney's theme parks even

4   though the parks were not at capacity and even though park reservations were available.  (FAC

5   ¶ 30.)  Ms. Nielsen seeks damages and injunctive relief.

6   **III.    ARGUMENT**

7          Federal Rule of Civil Procedure 8 requires that a pleading contain "only enough facts to

8   state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547

9   2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

10  court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

11  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In ruling on a motion to dismiss, the Court "must

12  accept as true all of the factual allegations contained in the complaint."  *Twombly*, 550 U.S. at 572.

13         **A.    Ms. Nielsen Is Not Alleging That Her Dream Key Pass Would Be Limited**
14                 **Only By The Capacity At Disney's Theme Parks**

15         Disney's Motion To Dismiss is based upon what must be a deliberate misreading of

16  Ms. Nielsen's allegations.  In the introduction to its motion, Disney incorrectly describes

    Ms. Nielsen's First Amended Complaint as being "based on the fundamentally flawed premise
17
    that 'no blockout dates' means that the *only* limit on her ability to make park reservations is park
18
    'capacity.'"  (MTD, p.1, lines 11-13.)  Disney repeats this misreading of the FAC, in one way or
19
    another, throughout its brief.  For example, it writes that Ms. Nielsen's allegations are based upon
20
    her supposed belief that her Dream Key entitles her to "access the parks every day of the year so
21
    long as the parks were not at capacity."  (MTD, p. 6, lines 7-8; *see also* MTD, p. 11, lines11-14)
22
    ("she supposedly understood "'no blockout dates'" to mean that she would have access to the
23
    parks every day of the year so long as the parks were not at capacity").
24
           Disney's assertions are not correct.  The First Amended Complaint acknowledges that
25
    Dream Key passes are subject to capacity limitations *and* availability of park reservations.  It then
26
    asserts that Disney made misleading statements when it told consumers that Dream Key passes
27
    could be used to secure available park reservations.  The distinction between "capacity" and
28

1  "subject to availability" as those terms are used in the Advertisement and the Terms and

2  Conditions is an important one.  The Advertisement and the Terms and Conditions contain several

3  statements regarding "capacity."  The Advertisement provides that:

4       •  "Admission is not guaranteed and is subject to capacity and other closures."

5         (FAC ¶ 10.)

6  The Terms and Conditions state that:

7       • Certain parks, hotels, restaurants, attractions, experiences and other offerings may

8         be modified or unavailable, ***have limited capacity***, and are subject to limited

9         availability or even closure, and park admission and offerings are not guaranteed.

10         (*Schoenfeld Decl.*, Ex. A, p. 1.)

11       • Theme park ***capacity may be limited from time to time due to various reasons***

12         ***including, but not limited to, Acts of God, governmental direction or guidance***

13         ***from health experts***. Some Pass benefits and features may not be available during

14         periods of limited capacity. (*Schoenfeld Decl.*, Ex. A, p. 2.)

15       • Passes are nonrefundable, nontransferable and remain the property of Disney.

16         ***Restrictions apply including, but not limited to, capacity constraints and other***

17         ***closures***. Passes may not be used for commercial purposes and are void if altered or

18         misused. (*Schoenfeld Decl.*, Ex. A, p. 2.)

19       • ". . . Theme parks, restaurants, attractions, entertainment, products, services and

20         offerings may be modified ***or limited in capacity*** or availability. . ." (*Schoenfeld*

21         *Decl.*, Ex. A, p. 2.)

22       Although neither the Advertisement nor the Terms and Conditions provides an exact

23  definition of "capacity," the above-quoted statements, taken together, make it clear that Disney

24  intended to put customers on notice that the parks might be closed, operating at reduced capacity,

25  or that certain attractions might be modified or unavailable (for example, enclosed theater shows).

26  These limitations, of course, are understandable given the Covid pandemic and they made it clear

27  that Disney was making no guarantees that the parks would be operating as "normal."  Any

28  reasonable consumer buying a theme park pass in the late-Summer 2021, of course, would know

1   that theme parks might not be operating regularly given the ongoing pandemic and that Disney

2   was not promising the "normal" Disney experience of the pre-Covid era.  The capacity warnings

3   put Ms. Nielsen and others on notice that, if Covid forced the parks to operate at half capacity,

4   they would not be heard to complain.

5          The "availability" issue is different.  It references the availability of "park reservations."

6   Park reservations might be unavailable for a variety of reasons having nothing to do with reduced

7   capacity at the parks.  These reasons could include all reservations being sold for a given date, a

8   labor shortage which means that Disney cannot accommodate the normal number of guests, or a

9   reduced number of reservations available because of special events happening within the parks.

10  (FAC ¶ 12.)  Disney, of course, reserved the right to make park reservations unavailable for any

11  number of business reasons and Ms. Nielsen does not quarrel with that fact.

12         She does, however, quarrel with the fact that, even when Disney decides to make park

13  reservations available generally, *it is nonetheless making those reservations unavailable to Dream*

14  *Key passholders.*  As alleged in the First Amended Complaint, it "would be one thing if Disney

15  had expressly told Ms. Nielsen and fellow customers that it intended to only allow a certain

16  number of Dream Key reservations each day, regardless of park capacity or the availability of park

17  reservations, so that Dream Key pass holders would be on notice that the parks would, as a

18  practical matter, be unavailable to them at Disney's whim.  Ms. Nielsen could have then decided

19  whether it was worth it to pay $1,399.00 for a pass that would allow her entry if and when Disney

20  decided it could not sell tickets to others for higher prices.  Disney, however, did the opposite of

21  providing such information.  It told customers that there would be no blockout dates and that she

22  could use her pass when park reservations were available, which reasonably led Ms. Nielsen and

23  others to believe that Disney would not engineer reservation unavailability."  (FAC ¶ 23.)

24         Ms. Nielsen is <u>not</u> alleging that Disney told her that her Dream Key pass would be subject

25  *only* to capacity limitations.  She agrees that her pass is subject to availability of park reservations.

26  She has filed her lawsuit because Disney is refusing to allow her to make a park reservation with

27  her Dream Key *even though Disney has park reservations available*.  (*See* FAC ¶ 18, "Disney had

28  park reservations available for all of the days it had blocked out to Dream Key passholders"; *see*

*also* FAC ¶¶ 19-21.)

