1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DAVID C. MARCUS (CA Bar No. 158704)
(Email: david.marcus@wilmerhale.com)
WILMER CUTLER PICKERING
        HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5312
Facsimile: (213) 443-5400

*Attorneys for Defendant*
*Walt Disney Parks and Resorts U.S., Inc.*

*(additional counsel listed below)*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENALE NIELSEN, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> WALT DISNEY PARKS AND RESORTS U.S., INC., a Florida Corporation, and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. 8:21-cv-02055-DOC-ADS <br><br> **DEFENDANT WALT DISNEY PARKS AND RESORTS U.S., INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |

## REDACTED VERSION OF DOCUMENT
## PROPOSED TO BE FILED UNDER SEAL

---

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

ALAN SCHOENFELD (*admitted pro hac vice*)
(Email: alan.schoenfeld@wilmerhale.com)
RYAN CHABOT (*admitted pro hac vice*)
(Email: ryan.chabot@wilmerhale.com)
WILMER CUTLER PICKERING
        HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 937-7294
Facsimile: (212) 230-8888

MARGARITA BOTERO (*admitted pro hac vice*)
(Email: margarita.botero@wilmerhale.com)
WILMER CUTLER PICKERING
        HALE AND DORR LLP
1225 Seventeenth Street, Suite 2600
Denver, CO 80202
Telephone: (720) 274-3130
Facsimile: (720) 274-3133

*Attorneys for Defendant*
*Walt Disney Parks and Resorts U.S., Inc.*

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

BACKGROUND ....................................................................................2

    A.    Creating The Magic Key Program .........................................2

    B.    Announcing The Magic Key Program ....................................3

    C.    The Four Tiers Of Magic Key Pass Go On Sale....................4

    D.    The Dream Key Experience ...................................................5

    E.    Magic Key 2.0 ........................................................................7

    F.    This Lawsuit ...........................................................................7

ARGUMENT ........................................................................................8

I.    Common Issues Do Not Predominate ...........................................8

    A.    The Express Contract Claim Requires Individualized Proof...............8

        1.  The contract's meaning turns on individualized extrinsic evidence 9

        2.  Breach is individualized under Nielsen's theory ...........................13

    B.    The Good Faith And Fair Dealing Claim Cannot Be Certified .........14

    C.    The CLRA Claim Requires Individualized Evidence........................15

        1.  Not all passholders saw the allegedly false statement ..................15

        2.  Common proof cannot show that all Dream Key purchasers
            misunderstood the actual attributes of the Dream Key.................16

        3.  Renewals into the Inspire Key undermine classwide reliance.......18

II.    Nielsen's Damages Model Fails *Comcast* ......................................18

    A.    Nielsen's Model Does Not Match Her Theory Of Liability ..............19

    B.    Nielsen's Damages Model Fails On Its Own Terms...........................21

III.    Nielsen Is An Inadequate Class Representative ...........................................24

CONCLUSION ....................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aronstein v. Massachusetts Mutual Life Insurance Co.*,
   15 F.4th 527 (1st Cir. 2021)...........................................................................10, 12

*Avritt v. Reliastar Life Insurance Co.*,
   615 F.3d 1023 (8th Cir. 2010) ................................................................................12

*Bruton v. Gerber Products Co.*,
   2018 WL 1009257 (N.D. Cal. Feb. 13, 2018) ......................................................24

*Comcast v. Behrend*,
   569 U.S. 27 (2013)...................................................................................................18

*Consolidate Fiberglass Production Co. v. Gemini Insurance Co.*,
   2011 WL 13180451 (S.D. Cal. Feb. 4, 2011) .......................................................15

*Cruson v. Jackson National Life Insurance Co.*,
   954 F.3d 240 (5th Cir. 2020) ....................................................................................9

*Eubank v. Pella Corp.*,
   753 F.3d 718 (7th Cir. 2014) ..................................................................................24

*Fletcher v. Security Pacific National Bank*,
   23 Cal. 3d 442 (1979) .............................................................................................11

*FTC v. Cardiff*,
   2020 WL 9936715 (C.D. Cal. Aug. 27, 2020) ......................................................15

*Gregurek v. United of Omaha Life Insurance Co.*,
   2009 WL 4723137 (C.D. Cal. Nov. 10, 2009) ......................................................12

*Grey Fox, LLC v. Plains All American Pipeline, L.P.*,
   2020 WL 1272613 (C.D. Cal. Jan. 28, 2020).........................................................9

*Hadley v. Kellogg Sales Co.*,
   324 F. Supp. 3d 1084 (N.D. Cal. 2018).................................................................21

*Hammes Co. Healthcare, LLC v. Tri-City Healthcare District*,
   801 F. Supp. 2d 1023 (S.D. Cal. 2011).................................................................13

ii

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

*Herskowitz v. Apple, Inc.*,
  301 F.R.D. 460 (N.D. Cal. 2014)................................................................14, 15

*Hiroshi (Genlin) Horiike v. Humane Society of U.S.*,
  770 F. App'x 405 (9th Cir. 2019) .........................................................13

*In re Ford Motor Co. Vehicle Paint Litigation*,
  182 F.R.D. 214 (E.D. La. 1998) ....................................................10, 18

*In re NJOY, Inc. Consumer Class Action Litigation*,
  120 F. Supp. 3d 1050 (C.D. Cal. 2015) ..............................................16

*Juarez v. Jani-King of California, Inc.*,
  273 F.R.D. 571 (N.D. Cal. 2011)........................................................15

*Kramer v. Wilson Sporting Goods, Co.*,
  2014 WL 12570919 (C.D. Cal. Mar. 21, 2014)...................................16

*Kulumani v. Blue Cross Blue Shield Ass'n*,
  224 F.3d 681 (7th Cir. 2000) ..............................................................23

*Lewis Jorge Construction Management, Inc. v. Pomona Unified School District*,
  34 Cal. 4th 960 (2004) .......................................................................19

*London v. Wal-Mart Stores, Inc.*,
  340 F.3d 1246 (11th Cir. 2003) ..........................................................25

*Lozada v. Advocate Health & Hospitals Corp.*,
  2018 IL App (1st) 180320-U ...............................................................19

*Marcus v. BMW of North America, LLC*,
  687 F.3d 583 (3d Cir. 2012) ....................................................16, 17, 18

*Martinez v. Welk Group, Inc.*,
  2012 WL 2888536 (S.D. Cal. July 13, 2012) .....................................14

*Mazza v. American Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ..............................................................15

*Mier v. CVS Pharmacy, Inc.*,
  2022 WL 1599633 (C.D. Cal. May 9, 2022).......................................23

iii

*Monaco v. Bear Stearns Cos.*,
  2012 WL 10006987 (C.D. Cal. Dec. 10, 2012)................................9, 12

*Nguyen v. Nissan North America, Inc.*,
  932 F.3d 811 (9th Cir. 2019) .....................................................19, 20

