DANIEL J. MULLER, SBN 193396
*dmuller@venturahersey.com*
ANTHONY F. VENTURA, SBN 191107
*aventura@venturahersey.com*
VENTURA HERSEY & MULLER, LLP
1506 Hamilton Avenue
San Jose, California 95125
Telephone:  (408) 512-3022
Facsimile:  (408) 512-3023

Nickolas J. Hagman (*admitted pro hac vice*)
nhagman@@caffertyclobes.com
CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP
135 S. LaSalle St., Suite 3210
Chicago, Illinois 60603
Telephone:(312) 782-4880
Facsimile: (312) 782-4485

Attorneys for Plaintiff Jenale Nielsen &
the Proposed Class

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENALE NIELSEN, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>WALT DISNEY PARKS AND RESORTS U.S., Inc., a Florida Corporation, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.:  8:21-cv-02055-DOC-ADS<br><br>**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:  July 28, 2023<br>Time:  8:30 a.m.<br>Judge:  Hon. David O. Carter<br>Court:  9D |

**Table of Contents**

I.      INTRODUCTION ...........................................................................................1

II.     ARGUMENT ................................................................................................1

        A.      The Breach of Contract Claim does not Require Individualized
                Proof..................................................................................................1

                1.      The Meaning of the Contract Does not Turn on
                        Individualized Extrinsic Proof ..............................................1

                2.      The Evidence For Breach Of Contract Is Common To
                        All Class Members .................................................................6

        B.      The Breach of Good Faith Claim Should Be Certified.........................9

        C.      The CLRA Claim Does Not Require Individualized Proof....................9

                1.      Disney Published its Misrepresentations to All Dream
                        Key Purchasers ......................................................................9

                2.      Common Proof will Demonstrate that Dream Key
                        Purchasers were Misled by Disney's Statements...................14

                3.      Disney's Sales Of The Inspire Key In 2022 And 2023 Do
                        Not Defeat Class Certification ...............................................16

        D.      Damages Model Does Not Fail Comcast...............................................17

                1.      Plaintiff's Model Matches Her Theory of Liability................18

                2.      Evidence Supports Plaintiff's Damages Model .....................20

        E.      Plaintiff Is An Adequate Class Representative.....................................24

III.    CONCLUSION ............................................................................................25

**Table of Authorities**

<u>Cases</u>

*Aronstein v. Mass. Mut. Life Ins. Co.*, 15 F. 4th 527, 535 (1st Cir. 2021) ...................4

*Bruno v. Quten Research Inst. LLC,* 280 F.R.D. 524, 537 (C.D. Cal. 2011)............16

*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*,
    2 Cal.4th 342, 371 (1992)................................................................................9

*Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 376
    (N.D. Cal. 2010)..........................................................................................14

*City of Hope National Medical Center v. Genentech, Inc.*,
    43 Cal. 4th 375, 395 (2008)..........................................................................2

*Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 255 (5th Cir. 2020) .................4

*Elkies v. Johnson and Johnson Servs., Inc.*, 2018 WL 11223465, *9
    (C.D. Cal. Oct. 18, 2018)............................................................................21

*Eubank v. Pella Corp.,* 753 F.3d 718 (7th Cir. 2014) ...........................................25

*Feller v. Transamerica Life Ins. Co.*, 2017 WL 6496803, *11
    (C.D. Cal. Dec. 11, 2017)...............................................................................1

*Gregurek v. United of Omaha Life Ins. Co.*, 2009 WL 4723137, *7
    (C.D. Cal. Nov. 10, 2009)..............................................................................4

*Grey Fox, LLC v. Plains All Am. Pipeline, L.P.*, 2020 WL 1272613, *4
    (C.D. Cal. Jan. 28, 2020).................................................................................3

*Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc.*,
    397 F.3d 1217 (9th Cir. 2005).....................................................................11

*Hershkowitz v. Apple, Inc.*, 301 F.R.D. 460 (N.D. Cal. 2014) ................................8

*Hiroshi (Genlin) Horiike v. Humane Soc'y of U.S.,* 770 F. App'x 405, 406
    (9th Cir. 2019) ............................................................................................7

*In re Anthem, Inc. Data Breach Lit.*, 2016 WL 11299891
    (N.D. Cal., May 27, 2016)...........................................................................19

*In re Medical Capital Securities Litigation*, 2011 WL 5067208,*7
    (C.D. Cal. July 26, 2011).................................................................................3

*In Re Tobacco II Cases*, 46 Cal.4th 298, 324 (2009) .............................................16

*Kramer v. Wilson Sporting Goods Co.*, 2014 WL 12570919
    (C.D. Cal. Mar. 21, 2014)............................................................................13

*Lewis Jorge Constr. Mgmt. v. Pomona Unif. School Dist.*,
    34 Cal.4th 960, 978 (2004)..........................................................................20

*Lewis v. The CCPOA Benefit Trust Fund*, 2010 WL 3398521, at *3-4
(N.D. Cal. August 27, 2010) ................................................ 12

*London v. Wal-Mart Stores, Inc.*, 729 F. 2d 1371, 1375 (11th Cir. 1984) ............... 24

*Lozada v. Advoc. Health & Hosps. Corp.*, 2018 IL App (1st) 180320-U ................ 20

*Maldonado v. Apple*, 333 F.R.D. 175 (N.D. Cal. 2019) ................................ 7, 8, 20

*Martinez v. Welk Grp., Inc.*, 2012 WL 2888536 (S.D. Cal. July 13, 2012) ............... 8

*McGinity v. The Procter & Gamble Co.*, No. 22-15080 (June 9, 2023) .................. 14

*Menagerie Productions v. Citysearch,* 2009 WL 3770668, *1-2
(C.D. Cal. Nov. 9, 2009) ...................................................... 3

*Mier v. CVS Pharm., Inc.*, 2022 WL 1599633, *4 (C.D. Cal. May 9, 2022) ........... 24

*Monaco v. Bear Stearns Co.*, 2012 WL 10006987, *6 (C.D. Cal. Dec. 10, 2012) ..... 3

*Moore v. Centrelake Med. Grp., Inc.*, 83 Cal. App. 5th 515, 531 (2022) ........... 18, 20

*New West Charter Middle School v. Los Angeles Unified School Dist.*,
187 Cal.App.4th 831, 844 (2010) .......................................... 18

*Nguyen v. Nissan N.A., Inc.*, 932 F.3d 811, 820-22 (9th Cir. 2019) ...................... 20

*Petersen v. Costco Wholesale Co., Inc.,* 312 F.R.D. 565, 579 (C.D. Cal. 2016) ...... 16

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) .............................. 25

*Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015) ........ 19, 21

*Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*,
601 F.3d 1159, 1176-77 (11th Cir. 2010) ................................... 4

*Salehi v. Surfside III Condo. Owners Ass'n*,
200 Cal. App. 4th 1146, 1159 (2011) ...................................... 1

*Shaeffer v. Califa Farms, LLC,* 44 Cal. App. 5th 1125 (2020) ...................... 15

*Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1375 (11th Cir. 1984) ........... 25

*Siqueiros v. General Motors LLC*, 2023 WL 3919462, *34, n.28
(N.D. Cal. June 8, 2023) ...................................................... 22

*Svenson v. Google Inc.*, 2015 WL 1503429 *4 (N.D. Cal., Apr. 1, 2015) ........... 19

*Turcios v. Carma Labs, Inc.*, 296 F.R.D. 638 (C.D. Cal. 2014) ...................... 15

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1229 (9th Cir. 1996) .................. 16

*Weisberg v. Takeda Pharmaceuticals U.S.A., Inc.*, 2018 WL 4043171
(C.D. Cal. Aug. 21, 2018) ...................................................... 5

*Williams v. Apple* 338 F.R.D. 629, 652 (N.D. Cal. May 28, 2021) ................... 19, 25

-iii-

1

<u>Rules</u>

2

Federal Rule Of Civil Procedure 30 ........................................................................11

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

I.      **INTRODUCTION**

Plaintiff Jenale Nielsen ("Plaintiff") reiterates her request that the Court certify the proposed class because she has established all of the elements required for class certification. Disney's arguments are meritless and should be rejected.