> **B.    Ms. Nielsen's Consumer Statutory Claims (Causes of Action One, Two, and Three) Should Not Be Dismissed**

The Court should reject Disney's request that it dismiss Ms. Nielsen's statutory tort claims. The first cause of action asserts violations of the Consumer Legal Remedies Act (CLRA), the second cause of action asserts violations of the False Advertising Law ("FAL"), and the third cause of action asserts claims for violations of the unfair competition law ("UCL").  The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code § 1770.  The FAL makes it unlawful for a business to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.  The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

Ms. Nielsen's statutory tort claims are governed by the "reasonable consumer" test, which requires a plaintiff to "show that members of the public are likely to be deceived."  *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (internal citations omitted).  "[W][hether a business practice is deceptive will usually be a question of fact not appropriate for decision on [a motion to dismiss]."  *Lilly v. ConAgra Foods, Inc.*, 743 F.3d 662, 665 (9th Cir. 2014) (internal citations and quotation marks omitted).  A reasonable consumer is "the ordinary consumer acting reasonably under the circumstances." *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App.4th 663, (2006) (internal citation and quotation marks omitted).  To prevail under this standard, Ms. Nielsen must "'show that members of the public are likely to be deceived' by the Advertisement and/or the Terms and Conditions. *See Williams*, 552 F.3d at 938 (*quoting Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir.1995)).

The First Amended Complaint appropriately alleges claims pursuant to each of the foregoing statutes.

> **1.    Ms. Nielsen's Consumer Statutory Tort Claims Should Not Be Dismissed Because She Has Alleged That Reasonable Consumers Were Misled By Disney's Advertisement And Terms And Conditions**

The Court should deny Disney's motion to dismiss because Ms. Nielsen has alleged that

she and other reasonable consumers were deceived by the statements contained in the Advertisement.  This is true for at least two reasons.  First, the Advertisement promises Dream Key passholders "[r]eservation-based admission to one or both theme parks *every day of the year.*"[2]  (FAC ¶ 10.)  It then twice provides—once in enlarged lettering—that Dream Key passes have "no blockout dates."  The phrase "no blockout dates" is not defined by the Advertisement.  A reasonable consumer contemplating paying $1,399.00 for a pass to theme parks which promises "reservations-based admission to one or both theme parks every day of the year" would reasonably believe that "no blockout dates" meant that Disney would not arbitrarily limit reservations availability and prevent passholders from entering the theme parks as many as 17 days in a single month.  As the cases that Disney cites reveal, "blockout" or "blackout" dates are generally known to consumers as dates when tickets, credits, passes, or rewards cannot be used.  No reasonable consumer would expect or understand that a $1,399.00 pass with "no blockout dates" would not be useable on 17 days in a single month.[3]  The issue of whether statements like those contained in the Advertisement are misleading to reasonable consumers presents a "quintessential" matter for a jury and claims based on them should not be dismissed pre-trial.  *Zeiger v. WellPet LLC*, 526 F.Supp.3d 652, 687 (N. D. Cal. 2021).

Second, the Advertisement is also misleading because the statements it contains are outright false.  *See Moore v. Mars Petcare US, Inc.* (9th Cir. 2020) 966 F. 3d 1007, 1017-1019 ("although literal truth can sometimes provide protection from a misleading claim, "there is no protection for literal falseness.")  In the advertisement, the only limitations on the phrases "every day of the year" and "no blockout dates" are the representations that "park reservations are subject to availability" and that "admission is not guaranteed and is subject to capacity and other closures."  FAC ¶ 10.  A reasonable consumer would read the "park reservations are subject to

---

[2]   Believe Key passholders were told they were buying access to "most days of the year." Enchant Key passholders were told they were getting "select days of the year."

[3]   If anything, Disney's Motion to Dismiss only proves the point.  What reasonable consumer would read the phrases "reservation-based admission to one or both them parks *every day of the year*" and "no blockout dates" and think to herself, I know what that means.  It means there will be no dates that are "categorically inaccessible," they will merely be "uncategorically inaccessible."

availability" limitation as meaning that, if park reservations are not available for a particular date, then the Dream Key pass will not be sufficient to gain admission.  Conversely, when park reservations are available, a Dream Key pass can be used to obtain admission.

As alleged in the FAC, however, the experience for Dream Key passholders has been decidedly different from what was advertised.  Even when Disney has park reservations available, it has still not allowed Dream Key passholders to make reservations.  (FAC ¶¶ 17-18.)  For each of the aforementioned 17 days in November 2021, Disney had park reservations available and was advertising them on its website but all 17 of those days were blocked out for Dream Key passholders.  (FAC ¶¶ 17-18.)  No reasonable consumer would think Disney would promise availability "every day of the year" and "no blockout dates" and then limit the availability of reservations as Disney has done.

As Disney points out, a plaintiff cannot ignore the terms and conditions accompanying a purchase and still claim to have been misled.  A reasonable consumer reads the terms and conditions and makes informed decisions.  In this case, however, the Terms and Conditions do not save Disney because they, too, contain statements that are likely to deceive reasonable consumers such as Ms. Nielsen.  In fact, they merely repeat the representations that park reservations are "subject to availability" and say only that, when park reservations are not available, a Dream Key cannot be used for admission.  The pertinent discussion of "park reservations" in the Terms and Conditions[4] is as follows:

> To enter a Disneyland® Resort theme park, each Passholder is required to have a theme park reservation and valid admission for the same park on the same date. ***Park reservations are limited and subject to availability and applicable Pass blockout dates***.  Passholders should ensure their Pass type is valid for park entry prior to making a park reservation.  It may be difficult for Passholders to get park reservations to visit on certain dates or a select park, and park reservations are not guaranteed for any specific dates or park, no matter the Pass type. Additionally, park reservations may not be available on select holidays for certain parks. A Pass will not guarantee park entry.  Other restrictions, such as Park Hopper® rules, may apply.

---

[4] Note that the Terms and Conditions apply to all Magic Key passes, not just Dream Key passes.  They discuss "blockout dates" that apply to other Magic Keys but those "blockout dates" are not supposed to apply to Dream Keys.

1   (Schoenfeld Decl., Ex. A, p. 2.; emphasis added.)  The Terms and Conditions do not define

2   "subject to availability" or qualify what it means for a "park reservation" to be available.