*Petrovic v. Amoco Oil Co.*,
  200 F.3d 1140 (8th Cir. 1999) ...........................................................24

*Pulaski & Middleman, LLC v. Google, Inc.*,
  802 F.3d 979 (9th Cir. 2015) ..............................................................19

*Sacred Heart Health Systems, Inc. v. Humana Military Healthcare
    Services, Inc.*,
  601 F.3d 1159 (11th Cir. 2010) ............................................................9

*Shaeffer v. Califia Farms, LLC*,
  44 Cal. App. 5th 1125 (2020) .............................................................18

*Shroder v. Suburban Coastal Corp.*,
  729 F.2d 1371 (11th Cir. 1984) ..........................................................25

*Singh v. Southland Stone, U.S.A.*,
  186 Cal. App. 4th 338 (2010) ...............................................................9

*Stratton v. American Medical Security, Inc.*,
  266 F.R.D. 340 (D. Ariz. 2009) ..........................................................15

*Turcios v. Carma Laboratories, Inc.*,
  296 F.R.D. 638 (C.D. Cal. 2014)....................................................16, 17

*United Teachers of Oakland v. Oakland Unified School District*,
  75 Cal. App. 3d 322 (1977) ................................................................10

*Vaquero v. Ashley Furniture Indus., Inc.*,
  824 F.3d 1150 (9th Cir. 2016) ............................................................22

*Weisberg v. Takeda Pharmaceuticals U.S.A., Inc.*,
  2018 WL 4043171 (C.D. Cal. Aug. 21, 2018) ......................................12

*William B. Logan & Assocs. v. Monogram Precision Indus., Inc.*,
  184 Cal. App. 2d 12 (1960) ................................................................12

iv

*Williams v. Apple, Inc.*,
 338 F.R.D. 629 (N.D. Cal. 2021).............................................................24

**Statutes & Codes**

Cal. Civ. Code § 3300.................................................................................20

Cal. Civ. Code § 3358.................................................................................20

v

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

**INTRODUCTION**

When Jenale Nielsen bought a Dream Key annual pass to the Disneyland Resort (DLR) theme parks, she became eligible to make reservations to visit every day of the year.  Reservations, Nielsen was informed, were subject to availability and not guaranteed for any date or pass.  Nielsen contends, however, that she understood her pass's terms and advertising to mean that Walt Disney Parks and Resorts U.S., Inc. (WDPR) could not allocate a separate inventory of reservations to annual passholders—that is, that her Dream Key pass gave her access to *every* reservation the Resort had.  On that basis, she brings claims for breach of contract and violation of the California Legal Remedies Act (CLRA).  Those claims are without merit but, in any event, they cannot be litigated as a class action.

For the contract claim, both the contract's meaning and the breach alleged turn on individualized proof.  The Court has already held that the meaning of the relevant contract terms is ambiguous.  As a result, this claim turns on extrinsic evidence of whether any individual Dream Key passholder expected a separate reservation inventory—which WDPR confirmed in widespread press reports, which DLR customer service confirmed when asked, and which is how both prior reservation-based DLR annual passes and Walt Disney World annual passes work.  Breach, for its part, turns on whether any individual Dream Key passholder was denied access to a reservation made available to someone else—a fact knowable only by individual testimony about whether, and when, someone wanted to make a reservation but could not (and why).  Common issues therefore do not predominate over individualized ones on Nielsen's contract claim, based on either the express contract terms or the implied covenant of good faith and fair dealing.

Her false advertising claim is equally unsuited to class treatment.  To begin, it fails the most basic requirement:  common proof that the whole class saw the sole alleged misrepresentation, "no blockout dates," which in fact only Dream Key

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

purchasers buying through the mobile app necessarily saw. Common proof also cannot show that all Dream Key purchasers misunderstood the actual attributes of the Dream Key—not when purchasers' understandings would have been individually informed by their knowledge of prior reservation-based passes, Walt Disney World annual passes, widespread press reports, customer service responses, and more. These issues preclude class certification of the CLRA claim.

Nielsen fails other requirements of class certification as well. She does not provide a damages model reliably computing class wide damages tied to her theory of liability; her model instead calculates restitution damages explicitly unavailable to her, and improperly calculates them to boot. And she cannot adequately represent a class in any event: she is the sister-in-law of the legal assistant at Ventura Hersey LLP, her putative class counsel, and their close but undisclosed personal and financial relationship creates a disqualifying conflict.

For all these reasons, her class certification motion should be denied.

## BACKGROUND

### A.   Creating The Magic Key Program

Since 1983, WDPR has sold annual passes to its California theme parks. Before the COVID-19 pandemic, WDPR offered several "Passports" that gave different levels of access to the parks. Some passes provided guests with access to the theme parks without advance reservations but with differing blockout dates, including a "Signature Plus" pass with no blockout dates. Another pass, the "Flex Pass," generally required visitors to make advance reservations from a distinct allocation of reservations; if allotted reservations ran out, Flex Pass holders could not visit with their passes even if they were not blocked out. Ex. 1.[1] The pre-pandemic annual pass program was very popular; indeed, some guests felt that the annual passes had led "to overcrowding, creating a lesser park experience for all."

---

[1] WDPR's Exhibits are attached to the Declaration of Alan Schoenfeld.

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

1  Ex. 2.  So when the Disneyland Resort closed during the pandemic, WDPR

2  sunsetted the existing annual passholder program to design something new.

3      WDPR designed a new annual pass program ██████████████

4  ████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████.

11      **B.     Announcing The Magic Key Program**

12      A new annual pass offering called the Magic Key program was announced

13 in August 2021.  In the Magic Key program, a reservation requirement—which

14 since May 2021 had applied to all Disneyland Resort visitors—would apply to

15 annual passholders too.  Guests with a Magic Key pass would obtain access to

16 reservation-based admission to the parks—that is, eligibility to make reservations

17 to the theme parks—without an additional fee.  They could hold reservations up to

18 90 days in advance, for one year from when their pass was activated by their first

19 visit using their pass.  Magic Key holders would access an allotted inventory of

20 reservations separate from the reservations available to regular-paid guests.  So, for

21 any given day, reservations for Magic Key holders might be available when

22 regular-paid reservations were sold out, or Magic Key reservations might be sold

23 out when regular-paid reservations were available.

24      The separate allocation of Magic Key reservations was a well-known feature

25 of the passes.  To the public, "spokesperson[s] for Disneyland confirmed that there

26 will be a separate set of reservations earmarked for Magic Key holders each day."