II.     **ARGUMENT**

      A.      **The Breach of Contract Claim does not Require Individualized Proof**

            1.      **The Meaning of the Contract Does not Turn on Individualized Extrinsic Proof**

Disney argues that Plaintiff's breach of contract claim requires individualized proof. (*Opposition to Motion for Class Certification*, Dkt. 70 ("*Opp.*"), p.8). Disney is wrong. First, Disney has not identified any admissible individualized extrinsic evidence. Class members' subjective understandings of the agreements are neither relevant, nor admissible, with regard to the breach of contract claim. *See Salehi v. Surfside III Condo. Owners Ass'n*, 200 Cal. App. 4th 1146, 1159 (2011) ("evidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language."); *Feller v. Transamerica Life Ins. Co.*, 2017 WL 6496803, *11 (C.D. Cal. Dec. 11, 2017) (a standardized contract provision is interpreted "wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing").

The extrinsic evidence to be considered by the Court will be Disney's own statements in its advertising materials and its use of the phrases "blockout dates" and "park reservations." The Court will also rely on the following common evidence: the advertising on Disney's website, the fact that Disney was offering "park reservations" to customers generally, and the fact that Disney admits that it said nothing to purchasers to distinguish between different tiers of park reservations.[1] These

---

[1] Ex. 10, Williams Depo. 40:4-41:8; 50:9-22; Ex. 3, SAC, Ex. A; Ex. 25 WDPR-NIELSEN-00002727; Ex. 26, WDPR-NIELSEN-00002630; Ex. 27, WDPR-NIELSEN-00006664; Ex. 1, WDPR-NIELSEN-00006460. Exhibits 1 to 24 are cited

statements, facts, and circumstances will provide the relevant extrinsic evidence to determine the meaning of the contract terms. *City of Hope National Medical Center v. Genentech, Inc.*, 43 Cal. 4th 375, 395 (2008). This evidence is not individualized, but instead is common to the entire Class because all Dream Key purchasers went to the same website or mobile application, saw the same advertising, and purchased their Dream Keys at roughly the same time.[2]

In its Opposition, Disney cites an internal survey and suggests that some Class member read news articles about Dream Key passes and possessed different information than others who relied on only Disney's website. (*Opp.*, pp.10-11). The data relied upon by Disney, however, was collected *after* Disney had stopped selling Dream Key passes (██████████████████).[3] ████████████████

████████████████████████████████████████

████████████ *Id.* ████████████████████████

██████████████████████████████████████.[4] ██

██████████████████████████████████

Disney also argues that consumers who purchased Dream Keys in September and October 2021—before Dream Key sales were halted on October 25, 2021— possessed more information than earlier purchasers because the lack of reservation availability became generally known. (*Opp.*, p.10.) The timing of Dream Key pass purchases is irrelevant because Disney admits that it provided the *same* advertising and terms and conditions to Dream Key purchasers throughout the entire time that it sold the passes.[5] If Disney changed its advertising or modified the terms and

---

in the Hagman Declaration, ECF 61.2, Exhibits 25 to XX are cited in the Supplemental Declaration of Nickolas J. Hagman ("Suppl. Hagman Decl.").

[2] Ex. 10, Williams Depo. 17:7-14; 24:16-25:10; 51:10-53:2.

[3] *Schoenfeld Decl.* ¶ 18.

[4] *Id.*

[5] Ex. 10, Williams Depo. 24:25-25:15; 51:10-52:18; Ex. 28, Williams Depo. 42:9-25; 43:21-24.

1   conditions for Dream Keys, the extrinsic evidence would vary, but that is not the case.

2   Even if Disney could show some variance in the terms of its agreements with

3   Class members, such evidence would not defeat certification. *See In re Medical*

4   *Capital Securities Litigation*, 2011 WL 5067208,*7 (C.D. Cal. July 26, 2011) (finding

5   that certification was appropriate despite the fact that Class members entered into the

6   contracts at different times and signed agreements offering differing "rate plans and

7   usage patterns") (Carter, J.). Here, certification is appropriate because all Class

8   members entered into the *same* agreement, with the *same* terms and conditions, based

9   on the *same* representations, and the period of time for formation of the agreements

10  was within a short, two-month window.[6]

11  *Menagerie Productions v. Citysearch* is instructive. There, the court certified a

12  class of purchasers of "pay-per-click" advertising. 2009 WL 3770668, *1-2 (C.D. Cal.

13  Nov. 9, 2009). The plaintiffs alleged that Citysearch breached its contracts by

14  charging for fraudulent clicks. *Id.* Citysearch argued that the court would have to

15  undertake an individualized analysis of each class member's understanding of the

16  contract terms. *Id.* at *10. The court disagreed because all class members entered into

17  contracts with the same terms. *Id.* ("Extrinsic evidence that the Court would consider

18  in making this determination, such as representations on Citysearch's website, can be

19  established on a classwide basis."). The same is true here. The representations on

20  Disney's website and mobile application, and the terms and conditions agreed to by

21  all Dream Key purchasers, are common to the entire Class.

22  Disney's reliance on *Monaco v. Bear Stearns Co.*, 2012 WL 10006987, *6

23  (C.D. Cal. Dec. 10, 2012), and *Grey Fox, LLC v. Plains All Am. Pipeline, L.P.*, 2020

24  WL 1272613, *4 (C.D. Cal. Jan. 28, 2020), is misplaced. In *Monaco*, the court found

25  that variability regarding "the circumstances surrounding the formation of the

26

27  [6] Ex. 1, WDPR-NIELSEN-00006460; Ex. 16; Terms and Conditions; Ex. 10,
    Williams Depo. 17:7-14; 24:16-25:10; 51:10-53:2; Ex. 28, Williams Depo. 41:21-
28  43:24.

contract[s]" meant that the claims required individualized evidence. *Id.* In *Grey Fox*, the court noted that certification was inappropriate when *individual* extrinsic evidence is relevant to a contract interpretation question, but not when the extrinsic evidence is "standardized and uniform." *Id.* at *7. Here, every Dream Key purchaser agreed to the exact same terms and conditions.[7] All Class member purchased their passes directly from Disney[8] and all Class member were presented with the same advertising language.[9] The extrinsic evidence as to the meaning of those terms is common to all Class member because Disney made the same statements to each Class member.[10]

Other cases cited by Disney are likewise distinguishable. Class certification was denied in *Gregurek v. United of Omaha Life Ins. Co.*, 2009 WL 4723137, *7 (C.D. Cal. Nov. 10, 2009), because the defendant provided its customers with varying information about the insurance policies prior to the purchase of the policies. Here,

---

[7]  Ex. 28, Williams Depo. 42:9-25; 43:21-24.

[8]  Ex. 10, Williams Depo. 51:10-53:2.