3          Critically, the above-quoted passage fails to notify consumers that Disney intended to have

4   two different types of "park reservations."  The Terms and Conditions likewise omit the fact that

5   Dream Key passes would only be usable for a separate class of park reservations, the numbers and

6   details of which are known only to Disney.  Having told consumers that park reservations would

7   be subject to availability, Disney was not free to leave out the fact that it planned to exclude

8   otherwise available park reservations from those that it considers to be "available."  *See Klein v.*

9   *Chevron U.S.A., Inc.* 202 Cal. App. 4th 1342,1383 (2012) (finding that a plaintiff's allegations

10  were sufficient "to state a CLRA claim predicated on a material omission, which "'consist[s] of

11  the suppression of a fact by one who ... gives information of other facts which are likely to mislead

12  for want of communication of that fact.'").  Any reasonable consumer would be deceived by

13  advertising which omits critical limitations on the use of a product or service, especially when

14  employing a commonly used, but undefined, term like "park reservations."

15         Disney knew from the start that it was going to treat park reservations for the general

16  public and park reservations for Dream Key passes differently.  (FAC ¶¶ 20-21; 45-46.)  Disney,

17  therefore, should have told Ms. Nielsen and her fellow Dream Key passholders of this fact so that

18  they could either agree to the terms when purchasing their Dream Keys or decide that the product,

19  which would provide decidedly less access to the theme parks, was not worth the price.

20         Cases decided in this Circuit support the conclusion that Disney's motion should be denied

21  with regard to the statutory tort claims.  In *Kang v. P.F. Chang's China Bistro, Inc.*, the Court of

22  Appeal reversed the dismissal of CLRA, FAL, and UCL claims.  844 Fed. App'x 969 (9th Cir.

23  2021).  *Kang* concerned a restaurant menu that offered sushi rolls made with "krab mix."  The

24  sushi rolls, of course, contained no crab meat and the plaintiff argued that the name was deceiving.

25  The Ninth Circuit agreed, holding that "it is at least plausible that reasonable consumers would be

26  deceived" into believing that crab was part of the mix that made up the sushi rolls.  *Id.* at 971.  The

27  Court ruled that "Because the term 'krab mix' lacks any commonly understood contrary meaning,

28  we cannot say, in the absence of evidence bearing on the issue, that Kang's allegation is

implausible on its face." *Id.*  Similarly, in this case, the phrase "blockout dates" has no commonly

understood meaning, especially when paired with the equally vague phrase "park reservations are

subject to availability."  Just as the P.F. Chang's diner might plausibly be confused by the fact that

a "krab mix" contains no crab, Ms. Nielsen and other consumers were plausibly deceived by the

fact that, when Disney told them Dream Key passes could be used to make park reservations

"subject to availability," it did not actually mean to refer to all available park reservations.  *See*

*also, Moore v. Mars Petcare US, Inc.* (9th Cir. 2020) 966 F. 3d 1007, 1018 (reversing dismissal of

consumer statutory tort claims because reasonable consumers could be plausibly deceived by

"prescription" pet food that contained no actual medicine); *Sultanis v. Champion Petfoods USA*

*Inc.,* 2021 WL 3373934 (N.D. Cal. August 3, 2021) (denying a motion to dismiss because

reasonable consumers are likely to be deceived by a claim that a product "made with free-run

chickens" was, in fact, made with chickens that are never allowed to run outside);  *Hall v. Marriott*

*International, Inc.,* 2020 WL 4727069 (S.D. Cal. August 14, 2020) (denying a motion to dismiss

consumer statutory tort claims where hotel operators imposed service fees that were hidden and /

or described in such a way as to likely deceive reasonable consumers).

Just as the Courts in *Kang, Moore, Sulanis,* and *Hall* found that reasonable consumers

were plausibly deceived by the defendants in those cases, the Court should find—at least at the

pleading stage—that Ms. Nielsen and the other purchasers of Dream Key passes were reasonable

consumers who were likely to be deceived by Disney's statements and representations.

The cases cited by Disney as examples of consumer statutory tort claims that have been

dismissed at the pleading stage do not require or even suggest a contrary result.  Taken

collectively, they stand for the unremarkable conclusion that consumer statutory violations claims

are dismissed when plaintiffs cannot point to anything that would deceive a reasonable consumer

or when plaintiffs ignore the terms and conditions that accompany a consumer purchase.  This

Court's decision in *Pridgen v Church & Dwight Co.* is a case in point.  2020 WL 2510515 (C.D.

Cal. Mar 2, 2020).  In that case, the label for the detergent product at issue was found to be

unlikely to deceive reasonable consumers because its statements about the number of "regular

loads" that could run with the detergent obviously applied only to normal usage situations.  *Id.* at

1   *3.  The consumer had all the information she needed to understand the claims on the label.  Here,

2   Ms. Nielsen and her fellow consumers had no way of knowing what Disney actually meant by "no

3   blockout dates" or that only certain available "park reservations" would be open to Dream Key

4   passholders.

5                    **2.        A Dream Key Pass Is A Service Pursuant To the CLRA.**

6            The Court should reject Disney's argument that a Dream Key is not a service as the term is

7   used by the CLRA.  As alleged in the FAC, when Ms. Nielsen purchased a Dream Key pass, she

8   purchased access to services.  (FAC ¶¶ 14, 28, & 39.)  These services include interactions with

9   Disney characters who populate the theme parks, musical and theater performances, games, and

10  rides operated by Disney within the theme parks.  Lest there be any doubt, Disney's Terms and

11  Conditions make it clear that Dream Key passholders are purchasing entertainment services and

12  products from Disney:  General term No. 4 provides as follows:

13                  A Passholder assumes the inherent risks associated with the operation of all rides
                    and attractions and should read and obey all safety signage, instructions and rules.
14                  Theme parks, restaurants, attractions, entertainment, **products**, **services** and
                    offerings may be modified or limited in capacity or availability
15

16  (*Schoenfeld Decl.*, Ex. A, p. 2.)  Disney also informed Dream Key passholders that, if they fail to

17  activate their Dream Key passes prior to expiration, the expired passes cannot be used for "any

18  other goods or services."  Clearly, even Disney concedes that a Dream Key pass provides access to

19  one set of "goods and services" that cannot be exchanged for "other" goods and services.  Given

20  that the California legislature has decreed that the CLRA "shall be liberally construed and

21  applied," the Court should find that Ms. Nielsen purchased services from Disney and that she is

22  protected by the CLRA.  *See* Cal. Civ. Code § 1760.

23          Disney nonetheless argues that a Dream Key pass is "neither a 'good' nor a 'service'

24  within the meaning of the CLRA.  (MTD, p. 22.)  Disney cites *Ex parte Quarg*, 149 Cal. 79 (1906)

25  and other cases for the proposition that a ticket of admission is merely a license and, therefore,

26  does not constitute a good or service.  These decisions do not address the CLRA and, therefore,

27  have no bearing on what services are covered by the statute.  Moreover, they fail to acknowledge

28  that tickets to an amusement park are simply the method by which theme park entertainment

-10-

1  services are purchased.  The question then becomes whether the services so purchased are covered

2  by the Act.