27 Ex. 5 (Aug. 5 *Marketwatch* article).  Multiple media outlets therefore reported that

28

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

"Magic Key holders will reserve dates from a separate theme park reservation inventory and access calendar than regular day visitors," Ex. 6 (Aug. 20 *Orange County Register* article); that "Magic Key passholders will be working off a separate inventory of theme park reservations from regular ticketholders," Ex. 7 (Aug. 9 *SYFY* article); and that "Magic Key holders will draw from a separate allocation of available reservations than Disneyland's day-ticket holders," Ex. 8 (Aug. 3 Theme Park Insider article); *see also* Ex. 9 (Aug. 3 *LA Times* article) (explaining WDPR would limit "how many reservations will be accepted"). Disneyland customer service similarly informed customers who asked that "Magic Key holders will have a separate inventory of theme park reservations from regular day guests."  Ex. 10.  The reservation-based Flex Pass operated the same way, as was widely noted.[2]  So did (and do) annual passes to Florida's Walt Disney World since it reopened under a reservation system in 2020, as was also widely reported.[3]

## C.    The Four Tiers Of Magic Key Pass Go On Sale

When the Magic Key program launched in August 2021, four tiers of Magic Key passes were offered: Dream, Believe, Enchant, and Imagine.  The Dream Key pass was eligible to make reservations every day of the year and hold up to six reservations at a time.  It provided free theme park parking,[4] and 20% off select merchandise and 15% off select food and beverage.  The Dream Key pass sold for $1,399.  The Believe Key pass could hold six reservations at a time and offered

---

[2] *See* Ex. 11 (noting "comparisons to the Anaheim theme park's former Flex Pass that foreshadowed the advance-reservation era that passholders are about to enter"); Ex. 12 (reproducing tweet that "If the Flex Pass worked for you (it did for me), this new program will too"); Ex. 13 ("[T]he program works a lot like one annual pass Disneyland introduced in 2019: the Disney Flex Passport.").

[3] *See* Ex. 7 ("Similar to Annual Passholders at Walt Disney World, MagicKey passholders will be working off a separate inventory of theme park reservations from regular ticketholders …."); Ex. 8 (noting Magic Keys separate allocation "much like annual passholders at the Walt Disney World resort do now").

[4] *See* Ex. 14 (parking cost $25 (10/2019-10/2021) or $30 (10/2021 to today)).

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

reservation-based admission most days of the year, excluding major holidays and some peak-season weekends, with 50% off parking, 10% off select merchandise, and 10% off select food and beverage; it sold for $949.  The Enchant Key pass could hold four reservations and offered reservation-based admission select days of the year, with 10% off select merchandise and food and beverage, and no parking benefit; it cost $649.  Finally, the Imagine Key pass, available only to Southern Californians, could hold up to two reservations for select days of the year and offered 10% off select merchandise and food and beverage but no parking benefit; it cost $399.  These Magic Key passes went on sale on August 25, 2021.

Passes were sold through the Disneyland website, the Disneyland mobile app, or main entrance ticket booths.  *See* Ex. 15.  Purchasers of the Dream Key through the mobile app purchase flow encountered the image that is attached to, and forms the basis for, Nielsen's complaint, stating that the Dream Key had "No Blockout Dates."  *Id.*  Website purchasers saw a different purchase flow, without that image.  *Id.*  Neither the website purchase flow nor any advertisement states "No Blockout Dates"; only the mobile app purchase flow contains that language.

WDPR allocated reservations to Magic Key passes as follows. ▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬

### D.    The Dream Key Experience

Many Dream Key holders were satisfied with the benefits their Dream Key pass offered, believing they received what they expected.  When asked what they liked most about their experience, for instance, Dream Key holders stated that they enjoyed "[h]aving ALL days available," "no black out dates," "very generous

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

discounts for food and merchandise," and "parking included with [their] pass." Ex. 17.  Many Dream Key holders reported satisfaction with the reservation system and their ability to visit the parks under it: for example, "I enjoy the reservation system and believe it's the best possible scenario for the parks," "I love how easy to is to get reservations," "I love the fact that I can go anytime I want with no blackout dates." *Id.* ████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████   Publicly, Dream Key holders made comments such as "I've gotten a reservation whenever I wanted one," the Dream Key "has allowed us to go every single day we've wanted to," and "I visit Disneyland EVERY WEEK with my Dream Key.  No issues."  *See* Exs. 19, 20.

As with any access program for an extremely popular destination with passionate guests like the Disneyland Resort, there are some periods of incredibly high demand, such as the holiday season from September to December.  As a September 27, 2021 report put it, while "making park reservations has been a mostly easy process," and "reservations help keep park attendance at a reasonable level," pre-purchase "reservations about reservations" of some passholders began to "materialize" around this time when weekends and holidays began "to book up further and further out."  Ex. 21.  In response, WDPR began making additional reservations available to Magic Key holders, and it stopped sales of Dream Keys in mid-October and Believe Keys in mid-November 2021.  Ex. 4 at 52-54, 173.

Ultimately, thousands of Dream Key passholders have visited the parks every day since August 2021, while individual Dream Key pass usage has varied

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

dramatically.  Some Dream Key passholders used their passes to book scores of reservations to the park; others hardly used their passes.  For instance, on each of the dates Nielsen claims she wanted to make reservations using her Dream Key but could not (November 3, 11, 12, and 18, 2021; December 13 and 29, 2021; and May 7 and 8, 2022, *see* Ex. 22), ███████████████████████████████████████

███████████████████████████████████.  *See* Ex. 23 ("Kirk Fair Report") ¶ 50.  This holds true for every visit date—for any date when some Dream Key passholders like Nielsen might have wanted to make reservations but couldn't, *thousands* of other Dream Key passholders could make reservations and did.  *Id.* ¶ 51. ████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████  *Id.* at nn.116-117.

### E.    Magic Key 2.0

For its second year beginning August 2022, WDPR revamped the Magic Key program to offer a new highest tier pass, the Inspire Key.  Dream Key passes were not offered.  Like the Dream Key pass, the Inspire Key pass could hold six reservations at a time—from a separate Magic Key reservation allocation—and offered free parking and 20% off select merchandise and 15% off select food and beverage.  Unlike the Dream Key pass, however, the Inspire Key did not offer reservation-based admission every day of the year, but instead was subject to certain blockout dates.  The Inspire Key pass sold for $1,599. ████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████  *See* Ex. 24.

### F.    This Lawsuit

Nielsen purchased a Dream Key pass on September 23, 2021.  On October 19, 2021, she claims she tried to make park reservations for November 2021.  She alleges that reservations were available to her for thirteen out of thirty days in

7

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

November, but that reservations were available to single-day ticket purchasers for all thirty days.  She claims that it contradicts the terms of her Dream Key pass and its advertising for WDPR to make any reservations available to regular-paid tickets but not to her.  SAC ¶¶ 18-19, 21.  She alleges that she understood the Dream Key "Advertisement—and the terms and conditions accompanying it—to mean that she could use her Dream Key to reserve a ticket to a park so long as the park was not at capacity and so long as park reservations were available."  SAC ¶ 21.