[9]  Ex. 10, Williams Depo. 17:7-14; 24:16-25:10; 51:10-53:2.

[10]  Disney's out-of-circuit authority is no more helpful.  The court in *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1176-77 (11th Cir. 2010), held that "substantial variation found in the material terms" of contracts made class certification inappropriate.  Unlike in this case, class members there each had *different* contracts, rendering class treatment clearly improper. *Id.* In *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 255 (5th Cir. 2020), the court ordered a district court, on remand, to consider whether any state-law variations existed with regard to considering extrinsic evidence and, if so, to determine whether those variations defeated predominance.  Here, there are no state law variations and a single rule of extrinsic evidence will apply to the Court's analysis.  In *Aronstein v. Mass. Mut. Life Ins. Co.*, 15 F. 4th 527, 535 (1st Cir. 2021), the court declined to certify a class because the defendant orally clarified a contract provision to the *majority* of class members and explained to them what the term meant *before* they purchased the subject insurance product.  Disney is not claiming that it explained the terms of the Dream Key to *any* purchasers, much less the majority.  The standard terms applied to everyone and Disney did not clarify the meaning of "park reservations" to anyone. Ex. 10, Williams Depo. 27:10-28:18; Ex. 28, Williams Depo. 42:9-25; 43:21-24.

1   Disney provided the same information to all Dream Key purchasers.[11]

2   In *Weisberg v. Takeda Pharmaceuticals U.S.A., Inc.*, 2018 WL 4043171 (C.D.

3   Cal. Aug. 21, 2018), plaintiffs were unable to "point to [contract] terms that are

4   identical and were 'executed under like conditions' across the putative class." *Id.*

5   Here, everyone agreed to the same terms and conditions.[12]

6   Disney attempts to manufacture differing circumstances among the Class

7   members by conjuring an imaginary witness who would testify to various

8   individualized circumstances that could differ from Class member to Class member.

9   (*Opp.,* pp.10-11.) Notably, Disney's imaginary witness is not supported by *real*

10  evidence. Disney has not provided the Court with statements from Class members

11  who could testify that they experienced circumstances of purchase that were markedly

12  different from Plaintiff, or that Disney provided Class members different information

13  about the Dream Key passes. Disney's speculation is insufficient.[13]

14  The few instances where Disney cites specific evidence only serve to highlight

15  that common evidence predominates. For example, ███████████████████

16  ███ Dream Key purchasers previously owned a Disney "Flex Pass." According to

17  Disney, purchasers who previously owned a Flex Pass might have had an unexpressed

18  understanding of what Disney meant by "park reservations" that differed from the

19  understanding of non-Flex Pass purchasers because Flex Pass used a two-tier

20  reservation system. (*Opp.*, p.5). Such evidence is not admissible to resolve

21  ambiguities in the contract terms because it reveals, at most, the unexpressed,

22  subjective understanding of the terms. It also does not change the fact that Disney

23  admits that it did not reveal to *any* Dream Key purchasers (whether they owned a Flex

---

[11] Ex. 10, Williams Depo. 17:7-14; 24:16-25:10; 51:10-53:2; Ex. 28, Williams
Depo. 200:17-201:1.

[12] Ex. 28, Williams Depo. 42:9-25; 43:21-24; Ex. 16, Terms and Conditions.

[13] Whether some Dream Key passholders made twenty or more park reservations
has no bearing on the question of the parties' objective intent when they entered into
the contract.

Pass or not) that they would not be able to use Dream Key passes to make reservations when general park reservations were available. Even if Disney could show that ███ Class members correctly guessed how Disney would restrict reservations, common proof still predominates because ███ of the Class had no such knowledge.

### 2. The Evidence For Breach Of Contract Is Common To All Class Members

Disney next argues that there is no common evidence of breach because "anyone who got every reservation they wanted experienced no breach." (*Opp.*, p.13). Disney's argument misconstrues Plaintiff's breach of contract claim. This case is not about specific reservations on specific days. Rather, it is about the level of access Disney promised to Class members and its failure to provide access as promised. Plaintiff does not claim that Disney breached its promises every time a passholder could not make a reservation. Plaintiff understood and agreed that, on days when park reservations were not generally available, she would not be able to visit the parks. Rather, Plaintiff's claim is that Disney breached its agreements by refusing to make even generally available park reservations available to Dream Key passholders.[14]

The reservation system created by Disney required Class members to compete against one another—and other Magic Key passholders—for a limited set of reservations, even while park reservations were readily available on Disney's website.[15] Dream Key passholders paid more for their passes so that they would have access to available "park reservations." Given Disney's representations and the Terms and Conditions (or lack thereof), no Dream Key passholder expected to compete for limited Magic Key reservations.  The Court will not need to consider reservations made, or actual park visits, to determine whether there was a breach of contract. Instead, the jury will decide what access to reservations Disney promised, and what access it actually provided.  Since all Dream Key passholders received the same level

---

[14]  Ex. 3, SAC, ¶ 60.
[15]  Ex. 28, Williams Depo. 142:20-143:8.

1  of access, the evidence of breach will be common and Class-wide.

2  　　Disney's claim that individual evidence will be necessary to determine breach

3  is wrong given Plaintiff's actual claim.  *See, e.g., Hiroshi (Genlin) Horiike v. Humane*

4  *Soc'y of U.S.,* 770 F. App'x 405, 406 (9th Cir. 2019). It does not matter whether and

5  why particular Class members could not make specific reservations. What matters is

6  that *all* Class members were subject to the same reservation system and *all* Class

7  members were prohibited from making reservations even though park reservations

8  were generally available.

9  　　Judge Orrick considered a similar situation in *Maldonado v. Apple*, 333 F.R.D.

10  175 (N.D. Cal. 2019). In that case, plaintiffs alleged that Apple failed to honor its

11  promise to provide replacement iPhones with devices that were new or like new. *Id.*

12  at 180-82. Predictably, Apple argued that individualized questions would

13  predominate because each customer received a different replacement phone and the

14  court would have to review which components of each device had a unique mix of

15  new and old parts. *Id.* at 190. The court rejected Apple's argument because it

16  misconstrued Plaintiff's liability theory. *Id.* at 191-92. The plaintiffs were not

17  asserting that some phones were "like new" and others were not, which arguably

18  would have required individualized trials on liability. *Id.* Rather, plaintiffs argued that

19  replacement phones *could never be* "like new" because *any* refurbished phone was

20  necessarily not "like new" if it had any reused parts. *Id.* If plaintiffs were correct,

21  individualized proof was not required because all customers who received refurbished

22  replacement devices suffered the same breach. *Id.* Similarly, in this case, Plaintiff

23  claims that Disney breached its promises to all Dream Key passholders because it

24  provided them with a different level of access to park reservations than it had

25  promised. Since all Dream Key passholders were subjected to the same reservation

26  system and resulting breach, proof of breach will be common to the entire Class.

27  　　Disney, of course, is free to argue that the level of access it provided to Dream

28  Key holders did not breach the agreements, just as Apple was free to argue that "like

new" iPhones really were equivalent to new devices. *Maldonado*, 333 F.R.D. at 191. Those arguments, however, are merits-based arguments for trial. *Id.* At this stage, the question is not whether Plaintiff will prevail, but instead whether her claim is susceptible to common, class-wide proof—which it clearly is.