3       Disney cites *Hall v. Sea World Entm't, Inc.* for the argument that tickets to an amusement

4  park are not covered by the CLRA.  That case contains a brief discussion of this issue and

5  concludes that "to hold that the tickets, or more specifically the admission to the parks that the

6  tickets provide, constitute a service requires a strained and unnatural construction of the term."

7  2015 WL 9659911 at *15 (S.D. Cal. Dec. 23, 2015).[5]  A subsequent decision by the same judge

8  reached the same conclusion with no additional analysis.  *Kouball v. SeaWorld Parks &*

9  *Entertainment, Inc.* 2020 WL 5408918 (S.D. Cal. September 9, 2020).

10      Ms. Nielsen requests that the Court reject the reasoning provided in *Hall* and *Kouball* and,

11  instead, consider the decision of *Anderson v. Seaworld Parks and Entertainment, Inc.*, 2016 WL

12  8929295 (N.D. Cal. Nov. 7, 2016).  In *Anderson*, the court concluded "that the term "services"

13  encompasses 'educational and entertainment services'".  *Id.* *12.  The Court acknowledged that

14  the California Supreme Court has not addressed whether consumers who buy theme park passes

15  have purchased "services" per the CLRA.  The Court framed the issue as "whether the alleged

16  'entertainment and education services' fall within the scope of the phrase 'services for other than a

17  commercial or business use'" and concluded that, "based on the plain language of the statute . . .

18  that phrase is broad enough to encompass 'educational and entertainment' services."  *Id.* *10.

19      As the Court pointed out, the *Hall* decision was based on a very limited reading of the

20  California Supreme Court's decision in *Fairbanks v. Superior Court*, 46 Cal. 4th 56, 65 (2009).

21  *Fairbanks* determined that life insurance is not a "service" because a contractual obligation to pay

22  money pursuant to an insurance contract is not work or labor.  *Id.*  As *Anderson* pointed out,

23

24  _____

    [5]    The *Hall* court chose to frame the question as whether "admission" constitutes a service.
25      Ms. Nielsen submits that such an approach is too narrow.  Admission is simply the act of
        walking through the gates of the park.  But people do not go to theme parks just to get
26      inside.  They go for the attractions and services on offer.  No one pays to go Central Park
        because it is—with apologies to New Yorkers—just a park.  One pays for Disneyland
27      because of the rides, theater shows, and interactions with characters.  In other words,
        people visit Disneyland for the services.  Relatedly, the reason Clark Griswold was so
28      disappointed when he got to Walley World was that there were no services to be had.

1   *Fairbanks* did not consider or establish the parameters of what *does* constitute a good or service.

2   In other words, just because "life insurance" does not constitute a service, does not mean that other

3   obvious services are excluded from coverage by the CLRA.  *See also Claiborne v. Water of Life*

4   *Community Church*, 2017 WL 9565337 (C.D. Cal. August 25, 2017) (finding the reasoning in

5   *Anderson* "persuasive" and determining that financial education services are covered by the

6   CLRA.)

7       A recent district court opinion from Colorado is also instructive.  *Goodrich v. Alterra*

8   *Mountain Co.* 2021 WL 2633326 (D. Col. June 25, 2021).  In *Goodrich*, the court adopted the

9   reasoning of *Anderson* and determined that season passes to a ski resort constitute the purchase of

10  services such as providing groomed trails, ski lifts, and gondola service.  As the Court found,

11  [t]hese services are not ancillary to but, instead, are at the heart of what a ski pass holder

12  purchased."  *Id.* at *11.  Similarly, Dream Key passes are not simply a license to enter a certain

13  space of private property.  Rather, the heart of what a Dream Key purchaser is purchasing is the

14  services to be enjoyed once inside the theme park: rides, theater performances, interactions with

15  characters, games, and food services.  All of these things are covered by the CLRA.  Ms. Nielsen's

16  CLRA claims should not be dismissed.

### 3.   The Court Can Grant Equitable Relief Pursuant To The Consumer Statutory Violations Alleged In The First Amended Complaint.

18      The Court should not dismiss Ms. Nielsen's claims for equitable relief.  In her First

19  Amended Complaint, Ms. Nielsen seeks injunctive relief pursuant to the CLRA (FAC ¶ 51), the

20  FAL (FAC ¶ 60), and the UCL (FAC ¶ 71).  Ms. Nielsen seeks such equitable relief because the

21  Magic Key program is ongoing, Disney is still blocking out dates for Dream Key passholders, and

22  Disney is still refusing to allow Dream Key passholders to make reservations on days when park

23  reservations are actually available.  The Court can, and should, order Disney to allow Dream Key

24  passholders to use their passes in a manner that is consistent with how they were advertised.  Such

25  a remedy would be the most efficient and effective way of stopping the harm caused by the unfair

26  and deceptive practices alleged in the First Amended Complaint.

27      Disney's arguments pursuant to *Sonner v. Premier Nutrition Corp.*, 971 F. 3d 834, 844 (9th

28

1   Cir. 2020) should not prevail because the FAC alleges ongoing harms caused by Disney's

2   practices for which equitable remedies are superior.  Damages in a case like this will be difficult to

3   calculate and subject to dispute.  An injunction which stops the ongoing harm would be far more

4   adequate.  Ms. Nielson acknowledges that the FAC does not recite the words "inadequate remedy

5   at law" but believes that, in context, she has made the requisite allegations.  If not, she should be

6   afforded an opportunity to amend her complaint to make the necessary allegations.  *Lisner v.*

7   *Sparc Group LLC,* 2021 WL 6284158 (C.D. Cal. December 29, 2021) (granting leave to amend to

8   allow Plaintiff to allege that damages may be an inadequate remedy at law); *cf. Sonner* at 971 F.

9   3d 834, 845 (denying leave to amend because the failure to allege damages was a strategic choice

10  made by plaintiff in that case on the eve of trial).[6]

11      Second, *Sonner* is distinguishable because it solely addressed requests for restitution.

12  Courts that have reckoned with its holding have been quick to allow CLRA, UCL, and FAL

13  claims to proceed when they seek damages as retroactive relief and equitable remedies for

14  prospective relief.  *See, e.g. Zeiger v. WellPet LLC,* 526 F. Supp. 3d 652, 687 (N. D. Cal. 2021)

15  ("Assuming that *Sonner* applies to injunctive relief, [plaintiff] has shown that monetary damages

16  for past harm are an inadequate remedy for the future harm that an injunction under California

17  consumer protection law is aimed at."); *see also Souter v. Edgewell Personal Care Company* 2022

18  WL 485000, *13 (S.D. Cal. February 16, 2022) ("The Court agrees with Plaintiff that *Sonner* is

19  inapplicable because it does not apply to claims of false advertising that may result in a future

20  harm, which Plaintiff is alleging here.").