In denying WDPR's motion to dismiss in part, the Court permitted Nielsen's express contract claim to proceed because it concluded that she had alleged facts sufficient to show that the meaning of the terms and conditions governing the Dream Key pass—specifically the term "subject to availability"—was ambiguous. It permitted her CLRA claim for damages to proceed because it concluded that it was a factual question how a reasonable consumer would have understood the terms "no blockout dates" and "subject to availability."  It dismissed her other claims, including her contract claim based on the implied covenant of good faith and fair dealing, which Nielsen then realleged in a second amended complaint. Nielsen now seeks to certify a class of all Dream Key purchasers.

## ARGUMENT

### I.  Common Issues Do Not Predominate

Nielsen's class certification motion should be denied because it fails to show that common issues predominate on any cause of action.

#### A.  The Express Contract Claim Requires Individualized Proof

Nielsen's breach of contract claim predicated on alleged express contractual promises of "no blockout dates" and reservations "subject to availability" requires individualized proof as to the meaning of those contract terms and as to breach. That claim therefore cannot be certified as a class action.

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

**1.  The contract's meaning turns on individualized extrinsic evidence**

Nielsen's contract claim turns on the meaning of the Magic Key terms and conditions, namely "blockout dates" and "subject to availability."  Nielsen claims those terms mean that WDPR cannot separately allocate Magic Key reservations; WDPR disagrees.  The Court has held that Nielsen has alleged sufficient facts to show the contract terms are ambiguous.  ECF No. 35 at 4-6.  If a contract term is ambiguous, then "extrinsic evidence of the parties' intention is admissible" to determine its meaning.  *Singh v. Southland Stone, U.S.A.*, 186 Cal. App. 4th 338, 352 (2010).  "[C]ommon issues [do] not predominate" where "extrinsic and parol evidence concerning the intent of each of the members of the [class] is required to establish the meaning of the contract for each individual [class] member."  *Monaco v. Bear Stearns Cos.*, 2012 WL 10006987, at *6 (C.D. Cal. Dec. 10, 2012); *see also Grey Fox, LLC v. Plains All Am. Pipeline, L.P.*, 2020 WL 1272613, at *4 (C.D. Cal. Jan. 28, 2020) ("Courts often find certification inappropriate where individualized extrinsic evidence is relevant to a contract interpretation question.").

"Even the most common of contractual questions—those arising, for example, from the alleged breach of a form contract—do not guarantee predominance if individualized extrinsic evidence bears heavily on the interpretation of the class members' agreements."  *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1176-77 (11th Cir. 2010); *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 255 (5th Cir. 2020) (same); *Monaco*, 2012 WL 10006987, at *5-7 (denying class certification where "extrinsic evidence [was] needed to determine the intent of the putative [class] members" even though they had "the same Loan Documents and disclosures").  That is because the purpose of contract interpretation, of course, "is to give consumers the bargain they 'reasonably expected,' … not to allow consumers to obtain benefits they never expected by creative legerdemain"—so a "standardized agreement"

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

"cannot be reasonably construed to allow a host of customers to exploit a provision they fully understood."  *Aronstein v. Mass. Mut. Life Ins. Co.*, 15 F.4th 527, 535 (1st Cir. 2021) (affirming denial of class certification on this basis).

Individualized extrinsic evidence will play a key role in this case.  Nielsen herself has urged this Court to consider "[e]xtrinsic evidence includ[ing] testimony as to the 'circumstances surrounding the making of the agreement … including the object, nature and subject matter of the writing,'" and therefore to give her "an opportunity to testify as to what she understood 'no blockout dates' to mean." ECF No. 29 at 16.  If Nielsen's testimony is relevant to interpreting her contract with WDPR, as she said, then so is other Dream Key passholders' "testimony … as to [their] belief" about the meaning of ambiguous contract terms.  *United Teachers of Oakland v. Oakland Unified Sch. Dist.*, 75 Cal. App. 3d 322, 330 (1977).  In Nielsen's own words, "the Court should hear the evidence."  ECF No. 29 at 16.

That evidence would show many Dream Key passholders who properly understood the contract terms, or cannot credibly claim otherwise.  Imagine, for instance, a Dream Key passholder who, like Nielsen, claims she did not interpret her Dream Key pass's terms to permit a separate allocation of reservations—and would not have bought the pass if she had.  But at trial, she testifies that she saw the widespread press coverage of separate reservation allocations, from sources many Dream Key holders follow.[5]  She testifies she bought her Dream Key in mid-October and so saw reports about reservation availability beforehand.[6]  She testifies she called Disneyland customer service, who confirmed Magic Keys had

---

[5] *See* Ex. 17 (passholders report visiting media outlets for Magic Key information).
[6] *See In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 221 (E.D. La. 1998) (where an "issue attracted increasing media attention over the period covered by this case, to which at least some plaintiffs could have been exposed," such that "they were aware of potential problems and bought the [product] anyway," then "reliance is an individualized issue"); Ex. 25 (showing thousands of Dream Key holders bought their passes after late September 2021).

10

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

separate reservation allocations.[7]  She testifies she previously owned a Flex Pass and that she knew that it accessed a separate reservation allocation, as do Walt Disney World annual passes.[8]  She testifies she used her Dream Key to make dozens or even hundreds of reservations,[9] and she never attempted to book a visit on a day where reservations were available to regular-paid ticketholders but not to her.  She testifies that she renewed her Dream Key into an Inspire Key with access only to a separate allocation of reservations, but *with* blockout dates, and costing more.[10]  And indeed she admits that she said publicly that she understood her Dream Key benefits to permit separately allocated reservations—such as:

- "If a day is blocked out, no Magic Key holder is able to reserve it.  As long as some Key holders get reservations, the day isn't blocked out."

- "I'm a reasonable person and I read how the keys worked and knew that buying a Dream Key didn't mean I could go … whenever I wanted to."

- "[M]any of us figured out that Dream Key holders would sometimes not be able to go to the park when they wanted to and … bought one anyway."

- "There are NO blackout dates with the Dream Key.  Everyone has to make reservations.  Thousands have done it and enjoy the parks everyday."

- "Dream Keys are not blocked out.  Learn the definition of blocked out and the difference between blocked and full."

- "It's understandable that Magic Keys and regular tickets have a different

---

[7] *See Fletcher v. Sec. Pac. Nat'l Bank*, 23 Cal. 3d 442, 448-449 (1979) (because "defendant had freely explained its [alleged misrepresentation] when asked," "there was no ready method, other than examining each of the individual[s], to determine … who had valid contract claims"); Ex. 26 (documenting select instances when reservation inventory FAQ was used in response to guest inquiry).

[8] *See* Ex. 17 (███████████████████████████████████████████████████).

[9] *See* Kirk Fair Report ¶ 66 (████████████████████████████████████████ ██████████████████████████████████████████████████████████).

[10] Ex. 24 (█████████████████████████████████████).