Disney also argues that Plaintiff's breach of contract claim requires "asking passholders if they ever wanted to make reservations but could not, and evaluating the credibility of their responses." (*Opp.*, p.14.)  Not so.  The question is whether passholders received the level of access they were promised.  Disney's reliance on *Hershkowitz v. Apple, Inc.*, 301 F.R.D. 460 (N.D. Cal. 2014) is misplaced.  There, the court ruled that common issues did not predominate because "the critical question of assent or non-assent turns on an individual inquiry for each customer."  *Id.* at 471. The issue was whether the class members actually intended to purchase two copies of the same item from Apple's App Store. *Id.* If they did, there was no breach.  Here, the breach will be for all Class members, or none, because each Class member agreed to Disney's uniform Terms and Conditions. If the level of access provided by Disney breached those Terms and Conditions, the same breach occurred as to all Class members. Individual reservation activity by Dream Key purchasers is not relevant.[16]

Proof in this case also does not turn on the "unique decisions" of Class members. (*See Opp*., p.14 (citing *Martinez v. Welk Grp., Inc.*, 2012 WL 2888536 (S.D. Cal. July 13, 2012)). In *Martinez*, plaintiff unilaterally decided not to use timeshare points believing that the timeshare property was contaminated with mold. *Id.* at *1. The plaintiff elected not to use the points, but provided no evidence other class members made similar choices. *Id.* at *4. Here, in contrast, liability turns on whether Disney failed to provide *all* Dream Key passholders with the promised level of reservation access.  Disney, of course, provides no evidence to establish that it employed different reservation systems for different Dream Key passholders.

---

[16]  *See also* Ex. 6, Declaration of Robert J. Mills, ("Mills Decl."), ¶¶ 25-37.

1   Everyone was subject to the same system.

2       **B.**    **The Breach of Good Faith Claim Should Be Certified**

3         Plaintiff's breach of the covenant of good faith and fair dealing claim should

4   also be certified. Disney claims that it has the contractual right to decide whether, and

5   when, to make park reservations "available" to Dream Key purchasers.[17] Whether and

6   to what extent Disney exercised its asserted contractual right to decide reservation

7   availability in good faith is common to all putative Class members because all Class

8   members were subject to the same reservation system and Disney's manipulation of

9   that system.[18] Disney provided access to reservations in precisely the same way to all

10  Dream Key purchasers and it does not claim otherwise. Disney's bad faith conduct in

11  allocating reservations was uniform as to all Dream Key purchasers.

12      **C.**    **The CLRA Claim Does Not Require Individualized Proof**

13          **1.**    **Disney Published its Misrepresentations to All Dream Key Purchasers**

14

15        Disney argues that the CLRA claim cannot be certified because not all Dream

16  Key passholders saw the false statements that Plaintiff attached to the SAC. (*Opp.*,

17  p.15). Disney even suggests that Plaintiff herself did not see the "no blockout"

18  language. (*Opp.*, p.16).  Disney's arguments are unsupported by the record.

19        Plaintiff testified unequivocally at her deposition that she reviewed and relied

20  upon advertising from Disney, including the advertisement attached to the SAC,

21  which stated that a Dream Key pass would not be subject to blockout dates.[19] Plaintiff

22

23  [17]  Plaintiff, of course, contends otherwise.  If, however, Disney convinces the Court

24  that it had such a right under the contract, then it would be required to exercise that
    right in good faith.  *See, e.g., Carma Developers (Cal.), Inc. v. Marathon*

25  *Development California, Inc.*, 2 Cal.4th 342, 371 (1992).

26  [18]  Ex. 28, Williams Depo. 142:20-143:8.
    [19]  *See* Ex. 29, Nielsen Depo. 89:21-90:7; 92:10-93:18; 94:5-17.  Disney points out

27  that the *printout* of the advertisement was made later, after Plaintiff experienced

28  Disney's reservations system and learned that it was not as advertised.  The timing

also testified that she read Disney's Terms and Conditions prior to purchase and, based on her reading of the advertisements and the Terms and Conditions, believed that her Dream Key pass would allow her to make a reservation for the parks whenever "park reservations" were available.[20]

Disney now claims that Plaintiff and other proposed Class members did not see Disney's "no blockout" advertising. Disney's argument is contradicted directly by the deposition testimony of its Rule 30(b)(6) witness, Stephen Williams. As Disney's 30(b)(6) witness, Mr. Williams was designated by Disney to testify on its behalf "about information known or reasonably available to the organization" on the topic of "[a]dvertisements published by Disney relating to the sale of Dream Key passes."[21] During his deposition, Mr. Williams was provided with a copy of the advertisement that is attached to the SAC and testified ███████████████████████████ ██████████████████████████████████████████.[22] Later, Mr. Williams again confirmed that the advertisement ████████████████████████████ ███████████████████████████████"[23]

Disney, however, now claims that the advertisement was not on its website. In his *Errata*, Mr. Williams tries to delete the testimony in which he admitted that ██ ████████████████████████████████████████████████████████████████

---

of when Plaintiff preserved evidence does not mean, as Disney asserts, that she did not see the advertisement until after her purchase.

[20]   *See* Ex. 29, Nielsen Depo. 106:1-107:8; 108:8-109:21; 113:16-114:1. Disney also claims that the "sole basis" for Ms. Neilsen's CLRA claim is "no blockout dates" misrepresentation.  (*Opp.*, p.15). That is wrong. The SAC explains in detail that Disney made misrepresentations regarding whether Dream Key passholders would be eligible to make reservations whenever "park reservations" are available. (*See, e.g.,* Ex. 3, SAC, ¶¶ 13, 44, 60.) At her deposition, Plaintiff testified: "they gave me a promise of being able to go whenever I wanted to. That's how it was advertised to me. And I don't feel like it actually was correct -- correctly advertised. There was a lot more restrictions than I thought." Ex. 29, Nielsen Depo. 146:7-11.

[21]   *See* Ex. 30, Deposition Notice To Disney, Topic No. 3.

[22]   Ex. 10, Williams Depo 24:25-25:15.

[23]   Ex. 10, Williams Depo. 64:19-20; *see also* Ex. 28, Williams Depo. 36:15-20.

-10-

█████████████████████.[24] Mr. Williams, though, leaves unchanged his testimony that words like those found in Exhibit A to the SAC appeared ██████████████████ █████████████████████████[25] Even if one considers *only* Mr. Williams unchanged testimony, Disney admitted that the advertising copy touting "no blockout dates" and the ability to make reservations "every day of the year" ██████████ ████████████████████████████████████████████████████████[26] Given the undisputed testimony of *its own* witness, Disney cannot credibly deny that *all* Dream Key consumers were exposed to the "no blockout date" promise.

In any case, Mr. Williams' "corrections" to his testimony should be disregarded. Mr. Williams' changes to his testimony were not made under oath.[27] Although Plaintiff granted courtesy extensions of time to allow for changes, she had no idea that the changes would directly contradict the substance of Mr. Williams' prior sworn testimony.[28]

The Court properly can, and should, disregard Disney's attempt to contradict the prior testimony of its Rule 30(b)(6) witness. *See Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc.*, 397 F.3d 1217 (9th Cir. 2005) (Rule 30(e) "cannot be interpreted to allow one to alter what was said under oath."). This is particularly true for a 30(b)(6) witness who was notified of the deposition topics well in advance and had a responsibility to prepare to testify as Disney's designee. *See Lewis v. The*

_____

[24] *See Schoenfeld Decl.*, Ex. 15.  Specifically, Mr. Williams seeks to change his ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████.