21      In this case, Ms. Nielsen has alleged that Disney's business practices, and the harm caused

22  by its misleading statements, is ongoing because Dream Key passholders are still being blocked

23  from making available park reservations.  (FAC ¶ 20, 24, 26, 29, & 48.)  Equitable relief is,

24  therefore, appropriate and Ms. Nielsen's equitable claims need not be dismissed.  In addition,

25  assuming this matter is certified as a class action, the equitable relief available under the FAL and

26

27  ---
    [6]   Ms. Nielsen also seeks damages pursuant to the CLRA.  (FAC ¶ 50.)  Even if the
          statutory equitable claims are dismissed, her CLRA damages claims should
28        proceed.

UCL, such as the disgorgement of ill-gotten funds into a fluid recovery fund, is different and more comprehensive than legal damages. *Kraus v. Trinity Management Services, Inc.,* 23 Cal.4th 116 (2000). Ms. Nielsen should be afforded an opportunity to pursue such remedies as allowed by California law.

### 4.   Ms. Nielsen Has Standing To Pursue Prospective Relief

The Court should also reject Disney's argument that Ms. Nielsen lacks standing to pursue prospective relief. According to Disney, Ms. Nielsen lacks standing because the FAC is "devoid of allegations that Nielsen would purchase a Dream Key in the future if [Disney] offered them . . ." (MTD, p. 22.) Ms. Nielsen's claim for prospective relief, however, is not premised on whether she will purchase another Dream Key. Rather, Ms. Nielsen seeks prospective relief under the CLRA, the FAL, and the UCL so that the Court can provide a remedy for ongoing harm suffered by her and the proposed class. Specifically, the Court can and should enjoin Disney from continuing to refuse to allow Dream Key passholders to make reservations with their Dream Keys when park reservations are available. Ms. Nielsen, of course, continues to own her Dream Key (it is not transferrable) and continues to suffer the harm caused by Disney's deceptive practices. Ms. Nielsen, therefore, has standing to seek an equitable remedy to correct those deceptive practices.

### C.   Ms. Nielsen's Claims For Breach Of Contract Should Not Be Dismissed

Ms. Nielsen has also adequately plead a claim for breach of contract because she has alleged that she and her fellow Dream Key passholders entered into contracts with Disney when they purchased their Dream Key passes. FAC ¶¶ 73-79. In exchange for $1,399.00, Disney promised to provide Dream Key passholders with access to the Anaheim theme parks so long as the parks were not at capacity and so long as park reservations were available. FAC ¶ 74. Ms. Nielsen has alleged that Disney breached its agreements because it has not allowed her and others to make park reservations with their Dream Key passes even though (1) the parks were not at capacity and (2) park reservations were available and being advertised on Disney's website. (FAC ¶ 77.)

Disney nonetheless argues that it has not breached its agreements with Ms. Nielsen or

other putative class members because, according to Disney, "reservations for Nielsen's Dream Key pass *are* free from blockout dates." (MTD, p.5.) Each of Disney's breach of contracts arguments is addressed in turn.

**1.  The Court Should Reject Disney's Strained And Implausible Definition Of The Phrase "No Blockout Dates"**

The Court should reject Disney's claim that Ms. Nielsen has failed to state a claim for breach of contract because she has not alleged that Disney has imposed blockout dates on Dream Key passes.[7] (MTD p. 5.) The FAC, of course, contains a specific allegation that Disney has imposed blockout dates. Ms. Nielsen alleges as follows:

> . . . Ms. Nielsen and others were blocked out from using their Dream Key passes to make reservations even though Disney had park reservations available and made those reservations available to others.

FAC ¶ 21.

The foregoing allegation is obviously sufficient to support Ms. Nielsen's breach of contract claim. Disney attempts to avoid this outcome by asking the Court to adopt, as a matter of law, a definition of the phrase "no blockout dates" that would allow Disney to make otherwise available park reservations off limits to Dream Key passholders whenever it wants to do so. In other words, Disney is trying to win this case before it starts by positing an overly narrow, and patently unreasonable, definition of the phrase "no blockout dates."

Specifically, Disney asks the Court to find that the "plain meaning" of "the phrase 'no blockout dates'" is that a date is not "categorically inaccessible" to Dream Key passholders. The Court should reject Disney's proffered definition for several reasons.

First, there is nothing plain or meaningful about the phrase "categorically inaccessible." A consumer like Ms. Nielsen would have no way of knowing that, when Disney promised "no blockout dates," it really meant no dates that are "categorically inaccessible." This is especially

---

[7]  To be clear, the Court does not need to settle on the definition of "no blockout dates" at this stage of the litigation. It is enough for the Court to determine that Ms. Nielsen's claim that Disney promised park access when the parks were not at capacity and when park reservations are available and that Disney breached that promise by denying park access to Dream Key passholders even when such conditions are met is based on a plausible reading of the Parties' agreement. The jury can then decide whether Ms. Nielsen's reading of the Agreement is the correct one.

1   the case if "no blockout dates" is read in connection with the phrase "reservation-based admission

2   to one or both theme parks every day of the year."  The Advertisement and the Terms and

3   Conditions are, at best, ambiguous in their use of the phrases "no blockout dates," "park

4   reservations," and "subject to availability."  *See WYDA Associates v. Merner*, 42 Cal.App.4th

5   1702, 1710 (1996) (a contract is ambiguous when its terms are reasonably susceptible to more

6   than one meaning).

7        The Court should give Ms. Nielsen an opportunity to testify as to what she understood "no

8   blockout dates" to mean so that the Court—or the jury—can decide what the phrase meant in the

9   context of the Advertisement and the Terms & Conditions.  "Extrinsic evidence is admissible to

10  explain the meaning of a contract if 'the offered evidence is relevant to prove a meaning to which

11  the language of the instrument is reasonably susceptible.'" *DVD Copy Control Assn., Inc. v.*

12  *Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 711 (2009) *quoting Pac. Gas & Elec. Co. v. G. W.*

13  *Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (1968).  Extrinsic evidence includes testimony

14  as to the "circumstances surrounding the making of the agreement . . . including the object, nature

15  and subject matter of the writing . . . " *Universal Sales Corp. v. California Press Mfg. Co.*, 20

16  Cal.2d 751, 761 (1942).  Whatever Disney says, the Advertisement and the Terms and Conditions

17  are, at the very worst, susceptible to multiple meanings and the Court should hear the evidence.