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

1    pool of reservations."

2    • "[Reservations aren't blocked out, the reservations are all taken by fellow

3        pass members who want to have dibs to go as many days as possible."[11]

4    It is inconceivable that a jury would find WDPR liable to that Dream Key

5    passholder for breach of contract. *See, e.g.*, *Aronstein*, 15 F.4th at 535.

6        Not every Dream Key holder would give all those answers—Nielsen herself

7    would not—but that is exactly the point. Courts routinely deny class certification

8    where even one significant, individualized question is likely to bear on the

9    defendant's liability to each class member. Courts have, for instance, denied class

10   certification where the content of "individual sales presentations" was likely to

11   "impact … the interpretation of the contract language" for each member of the

12   proposed class. *Gregurek v. United of Omaha Life Ins. Co.*, 2009 WL 4723137, at

13   *7 (C.D. Cal. Nov. 10, 2009). Courts have denied certification where "marketing

14   materials" were relevant to a breach of contract claim, but "multiple versions" of

15   those materials existed. *Weisberg v. Takeda Pharms. U.S.A., Inc.*, 2018 WL

16   4043171, at *10 (C.D. Cal. Aug. 21, 2018). And courts have denied certification

17   where the defendant explained a form contract's ambiguous terms to some, but not

18   all, consumers. *See Monaco*, 2012 WL 10006987, at *6-7; *see also Avritt v.*

19   *Reliastar Life Ins. Co.*, 615 F.3d 1023, 1030 (8th Cir. 2010) ("liability to the entire

20   class for breach of contract cannot be stablished with common evidence" where the

21   defendant is "entitled to introduce evidence about how the contract was explained

22   in various sales discussion" and about "each purchaser's understanding of the

23   contract"). Where, as here, several such individualized issues are likely to play

24

25   ─────────────────────────────
     [11] *See* Ex. 19; Ex. 17 (Dream Key survey responses, also including ones

26   recognizing the "separate pools of reservations for key holders and ticket
     holders"); Ex. 27. *C.f. William B. Logan & Assocs. v. Monogram Precision Indus.,*

27   *Inc.*, 184 Cal. App. 2d 12, 16 (1960) (rejecting contract interpretation where a
     party's "own letter … contradict[ed] his alleged understanding").

28

12

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

1   significant—or even dispositive—roles in resolving class members' individual

2   contract claims, common questions do not predominate over individualized ones.

3       **2.    Breach is individualized under Nielsen's theory**

4       Even applying Nielsen's interpretation of the contract—that WDPR could

5   not deny her reservations available to others—proving breach would be

6   individualized.  For someone never denied a reservation they wanted, WDPR did

7   not breach even under Nielsen's view.  It does not matter that WDPR took a

8   different view of its contractual obligations at the point of sale if that differing

9   view never manifested itself.  A breach of contract does not occur in the abstract.

10  Say a real-estate developer contracts with a builder to build a new 5-house

11  neighborhood.  The builder, however, only has enough crews to build 4 houses, or

12  thinks that is all the contract requires.  If the developer only asks for 4 houses

13  (maybe having decided to subdivide the development into bigger lots), and the

14  builder builds them, then he has not breached the contract.  The developer got

15  every house he wanted.  There is no breach unless the developer asks for a fifth

16  house and the builder refuses.  Just so here:  Anyone who got every reservation

17  they wanted experienced no breach.  *See Hiroshi (Genlin) Horiike v. Humane*

18  *Soc'y of U.S.*, 770 F. App'x 405, 406 (9th Cir. 2019) (no breach where plaintiff

19  "sued before [defendant] was required to perform"); *Hammes Co. Healthcare, LLC*

20  *v. Tri-City Healthcare Dist.*, 801 F. Supp. 2d 1023, 1038 n.15 (S.D. Cal. 2011) (no

21  breach if defendant's obligations were never "trigger[ed]").

22      Proof of breach, then, requires evidence of whether someone ever wanted a

23  reservation but was denied, and why.  That proof is hyper individualized.  There is

24  no way to know whether a Dream Key passholder wanted to make any reservation

25  but could not, when regular-paid ticketholders could, but to ask every individual

26  passholder.  Dream Key holders have said publicly they did *not* have this

27  experience—that "I've gotten a reservation whenever I wanted one," the Dream

28

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

Key "has allowed us to go every single day we've wanted to," or "I visit Disneyland EVERY WEEK with my Dream Key. No issues." Ex. 19. There is no breach for those passholders, but no common way to identify them. Nielsen, on the other hand, has admitted that she "has not kept track" and "does not know all of the exact dates for which she attempted to make reservations," Ex. 22, teeing up individualized credibility issues for trial. Because only individual proof—asking passholders if they ever wanted to make reservations but could not, and evaluating the credibility of their responses—can prove breach under Nielsen's interpretation of the contract, this claim cannot be certified as a class action. *See Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 471 (N.D. Cal. 2014) (denying class certification where "[d]etermining the actions each customer took in the course of her transaction can only be established through individualized proof" and the "breach of contract claim hinges on a question that can be resolved only on an individual basis"); *Martinez v. Welk Grp., Inc.*, 2012 WL 2888536, at *4 (S.D. Cal. July 13, 2012) (denying class certification where "determining whether [Defendant] breached the contract requires individual inquiries" and because the plaintiff's damages "result[ed] from his unique" decisions in the context of the contract).

### B.      The Good Faith And Fair Dealing Claim Cannot Be Certified

The same issues preclude certification of the good faith and fair dealing claim. The Court dismissed Nielsen's good faith and fair dealing (GFFD) claim because it concluded that her "factual allegations show only that Disney was exercising its express rights under the agreement." ECF No. 35 at 6-7. Nielsen repleaded that claim with allegations that WDPR exercised its express right, if any, in bad faith. Resolving that claim therefore turns on determining what WDPR's express rights under the contract were, since "acts and conduct authorized by the express provisions of the contract" cannot give rise to an implied "covenant of good faith and fair dealing ... which forbids such acts and conduct." *Id.* at 7.

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

Determining WDPR's rights under the contract—the first step in the good faith and fair dealing analysis—turns on individualized extrinsic evidence for all the reasons above. "In California, courts look to 'the reasonable expectations of the parties' to determine what actions may be prohibited by the implied covenant of good faith and fair dealing." *FTC v. Cardiff*, 2020 WL 9936715, at *3 (C.D. Cal. Aug. 27, 2020). So class certification is equally inappropriate for this claim. *See Consolidate Fiberglass Prod. Co. v. Gemini Ins. Co.*, 2011 WL 13180451, at *4 (S.D. Cal. Feb. 4, 2011) (declining to certify GFFD claim because "[c]ommon issues of law and fact do not predominate for the same reasons they do not for the breach of contract claim"); *Herskowitz*, 301 F.R.D. at 473 (individualized issues predominated GFFD claim); *Juarez v. Jani-King of Cal., Inc.*, 273 F.R.D. 571, 583 (N.D. Cal. 2011) (declining to certify GFFD claim); *Stratton v. Am. Med. Sec., Inc.*, 266 F.R.D. 340, 353 (D. Ariz. 2009) (same).