[25] Ex. 10, Williams' Depo. 25:5.

[26] Ex. 10, Williams Depo. 25:3-15; Ex. 28, Williams Depo. 36:15-20.

[27] *Schoenfeld Decl.*, Ex. 31.

[28] Mr. Williams attempts to change a simple "yes" response to a "no," while leaving other testimony which supports the "yes" answer unchanged and unexplained.  *See* Williams Depo. 64:19-20.  Mr. Williams' stated reason for the change is "Accuracy, after further investigation."

-11-

*CCPOA Benefit Trust Fund*, 2010 WL 3398521, at *3-4 (N.D. Cal. August 27, 2010) (changes that contradict prior testimony should be disregarded; "that a deposition should not be treated as a take home exam is particularly true here, where the deponent is not an unsophisticated witness but rather a 30(b)(6) designee").

In addition, at his deposition, Mr. Williams authenticated other advertisements published on Disney's website which informed Dream Key purchasers that their passes would not be subject to blockout dates. Specifically, he confirmed that Disney prepared, distributed, and made available on its website a document which provided details for each Magic Key pass.[29] That document informed potential Dream Key purchasers that Dream Key passes would not have blockout dates. Disney also provided potential Magic Key purchasers with a Magic Key block out calendar indicating the days that Believe Keys, Enchant Keys, and Imagine Keys would be blocked out. For Dream Keys, there are no block out dates indicated and, instead, Disney advised that Dream Key Pass holders can "Enjoy the Disneyland Resort everyday of the year!"[30] It is clear that Disney repeatedly told potential Dream Key purchasers that their passes would not be subject to blockout dates.

Disney's website purchase flow documents change nothing.[31] The website "purchase flow" document ███████████████████████████. For three of the Magic Keys, potential purchasers were told "blockout dates apply." The "blockout dates apply" statement, however, does *not* appear on the description of the Dream Key pass.[32] Any reasonable person considering purchasing a Dream Key pass would conclude that Dream Key passes had no blockout dates, especially because the advertisement expressly states that Dream Key purchasers would be able to make a

---

[29] Ex. 28, Williams Depo. 200:10-201:4 (discussing WDPR-NIELSEN-00002628-2630); Ex. 26, WDPR-NIELSEN-00002628-2630.

[30] Ex. 28, Williams Depo. 198:3-199:19 (quoting WDPR-NIELSEN-00002727); Ex. 25, WDPR-NIELSEN-00002727.

[31] *Nguyen Decl.,* ¶ 6, Ex. A., attached to *Schoenfeld Decl.* as Ex. 15.

[32] *Id.*

reservation to visit the parks "every day of the year" so long as Disney was offering "park reservations."[33]  Moreover, the website purchase flow documents were created on ███████████████████████████████████████████████ ████████████████████  The printout provides no evidence regarding what Dream Key purchasers saw on Disney's website in August, September, or October 2021, when Disney was selling the passes.

Critically, Disney also admits that it never told Dream Key purchasers what it meant by "park reservations" or "subject to availability."[34]  All purchasers agreed to the same Terms and Conditions, which provided that Dream Key holders could make "park reservations" when they were available.  Disney admits that it did not inform Dream Key purchasers of the separate types of reservations: one "inventory" of reservations for guests who purchase regular price tickets and a separate "inventory" for Magic Key purchasers.[35]  Disney admits that Dream Key purchasers would have learned about the two-tiered reservation system only if they inquired or complained.[36]  These facts independently justify certification of the CLRA claim.

Given the actual evidence, Disney's reliance on *Kramer v. Wilson Sporting Goods Co.*, 2014 WL 12570919 (C.D. Cal. Mar. 21, 2014), is unhelpful.  There, the court declined to certify a CLRA claim because defendant had "conducted a limited and small-scale advertising campaign involving" the sale of a particular model of tennis racquet.  *Id.* at *5.  The plaintiff admitted that he could not remember seeing the advertisement and there was no evidence he was exposed to it.  *Id.*  Here, Disney *admits* that ██████████████████████████████████████████ ███████████████████████████████████.[37]  Disney likewise admits that the

---

[33] *Nguyen Decl.,* ¶ 6, Ex. A., p.2.
[34] Ex. 10, Williams Depo. 37:10-16; 45:2-9.
[35] Ex. 28, Williams Depo. 36:2-13; 46:6-16; Ex. 10, Williams Depo. 50:9-22; 35:6-11.
[36] Ex. 28, Williams Depo. 47:18-48:11.
[37] Ex. 10, Williams Depo. 51:10-52:18.

advertisement (or substantially similar words) were on both Disney's webpage and its app for all purchasers to see.[38]  In addition, Disney concedes that it told all Class members that they would be able to use a Dream Key pass to make reservations whenever "park reservations" were available.[39]  Since all purchasers were exposed to the same misleading statements, reliance can be properly inferred for the entire Class. *See Chavez v. Blue Sky Natural Beverage Co.,* 268 F.R.D. 365, 376 (N.D. Cal. 2010).

### 2.   Common Proof will Demonstrate that Dream Key Purchasers were Misled by Disney's Statements

Next, Disney repeats its argument that, despite the misleading advertising, some Dream Key purchasers "knew how the reservations would actually work" because they could have read press articles from publications such as *Marketwatch*. (*Opp.*, pp.16-17.) In other words, Disney argues that *the misrepresentations and misleading statements* published on *its own website and app* were nullified because some Class members may have read articles from a third-party that mentioned a two-tier reservations system. Disney provides no evidence that any purchaser actually saw any such article. Wild speculation about what some Class members might have seen cannot defeat class certification.[40]

In any event, the news articles that Disney submits are actually full of references to Dream Key passes not having blockout dates.[41] If anything, the articles reinforced Disney's advertising campaign, which emphasized that Dream Key passes

---

[38]  *See, supra,* notes 1 & 2.
[39]  *Id.*
[40]  Without leave of Court, Disney filed a *Notice of Supplemental Authority* citing *McGinity v. The Procter & Gamble Co.*, No. 22-15080 (June 9, 2023).  ECF No. 71. *McGinity* is not a class certification case.  It found that when the front of a product label is ambiguous, the back of the label must be considered to determine whether statements are misleading. Plaintiff agrees that, in this case, all of Disney's statements should be considered when deciding whether consumers were mislead. *McGinity* does not pertain to third-party statements. Because *Disney's* statements are common to all consumers, the CLRA claim can be certified.
[41]  *Schoenfeld Decl.*, Exhs. ¶ 5-9.

-14-

would not have blockout dates and that Dream Key passholders could make reservations whenever park reservations were available on Disney's website.

The cases Disney relies on fail to support its argument. (*Opp.*, pp.16-17 (citing *Turcios v. Carma Labs, Inc.*, 296 F.R.D. 638 (C.D. Cal. 2014)). In *Turcios*, the manufacturer used false packaging for its lip balm to mislead consumers into believing they would receive more volume of product than they actually did. *Id.* at 646. The defendant presented *evidence* that consumers learned about the volume of product with each purchase *and then made repeated purchases of the same product*. *Id.* Here, Disney has not provided any evidence that Dream Key purchasers learned of the misrepresentations in the advertising and purchased additional Dream Keys.