18       Second, Disney's proffered definition that "no blockout dates" means "no categorically

19  inaccessible dates" should be rejected because it is implausible and makes no sense.  From its

20  brief, it appears that Disney is saying that, to be a blockout date, a date must be "absolutely"

21  unavailable or unavailable in an "unqualified" way.[8]  Dates that can either be available or

22  unavailable on Disney's whim are not, per Disney's technical and legalistic definition, blockout

23  dates.  Disney's argument is unreasonable.  One need only replace the phrase "no blockout dates"

24  in the Advertisement with the phrase "No Categorically Inaccessible Dates" to see the point.  If a

25  contracting party is promised "reservation-based admission to one or both theme parks every day

26  of the year" with "no blockout dates," she reasonably assumes that the parks will be accessible so

27

28  [8]   Websters defines the word "categorically" as meaning "absolutely, unqualified."

1   long as the parks are open, not at capacity, and reservations are available.  The same person

2   reading an advertisement that promises "reservations-based admission to one or both theme parks

3   every day of the year" with "no categorically inaccessible dates" would likely be confused beyond

4   all hope but, if not, would certainly conclude that the pass being offered was making no promises

5   regarding the availability of dates.

6        Accepting Disney's litigation-inspired definition of "no blockout dates" would completely

7   change the meaning of the Advertisement because it converts a promise of accessibility—"no

8   blockout dates"—into a warning that, while dates will not be "categorically" inaccessible, they

9   will be inaccessible in all sorts of other ways.  There is no actual distinction between a

10  "categorically inaccessible" date and a merely "inaccessible" date.

11       What is the point of telling Dream Key passholders that their passes are not subject to

12  blockout dates (twice) if that fact does not have any actual impact on their ability to enter the

13  theme parks?  The point, of course, is to sell Dream Keys.  It is cold comfort to learn you have not

14  been "categorically" excluded while you are being *actually* excluded.  It is unreasonable to

15  conclude that consumers such as Ms. Nielsen would pay $1,399.00 for a pass with "no blockout

16  dates" that nonetheless left Disney with plenary power to make otherwise available park

17  reservations unavailable to Dream Key passholders.  That is not the agreement that Dream Key

18  passholders reached with Disney when they handed over their credit card information and clicked

19  "purchase."

20       The proffered definition likewise does not make sense in the context of the other words

21  contained in the Advertisement.  As discussed, the Advertisement itself describes the limitations

22  on the phrase "no blockout dates."  The phrase is limited by (a) capacity and (b) availability of

23  park reservations.  If Disney wanted a definition of "no blockout dates" that excluded available

24  park reservations that Disney decides on a fluid and ongoing basis to make unavailable for its own

25  business reasons, then it should have included such a limitation in its Advertisement or in its

26  Terms and Conditions and it should not have told consumers that a Dream Key pass would

27  provide "reservations-based admission to one or both theme parks every day of the year."  Disney

28  should not now be allowed to invent new, but previously unstated qualifiers on the phrase "no

blockout dates" by simply proclaiming the "plain meaning" of the phrase contained in the Advertisement.  If "no block out dates" has any meaning at all, it means that Dream Key passholders would not be blocked from making a reservation when park reservations are available and the parks are not at capacity.

Third, the cases cited by Disney in support of its interpretation of the phrase "no blockout dates" do not support Disney's argument.  The cases, in fact, do not actually use or define the phrase "categorically inaccessible" or otherwise attempt to define "blockout date" as meaning "categorically inaccessible."  *See United States v. Fisher,* 137 F. 3d 1158, 1163 (9th Cir. 1998); *Morales v. Trans World Airlines*, 504 U.S. 374, 393 (1992); *In re Easysaver Rewards Litig.*, 906 F. 3d 747, 757 (9th Cir. 2018).  In fact, two of the three cases do not even mention the term "blockout."  The cases pertain to blocking out or blacking out days when scheduling a trial in federal court (*Fisher*), making travel days unavailable to participants in a reward program (*Morales*), and restricting the use of credits awarded as part of a class action settlement (*Easysaver*).  Read collectively, the cases make a series of glancing references to the idea that "blockout" and "blackout" dates refer to time periods when users cannot access services, credits, or rewards.  The cases in no way narrow or limit the phrase "no blockout dates" in the manner that Disney is asking the Court to do now and, of course, none of the cases addresses the actual words used in Disney's Advertisement or its Terms and Conditions.[9]

The Court should determine the meaning of "no blockout dates" in the context of the Advertisement in which it was used.  This means that the Advertisement and the Terms and Conditions must be read together and should be interpreted in such a manner as to give effect to all

---

[9]  In fact, the *Morales* case, if anything, supports Ms. Nielsen's argument that, by making otherwise available park reservations unavailable to Dream Key passholders, Disney has effectively blocked out Dream Key passholders from using their passes.  Although Morales certainly does not provide a definitive definition of either the term "blockout" or "blackout," the reward program policies quoted in the decision make it clear that use of the program is "blacked out" when otherwise available travel reservations are not available for use in the reward program.  In other words, reservations are available generally, but are blacked out for reward program participants.  That is exactly what Disney is doing:  It has park reservations available and is selling them to the general public.  It has, however, decided to block out Dream Key passholders from using their passes for those reservations on certain dates (*e.g.*, 17 days in November 2021 as alleged at FAC ¶¶ 17-18.)

1  of their provisions.  *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 872 (9th Cir.

2  1979) ("'It is beyond question that every provision of a contract should be examined to determine

3  the meaning and intention of the parties. . . . the meaning of words contained in a contract is to be

4  determined not from a consideration of the words alone but from a reading of the entire

5  contract.'")  Any ambiguities in the agreement must be resolved against the drafter. *See*, Cal Civ.

6  Code § 1654; *Victoria v. Superior Court*, 40 Cal.3d 734, 739 (1985) (ambiguous clauses are

7  interpreted against the drafter.)