### C.   The CLRA Claim Requires Individualized Evidence

#### 1.   Not all passholders saw the allegedly false statement

A false advertising class action can "include only members who were exposed to advertising that is alleged to be materially misleading" before their purchase. *Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 596 (9th Cir. 2012). The sole basis for Nielsen's CLRA claim is WDPR's "marketing and falsely representing Dream Keys as having 'no blockout dates.'" SAC ¶ 44; *see* Ex. 28 at 146:21-23 ("Q. So is there any other misrepresentation that you claim in this case besides no block out dates? A. No."). But the phrase "no blockout dates" appears only in the Dream Key purchase flow for the mobile app. Ex. 15 at 18-34. It does not appear on the website purchase flow (*id.* at 4-17) or on the only advertisement Nielsen cites (ECF No. 61-3). ██████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████ Nielsen herself bought her

15

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

1   pass on the website (Ex. 28 at 97:25), not the mobile app, and so did not see "no

2   blockout dates" before her purchase even though she claims she did.[12]  Nielsen

3   therefore does not demonstrate that all Dream Key purchasers saw the

4   representation "no blockout dates" before their purchases, as she must.[13]

5          Where "not all class members were likely exposed to the allegedly deceptive

6   information," courts deny class certification.  *Kramer v. Wilson Sporting Goods,*

7   *Co.*, 2014 WL 12570919, at *6 (C.D. Cal. Mar. 21, 2014); *see In re NJOY, Inc.*

8   *Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1110-11 (C.D. Cal. 2015)

9   (denying class certification where "it is likely that 'many class members were

10  never exposed to the allegedly misleading advertisements'").

11              **2.      Common proof cannot show that all Dream Key purchasers**

12                        **misunderstood the actual attributes of the Dream Key**

13         "What a consumer knew about [a product] prior to purchasing" it "is highly

14  relevant to whether that consumer can succeed on" a consumer protection claim.

15  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 607 (3d Cir. 2012).  Someone who

16  "understood the actual" attributes of a product was not misled by its advertisement.

17  *Turcios v. Carma Labs., Inc.*, 296 F.R.D. 638, 646 (C.D. Cal. 2014).

18         Here, individualized evidence would prove that (and which) Dream Key

19

20  ───────────────

21  [12] The metadata for the native file of the screenshot Nielsen attached to her
    complaint and produced at JN00677 shows that it was captured on October 19,
    2021, nearly a month after Nielsen purchased her Dream Key pass.  *See* Ex. 30.

22  [13] Nielsen incorrectly states that "Magic Key passes (including Dream Keys) were
    sold only on Disney's website," and that Dream Key advertisements "[e]ach

23  promised that Dream Keys would have 'No Blockout Dates.'"  Class Cert. Mem. at

24  4-5.  Besides the mobile app screenshot, the only document she cites for these
    errors are an advertisement that does not state "No Blockout Dates."  ECF No. 61-

25  3.  Otherwise, she cites only 30(b)(6) testimony that WDPR corrected through
    errata back in February 2023 to clarify that Dream Key passes were sold online

26  through the website and mobile app, with different purchase flows, which WDPR

27  supported with a declaration and exhibits that Nielsen disregards.  *See* Exs. 15, 31.

28
                                          16

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

1  holders understood how reservations would actually work.  *See supra* at 10-12.  To
2  summarize, it is inconceivable that a jury would find WDPR liable under the
3  CLRA to any passholder who "understood the actual" attributes of her Dream Key,
4  either because she had read press coverage where WDPR disclosed and confirmed
5  separate reservation allocations for Magic Keys, or received that information from
6  Disneyland customer service, or bought a pass at a time when reservation
7  availability was being widely discussed, or understood how Walt Disney World or
8  Flex Pass separate reservation allocations worked, or posted an understanding of
9  separate reservation allocations online (such as "Key Holders got exactly what they
10  were sold.  There are no blackout dates.  Key Holders are still in the park every
11  single day.  'All reservations are booked' is not the same as 'Keys are blacked
12  out.").  Ex. 19.  WDPR would offer that evidence at trial to show that Dream Key
13  passholders understood the actual attributes of the pass—or test the credibility of
14  anyone who, like Nielsen, claimed otherwise.

15      Where "some consumers were aware of" the actual facts, class certification
16  should be denied.  *Turcios*, 296 F.R.D. at 646 (declining to certify CLRA claim
17  where "some consumers were aware of the particular dimensions and designs of"
18  the product).  As the Third Circuit explains, "[T]he relevant issue is whether the
19  class members got less than they expected, but what a class member expected …
20  depends on what information, if any, about the alleged [issues] was available
21  during the class period and what that class member knew about it." *Marcus*, 687
22  F.3d at 607.  "If a consumer did know about the 'defects' but, despite that
23  knowledge, still decided to purchase … at the same price anyway," "then the
24  consumer would not have received something less than expected." *Id*.  If "this
25  could be true for a significant number of class members, then common questions of
26  fact will not predominate." *Id.* at 607-608.  Since "individual issues about what
27  each class member expected when purchasing" a Dream Key "would swamp the

28

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

inquiry," the CLRA claim is "inappropriate for class treatment." *Id.* at 608; *see Ford Motor Co.*, 182 F.R.D. at 221 (denying certification where some purchasers might have been "aware of potential problems and bought [the product] anyway").

### 3.     Renewals into the Inspire Key undermine classwide reliance

To prove a CLRA claim, any individual Dream Key passholder must demonstrate that she "'would not have bought the product but for' the allegedly actionable misrepresentation." *Shaeffer v. Califia Farms, LLC*, 44 Cal. App. 5th 1125, 1143 (2020). Any putative class member must contend, as Nielsen does, that she would not have bought the Dream Key but for the representation "no blockout dates," which Nielsen argues was false due to the separate inventory allocation.

In this case, that but-for world is not hypothetical. WDPR *did* sell a Magic Key pass with a known separate reservation allocation and with blockout dates—the Inspire Key. And ████ Dream Key passholders chose to buy it. *See* Ex. 24. Those Dream Key holders cannot credibly claim that they would not have bought a Dream Key with so-called blockout dates allegedly created by the separate reservation allocation when they *did* buy the Inspire Key with explicit blockout dates and a knowing separate reservation allocation, and for more money.

Since these Dream Key passholders cannot "truthfully allege"—let alone credibly prove—that they "'would not have bought the product but for' the allegedly actionable misrepresentation or omission," *Shaeffer*, 44 Cal. App. 5th at 1143, common proof cannot demonstrate that every Dream Key passholder relied on the alleged misrepresentation to make their purchase. The post-purchase conduct of ████ Dream Key passholders suggest that they did not. Nielsen's CLRA claim therefore cannot proceed classwide.