Remarkably, Disney also relies on a YouTube comment thread, which it describes as showing that Dream Key passholders "properly understood the contract terms, or cannot credibly claim otherwise." (*Opp.*, pp.11-12, fn. 19). The comment thread was created *after* this lawsuit was filed and consists of anonymous YouTube users describing their experiences as Dream Key passholders or their reasons for not purchasing passes. The unauthenticated hearsay statements do not constitute admissible evidence. Further, the video cited does not support Disney's position, as its creator concedes that the reservation system lacks transparency.[42]

Disney next argues that the CLRA claims cannot be certified because "any individual Dream Key passholder must demonstrate that she 'would not have bought the product but for' the allegedly actionable misrepresentation." (*Opp.*, p.18 (citing *Shaeffer v. Califa Farms, LLC*, 44 Cal. App. 5th 1125 (2020)). But *Shaeffer* did not address class certification. Instead, it concerns whether a plaintiff had adequately alleged that she relied on a misrepresentation. *Id.* at 1143. Here, Plaintiff has already

---

[42]  Disney also provided a printout of a Reddit thread which consists of users confirming that they were *misled* by Disney's Dream Key advertisements. *Schoenfeld Decl.* ¶ 21, Ex. 20, *What are your thoughts on the Magic Key lawsuit?*, https://www.reddit.com/r/Disneyland/comments/uqw0n9/what_are_your_thoughts_on_the_magic_key_lawsuit/.

met that standard because she has alleged—and *testified*—that she reviewed Disney's advertisements and Terms and Conditions before purchasing a Dream Key, relied on that information when making her decision to purchase, and would not have made her purchase had she known that the information was inaccurate.[43] That evidence is sufficient to support certifying a CLRA class. *Bruno v. Quten Research Inst. LLC*, 280 F.R.D. 524, 537 (C.D. Cal. 2011).

This is a quintessential CLRA case in which common questions of law and fact predominate. *Petersen v. Costco Wholesale Co., Inc.,* 312 F.R.D. 565, 579 (C.D. Cal. 2016) (*citing Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1229 (9th Cir. 1996) (noting that class certification is particularly appropriate where a case involves "only one manufacturer, only one product, only one marketing program, and a relatively short period of time . . .")). Here, the CLRA class can and should be certified.

### 3. Disney's Sales Of The Inspire Key In 2022 And 2023 Do Not Defeat Class Certification

Disney next argues that approximately ███ Dream Key purchasers were supposedly not misled in 2021 because, in 2022 and 2023, they chose to buy a *different* pass (the Inspire Key) for $200 more than the Dream Key, even though the Inspire Key has a handful blockout dates and Disney has now fully disclosed its reservation system.  Disney's argument is a merits-based argument that should be disregarded for purposes of class certification.  Moreover, Plaintiff did not purchase an Inspire Key and it is only *her* allegation of reliance that matters for certification of a CLRA claim.  *In Re Tobacco II Cases*, 46 Cal.4th 298, 324 (2009).[44]

In any event, the Inspire Key and the Dream Key are different products.  Unlike the Dream Key, the Inspire Key provides passholders with unlimited Disney

---

[43] Ex. 3, SAC, ¶ 28; Ex. 29, Nielsen Depo. 106:1-107:8; 108:8-109:21; 113:16-114:1.

[44] Ex. 29, Nielsen Depo. 143:4-5; 143:23-144:7.

PhotoPass digital photo downloads with each park visit.[45]  That product alone would cost $69 *per day* for a visitor to the parks.[46]  In addition, Inspire Keys provide 20% off the purchase of Disney Genie+, which is a service that provides users with "lightning lane" access to rides and costs $25 per day.[47] These combined benefits—neither of which was available to Dream Key purchasers—explain why some Dream Key holders chose to buy the Inspire Key pass for a higher price: the Inspire Pass provides greater benefits to passholders.[48]

Disney highlighting the sale and marketing of Inspire Keys only demonstrates how it misled Class members. Advertisements for the Inspire Key explicitly state that it is subject to blockout dates and inform purchasers *in advance* that they will only be able to make reservations specifically "allocated to Magic Key passes."[49]  As the Inspire Key advertisements demonstrate, Disney *could have* told Dream Key passholders about the separate reservations system, it just chose not to do so.

### D.   Damages Model Does Not Fail Comcast

Disney argues that the proposed Class cannot be certified because Plaintiff's damages model neither matches her theory of liability nor reliably calculates class-wide damages.  (*Opp.*, p.19).  Disney misconstrues Plaintiff's liability theory as seeking recovery for each time a class member "was denied a reservation." (*Opp.*, p. 20). As explained, Plaintiff's theory of liability is that Class members were promised a much higher level of access to Disney's theme parks than they actually received. The damage resulting from the liability is the difference in monetary value between the access Class members expected—and paid $1,399 for—and the value of what they

---

[45]  Ex. 31, Rebuttal Declaration of Robert J. Mills ("Mills Rebuttal Decl.") ¶ 35.
[46]  Ex. 32, *Disneyland Resort PhotoPass*, The Mouse for Less.
[47] Ex. 31, Mills Rebuttal Decl. ¶ 35.
[48]  The price difference is also partially explained by inflation, which was approximately 8.2% between September 2021 and September 2022.  Inflation alone accounts for approximately $114 of the price difference between the two passes. Ex. 31, Mills' Rebuttal Decl. ¶ 35.
[49]  Ex. 33, Disneyland Resort Magic Key Terms and Conditions (Aug. 15, 2022).

actually received—████████████████[50]   The difference is ██████.   These damages flow directly from the liability as alleged.

Plaintiff's damage model is similar to the model accepted in *Maldonado*. There, the certified damages model measured the difference in price that plaintiffs paid for replacement phones and the actual value of the phones received.  333 F.R.D. at 192. The court held that common facts predominated on the question of contract damages because the contract benefit-of-the bargain model "appropriately measures the difference between the value of what plaintiffs were promised—equivalent-to-new devices, as measured by the retail price of new devices—and what they received—remanufactured devices, as measured by their retail value.  Apple struck this bargain and was obligated to deliver on its promise." *Id.* Here, Disney struck a bargain with Dream Key purchasers which promised a higher level of park access. Disney did not deliver on its promise.  Plaintiff seeks to recover the benefit-of-the-bargain measured by the difference in value between the passes Dream Key purchasers paid for and what they actually received.[51]

### 1.   Plaintiff's Model Matches Her Theory of Liability

Disney claims that Plaintiff's proposed model seeks restitution rather than contract damages. (*Opp.*, p.19.).  Plaintiff does not seek restitution.  Rather, she seeks straightforward contract damages that are clearly recoverable under California law. In California, "[c]ontract damages compensate a plaintiff for lost expectation interest. This is described as the benefit of the bargain that full performance would have brought." *Moore v. Centrelake Med. Grp., Inc.*, 83 Cal. App. 5th 515, 531 (2022) (*citing New West Charter Middle School v. Los Angeles Unified School Dist.*, 187 Cal. App. 4th 831, 844 (2010)).  *Moore* expressly approved recovery of benefit-of-the-bargain damages in contract cases where a party seeks to recover the difference in the price it paid for a service and the value of the service it received.  *Id.* at 532

---

[50] Ex. 6, Mills Decl. ¶¶ 46-48.
[51]  Ex. 6, Mills Decl. ¶¶ 12, 38-48; Ex. 31, Mills Rebuttal Decl. ¶¶ 12-14, 29-35, 50.

("General damages for this alleged breach include the value to appellants of the promised data security (*i.e.*, performance itself).").