8      Disney's arguments do not survive the required wholistic analysis.  The Advertisement

9  states twice, once in enlarged lettering, that the Dream Key passes would have "No Blockout

10  Dates."  It also says that Dream Key passholders will be entitled to "Reservation-based admission

11  to one or both theme parks every day of the year."  Any reasonable person about to become a

12  counter-party to a contract by spending $1,399.00 would conclude that "No Blockout Dates" was

13  a meaningful phrase that would have the effect of making a Dream Key passholder (the highest

14  priced Magic Key) *more likely* to gain access to the parks, especially when coupled with the

15  "every day of the year" language.  In Disney's world, however, the phrase is something of a trojan

16  horse that gives license to Disney to exclude passholders at will, so long as no date is

17  "categorically inaccessible."  The Court should reject Disney's attempt to spin the phrase "no

18  blackout dates" into a term that actually *limits* the usability of the Dream Key pass.

19      Such an interpretation of "no blockout dates" is all the more unreasonable given what

20  Disney *did not* say in the Advertisement or the Terms and Conditions.  In neither document did

21  Disney provide Ms. Nielsen or other consumers with an explanation that "No Blockout Dates"

22  meant only that no days would be "categorically inaccessible."  Disney never told Ms. Nielsen or

23  other purchasers that, even when park reservations were available generally, Disney planned to

24  make them "unavailable" to Dream Key passholders for any reason or no reason whenever it

25  wanted to do so.  The Court should not endorse Disney's request that it imply a key term into the

26  parties' agreement when Disney could have easily, and explicitly, included such a term in the

27  Advertisement and/or the Terms and Conditions.

28

**2.      The Court Should Disregard Disney's Arguments Regarding "Reservation Availability" Because They Ignore The Actual Allegations Of The Complaint**

The Court should also reject Disney's "subject to availability" arguments because, as explained, they ignore the actual allegations contained in the First Amended Complaint.  In its brief, Disney repeatedly points out that the Advertisement and the Terms and Conditions make it clear that "Dream Key reservations are subject to availability *and* capacity."  (MTD, p. 6, lines 10-11.)  Ms. Nielsen does not quarrel with such observations and, in fact, quotes them in her First Amended Complaint.  FAC ¶¶ 7 & 13.  It is true that park reservation availability constitutes a distinct limitation on the use of a Dream Key pass.

Disney, however, ignores, and is asking the Court to ignore, the fact that Dream Key passholders are denied access to the parks *even when park reservations are available*.  As alleged in the FAC, in October 2021, Disney had park reservations available for every day in November 2021, even though 17 days in November were blocked out for Dream Key passholders.  FAC ¶ 18.  To be clear, neither the Advertisement nor the Terms and Conditions qualifies or limits the term "park reservations" but instead Disney used that term deceptively to cheat consumers such as Ms. Nielsen.  The phrase appears in the Advertisement once and in the Terms and Conditions several times.

Ms. Nielsen understood and agreed that her Dream Key would be subject to availability.  She did not agree that her Dream Key pass could only be used for certain, limited reservations.  Ms. Nielsen and other Dream Key passholders were aware, and agreed, that if park reservations were not available generally, they would not be able to enter the parks.  They also knew that, at least for the other Magic Key holders, park reservations would be subject to blockout dates (which is why Ms. Nielsen and others decided to buy Dream Keys).  Ms. Nielsen and others also reasonably understood, however, that if park reservations were available, a Dream Key pass could be used to make a reservation.  Nowhere in the Terms and Conditions did Disney inform Ms. Nielsen that not all park reservations were the same and that Dream Key passes could only be used for a special subclass of park reservations.  Even if Disney always *meant* to treat park reservations for the general public and park reservations for Dream Key passes differently,

1    Ms. Nielsen and her fellow Dream Key passholders had no way of knowing it and never agreed to

2    such a thing.  Disney cannot point to anything in the Advertisement or the Terms and Conditions

3    which even suggests otherwise.

4            **3.      The Contract Interpretation Cases Cited By Disney Do Not Support**

5                    **Disney's Breach of Contract Argument**

6            Disney argues that the decision in *National Tax Institute v. Topnotch* should control the

7    Court's assessment of Ms. Nielsen's breach of contract claim because that court decided that the

8    phrase "subject to availability" was not intended by the parties in that case to entitle a hotel

9    customer unlimited access to a group rate for open hotel rooms.  *See National Tax Institute, Inc. v.*

10   *Topnotch at Stowe Resort & Spa,* 388 F. 3d 15 (1st Cir. 2004).  The *Topnotch* case does not control

11   this case for any number of reasons.  First, the agreement at issue in *Topnotch* was a commercial

12   agreement between sophisticated parties.  *See* 388 F. 3d at 19.  The court's decision and reasoning

13   should not apply in the context of a unilateral contract between one of the world's largest

14   entertainment companies and its individual consumers.

15           Second, the tax institute in *Topnotch* that argued for an advantageous interpretation of the

16   "subject to availability" language was the author of the amendment that contained the disputed

17   language.  The opposite situation is before the Court.  Disney wrote the contract and is now

18   arguing for an extremely strained and implausible reading of its terms.

19           Third, the context in *Topnotch* was critical to the court's decision.  There, the "subject to

20   availability" language evaluated by the court appeared in an amendment to a multiyear contract

21   where the parties had heavily negotiated how many hotel rooms would be available each year and

22   at what price.  The "subject to availability" language amounted to little more than a stray sentence,

23   devoid of meaning.  Given the circumstances, the court found it implausible that the Topnotch

24   hotel would agree to make all of its open rooms available at a discount to the tax institute.  The

25   court concluded, essentially, that the language was an unenforceable statement by the hotel that it

26   could add rooms to the deal if it chose to do so.  Here, the phrase is in the agreement itself (not an

27   amendment) and must be read in the context of the other words also contained in the agreement.

28           As the court in *Topnotch* put it "[a]greements, especially commercial arrangements, are

-21-

1    designed to make sense." *Id.* at 19.  It makes sense that a heavily negotiated discounted room rate

2    between commercial parties would not contain a ten-year room giveaway.  Similarly, it "makes

3    sense" that Disney would not sell passes to consumers and advertise them as having "no blockout

4    dates" if "no blockout dates" could actually endow Disney with the silent and unlimited right to

5    make reservations "unavailable" whenever it chooses to do so.  If Disney wanted to reserve the

6    right to make otherwise available reservations "unavailable" to passholders, it should have told

7    them that in the Advertisement or the Terms and Conditions.  It did not.