## II.   Nielsen's Damages Model Fails *Comcast*

Under *Comcast v. Behrend*, 569 U.S. 27, 35 (2013), Nielsen must offer a damages model that can reliably calculate the classwide damages that flow from

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

her theory of liability.  Nielsen's model fails in both ways.  It neither matches her theory of liability nor reliably calculates classwide damages.

### A.    Nielsen's Model Does Not Match Her Theory Of Liability

To certify a class, the Court must ensure that the plaintiff's "damages model flows from [her] theory of liability." *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 819 (9th Cir. 2019).  Nielsen's does not.

The Court's motion-to-dismiss decision carefully limited the theories of liability and remedy available to Nielsen.  Her only remaining theories of liability are breach of contract and violation of the CLRA.  Her only remaining remedy for either claim is damages, not retrospective equitable relief.  Specifically, Nielsen's "remedy at law through her breach of contract claim" barred any "retrospective equitable relief under the CLRA," thus Nielsen cannot obtain "restitution for money Disney received for sale of the Dream Key Pass."  ECF No. 35 at 9.

Nielsen's damages model disregards the Court's decision and measures restitution.  Her model subtracts the purported "actual value" of the Dream Key from what she spent to purchase it.  That is a measure of restitution:  "Restitution is 'the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received.'"  *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015).  Since the Court has expressly held that restitution is not an available remedy for Nielsen's claims, but that is what Nielsen's model measures, her model fails to match her theory of liability, as required by *Comcast*.

Nielsen calls her approach a calculation of "the benefit of the bargain," Class Cert. Mem. 20-22, but it is not.  Rather, "benefit of the bargain" or compensatory damages measure how much is required, following a breach, to put the plaintiff "'in as good a position as he or she would have occupied' if the defendant had not breached the contract." *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 967 (2004); *c.f. Lozada v. Advoc. Health & Hosps. Corp.*,

19

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

2018 IL App (1st) 180320-U, ¶ 32 ("[P]laintiffs' 'overpayment' theory of damages is not a cognizable measure of breach of contract damages …. The damages plaintiffs are seeking … are effectively a refund, and the remedy they seek is restitution."). That is not what Nielsen's model measures at all.

Nielsen cites no authority sanctioning her approach to calculating restitution and calling it "benefit of the bargain." She relies primarily on *Nguyen v. Nissan North America, Inc.*, 932 F.3d 811 (9th Cir. 2019), a case about a defective clutch in which the court approved a damages model that calculated the difference in value between the non-defective vehicles promised and the defective vehicles delivered, without regard to whether the defect had manifested for any individual purchaser. But *Nguyen* is not about measuring compensatory damages; it is a products liability case that concerns "a restitution calculation" explicitly unavailable to Nielsen. *Id.* at 820; *id.* at 820 n.6 ("the CLRA contemplates restitution"); *id.* at 821 (plaintiff seeks the amount "he purportedly overpaid").

Nor would it make sense to extend cases about measuring restitution for defective products—which are defective for everyone—to alleged breaches of contracts. Compensatory contract damages are limited to the "detriment proximately caused" by a "breach," Cal. Civ. Code § 3300, and "no person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides," *id.* § 3358. Someone never denied a reservation they wanted suffered no detriment from WDPR's alleged breach and would gain nothing more by the full performance allegedly required—they already made every reservation they wanted. So while everyone who received a defective product might warrant restitution, cases about such restitution say nothing about measuring compensatory contract-style damages.

It is not as though compensatory damages are not calculable here—Nielsen is not without a remedy. If WDPR had performed as Nielsen claims was required,

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

then Nielsen could have made reservations on each day she wanted but was denied: November 3, 11, 12, and 18, 2021; December 13 and 29, 2021; and May 7 and 8, 2022. To put her in as good a position but for the alleged breach, then, she would need to be paid an amount to compensate her for being denied reservations for those eight days. One measure would be the cost of a regular paid ticket for those dates—which Nielsen purchased as a substitute for some of them. If those tickets average around $200, Nielsen's damages are $1,600.

Why does Nielsen avoid that measure, then, since it amounts to more than her model measures per class member ($379.19) and indeed more than her pass cost? Because that measure of damages—the only one available to her—cannot possibly be measured classwide. It turns on the number of dates that Nielsen wanted to make reservations but was denied. That number is unknowable except by individual Dream Key passholders' testimony (and even then of questionable credibility). So Nielsen's damages model chooses to pursue a restitution measure amounting to less damages for some classmembers, contrary to their individual interests, because the alternative cannot possibly proceed as a class action. That alternative, however, is the only path available to her since the Court has held that restitution is not available. Her model therefore fails to measure damages flowing from her available theories of liability—the exact issue in *Comcast*—and class certification should be denied. *See, e.g.*, *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1114 (N.D. Cal. 2018) (damages model failed *Comcast* because it measured "nonrestitutionary disgorgement" when only "restitutionary disgorgement" was available under plaintiff's theory of liability).

## B.  Nielsen's Damages Model Fails On Its Own Terms

Nielsen's damages model, supported by the expert report of Robert Mills, also fails to actually calculate the difference in value it purports to measure. Its premise is that the Dream Key "is analogous to the Believe Key," the next-highest

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

tier pass, but with "free parking … and larger merchandise and food and beverage discounts"—so it subtracts from the Dream Key's $1,399 price the cost of the Believe Key ($949) and supposed value of Dream Key benefits ($79.81) to get uniform per-classmember damages of $379.19.  That measure if rife with errors.

*First*, Nielsen and her expert disregard meaningful benefits of the Dream Key over the Believe Key.  They dismiss the 48 additional dates when Dream Key holders but not Believe Key holders could make reservations.  That is 15% more dates, including the most valued weekends and holidays. ███████████████ ████████████████████████████████████.  *See* Kirk Fair Report ¶¶ 52, 63 & Figure 7.  Yet Nielsen and her expert ascribe $0 in value to access to those 48 additional, highly valued dates.  They also ignore the fact that the Dream Key offered the prestige of owning the highest-status membership at Disneyland; though Dream Key passholders valued that benefit greatly, Nielsen and her expert ascribe it too $0 in value.  *See id.* ¶ 30.[14]  Because Nielsen fails to account for other attributes contributing to the Dream Key's price premium over the Believe Key, she does not show that the price differential that she deems damages ($379.19 per class member) all "stemmed from the defendant's actions that created the legal liability," not unrelated sources of value.  *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1154 (9th Cir. 2016); *see also* Kirk Fair Report ¶¶ 18-31.