The *Moore* court further noted that federal district courts have similarly interpreted California law as allowing recovery of such benefit-of-the-bargain damages in breach of contract cases. *Id.* at 532-33 (citing *In re Anthem, Inc. Data Breach Lit.*, 2016 WL 11299891 (N.D. Cal., May 27, 2016) (permitting contract damages in a data security services case measured as "the difference in value between what Plaintiffs should have received . . . and Defendants' partial, defective, and deficient performance by failing to provide reasonable and adequate data security"); *Svenson v. Google Inc.*, 2015 WL 1503429 *4 (N.D. Cal., Apr. 1, 2015) (permitting contract damages in a data services case as measured by the difference between what plaintiff paid for and what she received).

In *Williams v. Apple*, the court certified a class pursuing breach of contract claims related to Apple's alleged failure to provide promised iCloud storage services. 338 F.R.D. 629, 652 (N.D. Cal. May 28, 2021). The contract damages sought were measured by the difference in price between what plaintiffs paid for iCloud storage and the value they actually received. The court accepted the model:

> The difference between price paid for a product and value received is in fact the main measure of contract damages. Both the Restatement (Second) of Contracts and California case law make this clear. The Restatement provides that the "measure of damages in general" is the injured party's "loss in the value to him of the other party's performance *caused by its failure or deficiency*, plus" any other losses. . . California case law holds that a proper measure of contract damages is "*the difference between the actual value* of what plaintiff has received and that which he expected to receive." *Overgaard v. Johnson*, 68 Cal. App. 3d 821, 823 (1977). . .

*Williams, supra,* 338 F.R.D. at 652 (emphasis in original). Disney ignores *Williams*, but cites *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015), to support its claim that Plaintiff seeks restitution. (*Opp.*, p.19). *Pulaski* did not involve breach of contract claims or claims under the CLRA. Instead, it concerned claims seeking purely equitable relief available under California's Unfair Competition Law

and its False Advertising Law. *Pulaski*, 802 F.3d at 982.  It says nothing about contract damages. Nowhere in *Pulaski* does the court define or even discuss the extent of contractual damages available to California breach of contract plaintiffs.

Disney also relies on *Lewis Jorge Constr. Mgmt.*, but misreads its conclusion. (*Opp.*, p.19). There, the California Supreme Court determined that the trial court improperly awarded lost profits as "general damages." *Lewis Jorge Constr. Mgmt. v. Pomona Unif. School Dist.,* 34 Cal.4th 960, 978 (2004). The court did not prohibit contract-based "benefit of the bargain" damages, and the decision does not address that issue. Indeed, courts have held that *Lewis Jorge supports* awarding contract damages measured by the difference between what a plaintiff paid and what she received.  *Moore*, 83 Cal. App. 5th at 531.[52]  Tellingly, Disney ignores *Maldonado*, which is cited in Plaintiff's opening brief, and which above, certified a class with a breach of contract damages model similar to the model proposed in this case.

Disney concedes that benefit of the bargain damages are recoverable pursuant to the CLRA and that those damages can be measured as the difference between the price paid for a service and the value received.  *Nguyen v. Nissan N.A., Inc.*, 932 F.3d 811, 820-22 (9th Cir. 2019).  Both the breach of contract claim and the CLRA claim can and should be certified.

### 2.    Evidence Supports Plaintiff's Damages Model

Disney next argues that Plaintiff's damages model "fails on its own terms."  All of Disney's complaints focus on the weight of the evidence, not whether the damage model complies with *Comcast* (it does).  *Comcast* "does not require—particularly at the class certification stage—that Plaintiff[] affirmatively rule out all other possible contributors to, or causes of, the damage suffered." *Elkies v. Johnson and Johnson*

---

[52]  Disney also cites *Lozada v. Advoc. Health & Hosps. Corp.*, 2018 IL App (1st) 180320-U, as support for the definition of damages.  *Lozada* is an Illinois state court decision decided under Illinois law, and says nothing about contract damages recoverable under California law. Further, it is an unpublished decision that may not be cited as precedent or even persuasive authority. Il. S. Ct. R. 23(e).

*Servs., Inc.*, 2018 WL 11223465, *9 (C.D. Cal. Oct. 18, 2018). *Comcast* requires only that Plaintiff propose a damage model that matches the theory of liability. *Id.*; *see also, Pulaski*, 802 F.3d at 986 (damage calculation issues cannot defeat class certification). Plaintiff's damages model satisfies *Comcast* because it matches her theory of liability. Specifically, it provides a method for determining the difference between what Class members paid for Dream Key passes and the value of what they actually received.[53]

Disney first argues that the Believe Key is an inadequate comparator to the Dream Key because Mr. Mills supposedly fails to consider the Believe Key blockout dates in his analysis. (*Opp.*, p.22.) Not true. Mr. Mills' acknowledges the Believe Key blockout dates and explains that, if Dream Keys truly provided the access that was promised, the ███████████████████████████████████████

███████████████.[54] ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████ ██████████████████████████████████████████████

██████████████████████████████████████[55] ████████████

████████████████████████████████████████████████████

██████████.[56] ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████[57]

---

[53] Notably, Disney does not challenge Robert Mills' expertise. Its criticisms of his methodology amount to merits-based damages arguments for the jury to consider and weigh. They do not pertain to class certification.

[54] Ex. 6, Mills Decl. ¶¶ 38-42; Ex. 31, Mills Rebuttal Decl. ¶¶ 37, 45.

[55] Ex. 6, Mills Decl. ¶ 20 (citing WDPR-NIELSEN-00013130).

[56] Ex. 6, Mills Decl. ¶ 29 (citing WDPR-NIELSEN-00000002).

[57] Specifically, ███████████████████████████████████████████
███████████████████████████████████████ Ex. 6, Mills Decl. ¶ 41.

1    Disney also contends, without citing any facts, that the Believe Key blockout

2    days are "highly valued dates" and that Mr. Mills fails to account for the purported

3    value. (*Opp.*, p.22).  Disney, however, ████████████████████████████████████

4    ████████████████████████████████████,[58] which meant that Dream Key

5    passholders had no meaningfully greater access to the supposedly highly valued dates.

6    Moreover, Disney did not promise Dream Key passholders that they were buying a

7    *chance* to visit the park on a "highly valued date."  Disney promised the ability to

8    make a reservation whenever park reservations were available.  Disney admits that it

9    did not deliver on its promise and Mr. Mills' analysis shows that, what Disney did

10   deliver, was comparable to the level of access promised to Believe Key purchasers.

11   Disney next argues that Mr. Mills' damage model fails because it does not

12   account for the "prestige" value of owning a Dream Key.  (*Opp.,* p.22).  Disney's

13   claim is unsupported by the facts and ignores ████████████████████████████

14   ████████████████████████████.[59]   Disney cites portions of the

15   Plaintiff's deposition wherein she testified that she is a fan of Disney generally, but

16   Plaintiff never claimed that there was value or "prestige" in owning a Dream Key.

17   Regardless, a purchaser's subjective feelings of prestige in the product purchased are

18   immaterial to whether Dream Key purchasers received the benefit of the bargain.  *See*

19   *Siqueiros v. General Motors LLC*, 2023 WL 3919462, *34, n.28 (N.D. Cal. June 8,

20   2023) (utilizing an objective measure of damages, rather than a subjective standard

21   based on each class member's preferences).