8          Fourth, the *Topnotch* court's discussion on blockout dates is revealing.  The court notes

9    that blockout dates can be used to limit a promise.  In other words, a seller of goods or services

10   promises to deliver those goods or services but limits their availability to certain days, times, or

11   situations by imposing blockout dates.  The court pointed out that the concept of blockout or

12   blockout dates is an economically reasonable way for a business to put reasonable limits on its

13   offerings.  Here, of course, Disney promised "*no* blockout dates."  It used the phrase to signal to

14   consumers that it was *not imposing* limits on Dream Key customers.  It was saying, in essence,

15   purchase this most expensive Magic Key because it has no—or at least very few—restrictions.

16   Specifically, the message was: "you can use this pass whenever we have park reservations

17   available and whenever the parks are not at capacity."  When read in the context of an

18   Advertisement promising "no blockout dates," the "park reservations subject to availability"

19   language is nothing more than a reminder that, when Disney is not offering any park reservations

20   to anyone on a particular day (either because the parks are closed, they are sold out, or normal

21   capacity is reduced for a special event or health concerns), a Dream Key pass cannot be used for

22   entry to the parks.

23         Finally, the *Topnotch* case was decided on summary judgment after the court evaluated

24   evidence of the parties' intentions at the time they entered into the contract.  The meaning of the

25   phrases "no blockout dates" and "park reservations subject to availability" is uncertain and

26   ambiguous.  As noted, California law requires that the parties be able to take discovery as to the

27   meaning of the terms and present that evidence to the jury so that it can interpret the agreement.

28         Disney's citation to *Scales v. Six Flags, Inc.* also helps Ms. Nielsen's cause.  2004 WL

-22-

1   1870499 (Ohio Ct. App. Aug 20, 2004).  In *Scales*, an Ohio appellate court rejected an amusement

2   park passholder's claim that an amusement park breached a promise to her when certain rides

3   were, in the passholders' opinion, "unavailable" due to long lines.  The Court noted that the terms

4   and conditions of the pass provided that "rides are subject to availability."  Based on the plain

5   meaning of the phrase "subject to availability," the court found that the rides in question were

6   equally available to passholders and other customers even if everyone had to wait a while to take

7   their turn.  Here, Disney is trying to avoid the plain meaning of the word "available" because, as

8   Ms. Nielsen alleges, Disney is making park reservations available to the general public but saying

9   those same reservations are "unavailable" to Dream Key passholders.  In other words, Dream

10   Keys are not subject to availability (the reservations are available!), they are subject to Disney

11   blocking out Dream Key passholders from available reservations.

12       Finally, Disney's citation to *Lowry v. Southwest Airlines, Co.* does not support Disney's

13   motion.  2015 WL 126569950 (C.D. Cal. Aug. 10, 2015).  In that case, the court determined on

14   summary judgment that Southwest Airlines did not promise the purchaser of an early check-in

15   option that she would have a higher priority than other passengers with status or that passengers

16   on the aircraft would be prohibited from saving seats.  The plaintiff in that case sought to imply

17   any number of promises into the terms of her early check-in option even though Southwest made

18   no such explicit promises.  As the court put it, the plaintiff in *Lowry* "impermissibly seeks to

19   'impose substantive duties or limits on the contracting parties beyond those incorporated in the

20   specific terms of their agreement."  *Id., quoting Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 349-350

21   (2000).  Here, Ms. Nielsen's breach of contract claim is based entirely on the words contained in

22   the Advertisement and Terms and Conditions.  As Ms. Nielsen has alleged, Disney explicitly

23   promised there would be "no blockout dates" and Disney imposed only the limitations of park

24   capacity and park reservation availability on its promise.  All Ms. Nielsen is trying to do is hold

25   Disney to its actual promises.

26       **4.     Ms. Nielsen's Breach of Covenant of Good Faith And Fair Dealing
             Allegations Should Not Be Dismissed**

27

28   The Court should also reject Disney's claim that Ms. Nielsen has not asserted any

-23-

1  "plausible breach of the covenant of good faith and fair dealing."  (MTD, p. 9.)  In California,

2  every contract contains an implied promise by the contracting parties that they will not do

3  anything that would injure the right of the other to receive the benefits of the agreement.

4  *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal. 3d 566, 573.  The implied covenant protects the

5  reasonable expectations of the contracting parties with respect to the terms of the contract.  An

6  implied covenant claim need not be brought as a separate cause of action.  *Digerati Holdings, LLC*

7  *v. Young Money Entertainment, LLC,* 194 Cal. App. 4th 873, 885 (2011) ("Although breach of the

8  implied covenant often is pleaded as a separate count, a breach of the implied covenant is

9  necessarily a breach of contract.")

10        Disney argues that the Court should dismiss Ms. Nielsen's implied covenant allegations

11  because the allegations "do not go beyond statement of a mere contract breach."  (MTD, p.9.)  Not

12  true.  Ms. Nielsen alleges that, if the Court accepts Disney's interpretation of the Parties'

13  agreement as investing Disney with the discretion to decide whether and when to make certain

14  otherwise available park reservations unavailable to Dream Key pass holders, then Disney has still

15  breached the agreement by exercising its discretion in bad faith.   In *Carma Developers (Cal.), Inc.*

16  *v. Marathon Development California, Inc.,* 2 Cal. 4th 342 (1992), the California Supreme Court

17  recognized that "[t]he covenant of good faith finds particular application in situations where one

18  party is invested with a discretionary power affecting the rights of another." *Id.* at 372. The court

19  expressed the view that "[s]uch power must be exercised in good faith." *Id.*  As Ms. Nielsen

20  alleges, even if the Parties gave Disney the discretion to convert available park reservations into

21  unavailable park reservations, Disney nonetheless had an obligation to exercise that discretion in

22  good faith but failed to do so.  FAC ¶ 78.  Ms. Nielsen should be afforded the opportunity to take

23  discovery regarding Disney's practice of making otherwise available park reservations unavailable

24  so that she can demonstrate that Disney has acted in bad faith.

25        **D.      Ms. Nielsen Does Not Oppose The Dismissal Of Her Fifth And Sixth Causes Of
              Action**

26

27        Ms. Nielsen does not oppose Disney's request that her fifth and sixth causes of action be

28  dismissed because she cannot allege injury distinct from the economic harm caused by Disney's

-24-

1  breach of its agreements with Ms. Nielsen and other Dream Key purchasers.

2  **IV.    CONCLUSION**

3       Based on the foregoing, Ms. Nielsen requests that the Court deny Disney's motion as to

4  her First, Second, Third, and Fourth causes of action.

5  Dated: March 14, 2022                    VENTURA HERSEY & MULLER LLP

6

7                              By:    /s/
                                     DANIEL J. MULLER
8                                    Attorneys for Plaintiff and the Proposed Class

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**