*Second*, Nielsen and her expert make several unjustifiable decisions in their measurement.  They wrongly rely on reservations "redeemed"—i.e., visits—not reservations made.  Nielsen's complaint is not that Dream Key holders could not

---

[14] *See also* Ex. 28 at 22:4-6, 26:11-14 ( "Disney enthusiasts" are "very loyal," "very committed to whatever [Disney] offers," and "willing to pay because they just love Disney" and "circle their life around" Disney); Ex. 17 (Many Dream Key holders reporting that what they like most about their experience is feeling special, loyal, and a part of the Disney family: "[b]eing part of a Disney family with total access," "[b]eing part of the Disney family," "feeling like I'm apart of the Disney family," "I also like to feel special," "[b]eing part of the loyal group").

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

redeem reservations, but that they could not make them in the first place.  Once made, a reservation could be redeemed or canceled at the passholder's option.  If any passholder did not redeem every reservation they made, it was their own choice.  So the value WDPR gave Dream Key passholders can only be measured by reservations made, not reservations redeemed—which metric Nielsen ignores. *See* Kirk Fair Report ¶ 66.  Additionally, Nielsen disguises the many Dream Key holders who used their passes to make dozens or even hundreds of reservations by misleadingly relying on *median* reservation redemptions, when the *mean* would "convey more information," including about "extremes" in the data set.[15] *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000).

*Third*, Nielsen and her expert make several outright errors.  For one, they conclude that Dream and Believe Key holders used their passes a similar number of times even though their own figures show Dream Key holders used their passes ██ more ████████████████████████████████████—basically citing proof that Dream Key holders went more often to conclude that Dream Key holders went the same amount.  *See* Kirk Fair Report ¶ 64.  For another, they address the "August 25, 2021 through August 24, 2022" time period even though Dream Keys' year of access began at first visit, not purchase—basically using part of a year to conclude how often Dream Key passholders visited per year.  *See id.* ¶ 65.  For another, Mills uses conjoint study "consumer willingness-to-pay" data to compute a "market price" for free parking and better discounts, a fundamentally different measure.  *Mier v. CVS Pharmacy, Inc.*, 2022 WL 1599633, at *4 (C.D. Cal. May 9, 2022); *see* Kirk Fair Report ¶¶ 71-73.  His use of WDPR's conjoint study also erroneously measures the value of Dream Key benefits *to Dream Key*

---

[15] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████.  *See* Kirk Fair Report nn.116-117.

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

*holders* with data from all survey participants—like measuring the value of a Lakers win to Lakers season ticketholders using survey data from all NBA fans.

Considering these flaws, Nielsen fails to carry her burden to model the damages "attributable to" WDPR's allegedly "misleading statements." *Bruton v. Gerber Prods. Co.*, 2018 WL 1009257, at *9 (N.D. Cal. Feb. 13, 2018).

## III. Nielsen Is An Inadequate Class Representative

Finally, Nielsen fails the threshold requirement of Rule 23(a)(4):  she is not an adequate class representative.  As relevant here, "a grave conflict of interest" presumptively preventing a named plaintiff from "adequately protect[ing] the interests of the class" arises when a putative class representative has an in-law relationship with class counsel. *Eubank v. Pella Corp.*, 753 F.3d 718, 724 (7th Cir. 2014) (reversing class settlement on this basis, among others).  Such "a close familial bond between a class counsel and a class representative" presents "a clear danger that the representative may have some interests in conflict with the best interests of the class as a whole when making decisions that could have an impact on attorney fees." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1155 (8th Cir. 1999) (affirming disqualification of class counsel on this basis).  That is because, simply put, "the larger the fee award to class counsel," "the better off [the named plaintiff's] … in-law would be financially." *Eubank*, 753 F.3d at 724.  Such a relationship renders a named plaintiff inadequate. *See Williams v. Apple, Inc.*, 338 F.R.D. 629, 647 (N.D. Cal. 2021) (named plaintiff was "inadequate class representative" because she was "the sister-in-law of class counsel").

That is the case here.  Nielsen's sister-in-law Erin Torino, who is married to Nielsen's brother Nathaniel, is the legal assistant of putative class counsel Ventura Hersey, a small law firm with only four partners.  Ex. 32.  Ms. Torino has played an active role in this litigation, serving discovery responses, signing certificates of service, and collecting documents from Nielsen. *See* Exs. 22, 33-35.  Indeed,

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

Nielsen's counsel asked that WDPR "include Erin Torino on any service."  Ex. 36. Nielsen has close personal ties to her brother and sister-in-law, giving expensive gifts, Ex. 28 at 29:24-25, and often traveling with them, including from San Jose to Disneyland and, indeed, flying to Florida to join them on their honeymoon at Walt Disney World.[16]  She also has close financial ties to them:  Nielsen's brother works for Nielsen and her husband, *see* Ex. 37, and Nielsen appears to regularly pay for her trips with her brother and Ms. Torino, *see* Exs. 38-41.

Such "significant personal and financial ties" create an "incentive for [a named plaintiff] to place the interests of [class counsel] above those of the class." *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 (11th Cir. 2003) (reversing class certification based on personal and business relationship).  They raise the risk that Nielsen would "be concerned not so much with other class members as [she] will be in pleasing" her close family member's employer, *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1375 (11th Cir. 1984)—for instance, by prioritizing even unconsciously a large attorney's fee award for the small firm employing her sister-in-law, thus making her sister-in-law's employment more stable and perhaps benefiting her financially directly (which is unknown, since this relationship was not disclosed).  Even though Ms. Torino "is not an attorney" at class counsel, the fact that she is "an employee of the law firm" seeking to represent the class means that she—and, by extension, her close family member Nielsen—has "a financial stake in the firm." *Id.*  Given this conflict, the Court should deny class certification for failure to satisfy Rule 23(a)(4)'s adequacy requirement.

### CONCLUSION

For these reasons, the Court should deny class certification.

---

[16] *See* The Torinos, YouTube, https://www.youtube.com/c/TheTorinos (including videos entitled "We Went To Disney World!"; "We Went To Disneyland's 'Merriest Nites'!"; "Erin's Birthday Bash At The Happiest Place On Earth!").

25

1

Dated:  May 31, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/ Alan Schoenfeld

Alan Schoenfeld

WILMER CUTLER PICKERING
HALE AND DORR LLP

*Attorneys for Defendant Walt Disney
Parks and Resorts U.S., Inc.*

**WDPR'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**
*Nielsen v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:21-cv-02055

## L.R. 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant Walt Disney Parks and Resorts U.S., Inc., certifies pursuant to L.R. 11-6.2 that this brief complies with Procedure No. 6 of the Honorable David O. Carter ("Length and format of motions"), which provides that "Memoranda of Points and Authorities are subject to a 25-page limit."

Dated: May 31, 2023

_/s/ Alan Schoenfeld_

Alan Schoenfeld

WILMER CUTLER PICKERING HALE AND DORR LLP

_Attorneys for Defendant Walt Disney Parks and Resorts U.S., Inc._