22   Disney next repeats its argument that Plaintiff's damage model is insufficient

23   because it focuses on visits to the parks, instead of reservations made.  (*Opp.,* pp.22-

24   23).  But, as Mr. Mills explains, because both the Believe and Dream Key passes

25   allowed passholders to make and hold up to six reservations, ████████████████████

26

27   ───────────────

28   [58] Ex. 6, Mills Decl. ¶ 29.
     [59] Ex. 31, Mills Rebuttal Decl. ¶ 46.

1   ████████████████████████████████████████████[60] Mr. Mills' analysis

2   appropriately focuses on *admission* to the parks because Disney promised Dream Key

3   passholders "reservation-based *admission* to one or both theme parks every day of the

4   year."[61]  As Mr. Mills shows, Disney's reservation system limits park admissions for

5   Dream Key holders.  Disney's focus on the meaningless metric of reservations made,

6   as opposed to park visits, only underscores its effort to obfuscate the substantial

7   damage caused by its conduct.[62]

8        Disney next claims that the Class was not damaged because ████████

9   ███████████████████████████████████████████████.  (*Opp.*, p.

10  23).  Disney misses the point.  Mr. Mills' analysis shows that, had Dream Keys been

11  usable as promised, Dream Key passholders would have visited the parks, on average,

12  ████████████████████████[63]  In reality, they went a ███████████.[64]  The

13  actual amount of visits was much closer to the ██████████████████████

14  ████████████████████████████████████████████████████

15  ██████████████████████████████  Disney does not contest

16  Mr. Mills' conclusion in this regard but rather just ignores it.

17       Disney also complains that Mr. Mills assessed data from ██████████

18  ███████████████████████████████████████████████████.

19  Mr. Mills focused on the first year of the Magic Key program because ███████

20

21  _____

22  [60]  Ex. 31, Mills Rebuttal Decl. ¶¶ 41.

23  [61]  Ex. 1, WDPR-NIELSEN-00006460; Ex. 31, Mills Rebuttal Decl. ¶¶ 39-40.
    [62]  Disney's expert suggests that ██████████████████████████████

24  ██ *Kirk Fair* Decl. ¶ 66. ██████████████████████████

25  ████████████████████████████████  Ex. 6, Mills Decl.
    ¶¶ 25-37. ███████████████████████████████

26  ███████████████████  Ex. 31, Mills Rebuttal Decl.

27  ¶ 41.
    [63]  Ex. 6, Mills Decl. ¶ 20.

28  [64]  Ex. 6, Mills. Decl. ¶¶ 36, 41.

█████████████████████████████████████████████████████████████.[65]  Had Mr. Mills included later time periods, the usage rates of the various passes would have been skewed by inclusion of new or renewed Magic Keys.

Last, Disney claims that Mr. Mills improperly determined the value of Dream Keys by referencing ████████████████████. (*Opp.*, p. 23).  Mr. Mills' determination of value of the passes, however, is not based solely ██████████████.  Rather, his determination of value is based on the market price of the two passes.[66]  Mr. Mills ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████.[67] *See Mier v. CVS Pharm., Inc.*, 2022 WL 1599633, *4 (C.D. Cal. May 9, 2022).  █████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████.[68]

### E.    Plaintiff Is An Adequate Class Representative

The Court should reject Disney's argument concerning Plaintiff's adequacy. First, Ms. Torino is <u>not</u> employed by VHM and has not worked for the firm since August 2022.[69]  Ms. Torino neither had, nor has, any economic interest in this litigation. VHM has no historical or business ties to Plaintiff, much less the type of "significant personal and financial ties" that would warrant a finding of inadequacy.[70] S*ee London v. Wal-Mart Stores, Inc.*, 729 F. 2d 1371, 1375 (11th Cir. 1984). Second, Ms. Torino never had any influence over the direction of this case and there is no way her relationship with Plaintiff would in any way compromise Plaintiff's ability to represent the class.[71] Ms. Torino's only role in the litigation was to serve discovery

---

[65]  Ex. 31, Mills Rebuttal Decl. ¶ 36.
[66]  Ex. 6, Mills Decl. ¶¶ 38, 43; Ex. 31, Mills Rebuttal Decl. ¶¶ 29-31, 49-52.
[67]  Ex. 31, Mills Rebuttal Decl. ¶¶ 47-59.
[68]  Ex. 6, Mills Decl. ¶ 46; Ex. 31, Mills Rebuttal Decl. ¶ 49-52.
[69]  Ex. 34, Declaration of Daniel J. Muller ("Muller Decl.), ¶ 2.
[70]  Ex. 34, Muller Decl., ¶ 3.
[71]  Ex. 34, Muller Decl. ¶ 3.

responses and organize documents produced by Plaintiff.

Third, no case cited by Disney requires—or even suggests—that a class representative is inadequate because her non-lawyer, in-law formerly worked as an administrative assistant at one of the law firms litigating the case. Disney nonetheless suggests that a "grave" conflict-of-interest exists and cites *Eubank v. Pella Corp.,* 753 F.3d 718 (7th Cir. 2014), and *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999). Both decisions are easily distinguishable because, in each, the class representatives were related to an *attorney* handling the case. *Eubank*, 753 F.3d at 722-23; *Petrovic*, 200 F.3d at 1155. The family relationship between the representatives and the lawyers in those cases triggered the conflict. Here, in contrast, Plaintiff has no relationship with any lawyer in this case.[72] Disney misleadingly cites *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1375 (11th Cir. 1984), contending that an in-law of a class representative cannot be employed by one of the law firms handling a case. *Shroder*, however, addressed a situation in which the *class representative himself* was *employed by* class counsel. *Id.* Obviously, if VHM employed Plaintiff, she could not serve as a class representative. VHM *does not* employ Plaintiff and never has.[73] As explained, it has not even employed her sister-in-law for nearly a year.

**III.      CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court certify the proposed Class under Rule 23(b)(3), appoint Plaintiff as Class representative, and appoint Plaintiff's Counsel as Class Counsel pursuant to Rule 23(g).

/ /

/ /

---

[72]  Disney also cites *Williams*, *supra,* 338 F.R.D. at 647. The relationship in that case was between the class representative and the *lawyer* handling the case. No such relationship exists here. Ex. 34, Muller Decl., ¶ 4.
[73]  Ex. 34, Muller Decl. ¶ 4.

1   Dated:  July 7, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**VENTURA HERSEY & MULLER, LLP**

/s/ *Daniel J. Muller*
Daniel J. Muller, SBN 193396
Anthony F. Ventura, SBN 191107
    1506 Hamilton Avenue
San Jose, California 95125
Telephone: (408) 512-3022
Facsimile: (408) 512-3023

Nickolas J. Hagman (*admitted pro hac vice*)
nhagman@caffertyclobes.com
CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP
135 S. LaSalle St., Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485

*Attorneys for Plaintiff Jenale Nielsen & the proposed Class*

-26-

REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1

## L.R. 11-6.2 CERTIFICATE OF COMPLAINCE

2     The undersigned, counsel of record for Plaintiff Jenale Nielson, certifies

3 pursuant to L.R. 11-6.2 that this brief complies with Procedure No. 6 of the Honorable

4 David O. Carter ("Length and format of motions"), which provides that "Memoranda

5 of Points and Authorities are subject to a 25-page limit."

6

7 Dated: July 7, 2023                       /s/ *Daniel J. Muller*
                                            Daniel J. Muller, SBN 193396
8                                           Anthony F. Ventura, SBN 191107
                                            1506 Hamilton Avenue
9                                           San Jose, California 95125
                                            Telephone: (408) 512-3022
10                                          Facsimile: (408) 512-3023

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28